ALMADANI LAW
Yasin M. Almadani, State Bar No. 242798
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph: 949-877-7177
Fax: 949-877-8757
yma@lawalm.com

AI LAW, PLC
Ahmed Ibrahim, State Bar No. 238739
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph.:   949-266-1240
Fax:   949-266-1280
aibrahim@ailawfirm.com

Attorneys for Plaintiffs, Individually
and On Behalf of All Others Similarly Situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

LAURA HABBERFIELD, an individual, KEONA KALU, an individual, KATIE RUNNELLS, an individual, JUANITA CARMET CACHADINA, an individual, SARAH HUEBNER, an individual, YESENIA VALIENTE, an individual, VERONICA WALTON, an individual, LISA MURPHY, an individual, NICOLE HILL, an individual, NICOLE STEWART, an individual, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

BOOHOO.COM USA, INC., a Delaware corporation, BOOHOO.COM UK LIMITED, a United Kingdom private limited company, BOOHOO GROUP PLC, a Jersey public limited company, PRETTYLITTLETHING.COM USA INC., a Delaware corporation, PRETTYLITTLETHING.COM LIMITED, a United Kingdom private limited company, NASTYGAL.COM USA INC., a Delaware corporation, NASTY GAL LIMITED, a United Kingdom private limited company, and DOES 1-10, inclusive.

Defendants.

CASE NO.: 2:22-CV-03899-GW-JEMx

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

Plaintiffs Laura Habberfield, Keona Kalu, Katie Runnells, Juanita Carmet Cachadina, Sarah Huebner, Yesenia Valiente, Veronica Walton, Lisa Murphy, Nicole Hill, Nicole Stewart, Me'Lisa Thimot, and Marika Walton (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, hereby allege the following at all times relevant to this complaint:

## I. BACKGROUND

1. This action[1] is brought against defendants Boohoo.com USA, Inc., Boohoo.com UK Limited, Boohoo Group PLC, PrettyLittleThing.com USA Inc., PrettyLittleThing.com Limited, NastyGal.com USA Inc., and Nasty Gal Limited (collectively, "Boohoo Companies," or "Defendants") for their false and deceptive pricing practices in connection with their sale of clothing, accessories and other items on their U.S. websites http://us.boohoo.com., https://www.prettylittlething.us, and http://nastygal.com (collectively, the "U.S. Websites")[2]  Defendants do so by advertising fake and inflated comparison reference prices to deceive customers into a false belief that the sale price is a deeply discounted bargain price.  For example, anyone visiting Boohoo's site on a given

---

[1] To be clear, this action is NOT being filed on behalf of California class members.  The claims of California class members have been settled pursuant to a written settlement agreement dated May 20, 2022 in the three class actions consolidated for pretrial purposes pending before this Court entitled *Khan v. Boohoo.com USA, Inc., et al.*, No. 2:20-CV-03332-GW-JEMx, *Hilton v. PrettyLittleThing.com USA, Inc., et al.*, No. 2:20-CV-04658, and *Lee v. NastyGal.com USA, Inc., et al.*, No. 2:20-CV-04659.  On June 3, 2022, this Court granted preliminary approval of the class settlement in the aforementioned actions.  (*See* Docket Entry No. 158 in *Khan v. Boohoo.com USA, Inc., et al.*, No. 2:20-CV-03332-GW-JEMx.).  This action is brought by the Plaintiffs named herein on behalf of a nationwide class of purchasers of Defendants' products, *excluding* California purchasers, during the respective class periods defined below, or alternatively, on behalf of subclasses of purchasers from New York, Florida, Maryland, Massachusetts, Michigan, Ohio, and Illinois.  At no time did any of the Plaintiffs named herein intend to bring any claims on behalf of California purchasers.  The amendments to this Second Amended Complaint merely clarify this point.

[2] Defendants also uses mobile applications to showcase their U.S. Websites' products and make sales to U.S. residents of those products.  Therefore, in the Second Amended Complaint, wherever there is a reference to "websites," this refers to sales using both the website and the mobile application.

SECOND AMENDED CLASS ACTION COMPLAINT

day during a "50% OFF EVERYTHING SALE" who buys a dress "on sale" for $20 based on a crossed-out reference price of $40 is being misled.  This is deception because that dress has rarely, if ever, been sold in the recent past on the site for $40.  Further, because Defendants' websites are the only channel through which Boohoo products are sold, Boohoo cannot justifiably claim that another retailer has sold that dress for $40.  In other words, Defendants' "sales" are not really sales at all.  They are a scam.  All the reference prices on Defendants' websites are fake.  They are not original, regular, retail, or former prices.  They are inflated prices posted to lure unsuspecting customers into jumping at a fake "bargain."  That is, Defendants engage in this deceptive advertising and pricing scheme to give customers the false impression that they are getting a deal or bargain when in reality they are being swindled by fake sales and promotions.  As a result, customers are deceived into spending money they otherwise would not have spent, purchasing items they otherwise would not have purchased, and/or spending more money for an item than they otherwise would have absent the deceptive marketing.  By this action, Plaintiffs seek to put an immediate end to Defendants' untruthful marketing practices and recover restitution and damages on behalf of all persons who have fallen victim to Defendants' sham sales by purchasing products on Defendants' websites during the class periods defined below.

## II.   PARTIES

2.   Plaintiff Laura Habberfield is a citizen of the State of New York.

3.   Plaintiff Keona Kalu is a citizen of the State of New York.

4.   Plaintiff Katie Runnells is a citizen of the State of New York.

5.   Plaintiff Juanita Carmet Cachadina is a citizen of the State of Florida.

6.   Plaintiff Sarah Huebner is a citizen of the State of Florida.

7.   Plaintiff Yesenia Valiente is a citizen of the State of Florida.

8.   Plaintiff Veronica Walton is a citizen of the State of Maryland.

9.   Plaintiff Lisa Murphy is a citizen of the State of Massachusetts.

10.   Plaintiff Nicole Hill is a citizen of the State of Michigan.

11.   Plaintiff Nicole Stewart is a citizen of the State of Ohio.

12.     Plaintiff Me'Lisa Thimot is a citizen of the State of Illinois.

13.     Plaintiff Marika Walton is a citizen of the State of New York.

14.     Defendant Boohoo.com USA, Inc. ("Boohoo USA") is a Delaware corporation and is headquartered in the County of Los Angeles within the State of California, where it has its principal place of business.

15.     Defendant Boohoo.com UK Limited ("Boohoo Limited") is a private limited company organized and existing under the laws of the United Kingdom.  Boohoo Limited is the parent company of Boohoo USA.

16.     Defendant Boohoo Group PLC ("Boohoo Group") is a public limited company incorporated and domiciled in Jersey, a British Crown Dependency.  Boohoo Group is the parent company of Boohoo Limited and Boohoo USA and the online brands boohoo, boohooMAN, PrettyLittleThing, Nasty Gal, Karen Millen, Coast, and Miss Pap.

17.     Defendant PrettyLittleThing.com USA Inc. ("PLT USA") is a Delaware corporation and is headquartered in the County of Los Angeles within the State of California, where it has its principal place of business. PrettyLittleThing.com USA Inc. is a subsidiary of Boohoo Group PLC.

18.     Defendant PrettyLittleThing.com UK Limited ("PLT Limited") is a private limited company organized and existing under the laws of the United Kingdom. PLT Limited is the parent company of PLT USA.

19.     Defendant NastyGal.com USA, Inc. ("Nasty Gal USA") is a Delaware corporation and is headquartered in the County of Los Angeles within the State of California, where it has its principal place of business.

20.     Defendant Nasty Gal Limited is a private limited company organized and existing under the laws of the United Kingdom. Nasty Gal Limited is the parent company of Nasty Gal USA.

21.     The true names and capacities of defendants DOES 1 through 10, inclusive, whether individual, plural, corporate, partnership, associate or otherwise, are not known to Plaintiffs, who therefore sue said defendants by such fictitious names.   Plaintiffs are

SECOND AMENDED CLASS ACTION COMPLAINT

informed and believe and thereon allege that each of the defendants designated herein as DOE is in some manner responsible for the acts and occurrences set forth herein. Plaintiffs will seek leave of court to amend this Complaint to show the true names and capacities of defendants DOES 1 through 10, inclusive, as well as the manner in which each DOE defendant is responsible, when the same have been ascertained. DOES 1 through 10 shall be included within the definition of "Boohoo Companies" and "Defendants."

22.     Upon information and belief and at all times relevant to this Complaint: Boohoo USA, Boohoo Limited, Boohoo Group, PLT USA, PLT Limited, Nasty Gal USA, and Nasty Gal Limited operated as one big company to market and sell products throughout the U.S., including California. The Boohoo Group "subsidiaries" (*e.g.*, Boohoo USA and Boohoo Limited) operated like divisions or departments within the larger Boohoo company.

23.     Upon information and belief and at all times relevant to this Complaint: Each of the Defendants herein was an agent, servant, employee, co-conspirator, partner, joint venturer, wholly owned and controlled subsidiary and/or alter ego of each of the remaining Defendants, and was at all times acting within the course and scope of said agency, service, employment, conspiracy, partnership and/or joint venture.

24.     Upon information and belief and at all times relevant to this Complaint: Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein. In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## III.   JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 and 28 U.S.C. § 1332 because the total matter in controversy

exceeds $5 Million and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

26.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(1), (c)(2), and (c)(3) because Defendants are subject to the Court's personal jurisdiction in this judicial district, and because one of the defendants resides in this judicial district while the other defendant is not resident in the United States.

## IV.    GENERAL ALLEGATIONS

### A.    Background of Boohoo

27.    The "boohoo" brand and company launched in 2006 and is in the business of marketing and selling "boohoo" clothing and other products on the Internet. Defendants Boohoo Group, Boohoo USA, and Boohoo Limited ("Boohoo") exclusively sell their boohoo clothing and other boohoo products online. Boohoo's marketing emphasizes its bargains and its vast online presence, including over 10 million followers on social media.

28.    Boohoo's online store for United States customers was launched in 2012 and can be found at http://us.boohoo.com. According to its website, Boohoo opened an office in New York City in 2015. On its website, Boohoo also states "[w]e moved to LA"—an apparent reference to the company moving its United States headquarters to Los Angeles, California. On information and belief, Boohoo began selling products to customers in the United States via its http://us.boohoo.com website by at least March 13, 2012.

29.    Boohoo offers customers a wide range of boohoo apparel, accessories, and other products for both men and women. Products for women include, among other items, dresses, tops, jeans, sleepwear, swimwear, and shoes. Similarly, for men, Boohoo offers a broad range of products including, among other items, shirts, jackets, tracksuits, sweatshirts, pants, and shoes. Because Defendants sell their "boohoo" products (i.e., "boohoo"-branded items or items made primarily for Boohoo containing other branding)

exclusively, or almost exclusively, on their website, there is no other regular price or market price for their products they sell other than the price on the company's own website.

### B.   Background of PrettyLittleThing

30.    Upon information and belief, the "PrettyLittleThing" brand launched in 2012. PrettyLittleThing or "PLT" (referring to PrettyLittleThing.com USA, Inc., PrettyLittleThing.com Limited, and Boohoo Group PLC) is in the business of marketing and selling "PrettyLittleThing" clothing and other products on the Internet.

31.    PLT exclusively sells its "PrettyLittleThing" clothing and other "PrettyLittleThing" products online.  PLT's marketing emphasizes its bargains and vast online presence, including millions of followers on social media.

32.    Upon information and belief, PLT's online store for United States customers—found at https://www.prettylittlething.us—was launched in 2016 and PLT began selling products to customers in the United States through its online store by at least that year.

33.    PLT offers customers a wide range of "PrettyLittleThing" apparel, accessories, and other products for women, including, among other items, dresses, tops, jeans, jewelry, workout gear, sleepwear, swimwear, and shoes.  As noted, because PLT sells its "PrettyLittleThing" products (i.e., "PrettyLittleThing"-branded items or items made primarily for PLT containing other branding) on its website, there is no other regular price or market price for the products it sells other than the price on the company's own website.

### C.   Background of Nasty Gal

34.    Nasty Gal (referring to NastyGal.com USA Inc., Nasty Gal Limited, and Boohoo Group PLC) is an online clothing, shoes, and accessories company founded in 2006 in San Francisco.  In 2010, the company moved its headquarters to Los Angeles and in the ensuing years, opened retail stores in the Los Angeles area (which have since closed).

35.    The company is now based in Los Angeles and according to public filings, the company acknowledges that "[t]he brand has its roots in Los Angeles" with its principal

market in the U.S. All products are sold under the company's own "Nasty Gal" label. Nasty Gal exclusively sells its products on its website at http://nastygal.com. Nasty Gal's marketing emphasizes its bargains and vast online presence, including 6 million followers on social media. The company claims it has nearly one million active customers.

36. Nasty Gal offers customers a wide range of apparel, shoes, and accessories for women. Products include, among other items, dresses, tops, jeans, workout gear, sleepwear, swimwear, and formal and casual shoes. Because Nasty Gal sells its "Nasty Gal" products (i.e., "Nasty Gal"-branded items or items made primarily for Nasty Gal containing other branding) exclusively, or almost exclusively, on its website, there is no other regular price or market price for the products they sell other than the price on the company's own website.

**D.** **Defendants' False and Deceptive Pricing Scheme**

37. Unfortunately, Defendants' business model relies on deceiving customers with fake sales. On a typical day, the three websites at issue prominently display on their landing page some form of a sale where all or nearly all products are supposedly marked down by a specified percentage—for example, 40, 50, or 60% off. All or nearly all products on the sites are represented as being marked down by the specified percentage discount from a substantially higher reference price (hereafter, the "Reference Price"). The supposed markdowns are represented to the customer by prominently displaying a crossed-out Reference Price next to the sale price reduced by the specified percentage discount. Alternatively, Defendants run the same fake promotions by providing customers with site-wide promo codes and/or discounts—typically for 40, 50, or 60% off—which customers may use to obtain reductions off items from the Reference Price. Defendants employ these deceptive tactics to convey to customers that the product had previously sold in the recent past at the Reference Price, but is being sold to the customer at a substantial discount.

38. However, this Reference Price is almost always, if not always, a falsely inflated price because Defendants very rarely—if ever for a week or two at the beginning of the life cycle of a product but certainly not for the majority of the product's life cycle—

sell their products at the Reference Price.  The law prohibits this as the primary purpose of the Reference Price is to mislead customers into believing that the displayed Reference Price is an original, regular, or retail price at which Defendants usually sell the item or previously sold the item in the recent past.  As a result, Defendants falsely convey to customers that they are receiving a substantial markdown or discount, when in reality the alleged discount is false and fraudulent.  Moreover, because Defendants' products are sold only through their own websites, the Reference Price cannot mean the prevailing market price of the product at any outlet other than Defendants' websites.  Compounding the deception, Defendants' websites will often display a ticking countdown clock, or advertise messages like "Don't Miss Out!" or "Hurry. Offer Ends Soon!" to give customers a sense of urgency to take advantage of the fake promotions, when in reality, Defendants run a promotion or sale on all, or nearly all, items on their sites everyday or nearly everyday.

39.    For example, on March 27, 2020, Boohoo's landing page prominently displayed the statement "60% OFF EVERYTHING!"  On the individual product pages of all (or nearly all) boohoo products offered on the site, as well as on the thumbnail displays of each product when presented as a list, Boohoo represented each product as being "60% OFF" and included this representation beside the crossed-out fake Reference Price.  Thus, for a product being offered for $20.00, Boohoo displayed the following:

**$20.00 (60% OFF)**  ~~$50.00~~

40.    Defendants further reinforce the false conception that the customer has received a deep discount off of an original, retail, or regular price during the order process.  More specifically, Defendants include a line item for the "Discount" or "Promotions included" that the customer has received, which computes the amount of the supposed "Discount" or "Promotion" corresponding to the percentage markdown from the false Reference Price the customer purportedly benefited from according to each product's individual product description page.  This phantom "Discount" or "Promotion" appears in the final order confirmation and receipt displayed to customers and delivered to customers by e-mail after the order has been completed and payment has been made.  By doing so,

Defendants not only deceive the customer with the sham sale, but then further use that deception to build goodwill to lure customers back for more fake "sales" and "discounts."

41.     These pricing and advertising practices reflecting high-pressure fake sales are patently deceptive.  They are intended to mislead customers into believing that they are getting a bargain by buying products from Defendants on sale and at a substantial and deep discount.  The truth is that Defendants rarely, if ever, sells any of their products at the Reference Price.  The Reference Price is, therefore, an artificially inflated price.  In turn, the advertised discounts are thus nothing more than phantom markdowns.

42.     By way of further example, on May 14, 2020, PLT's landing page prominently displayed the statement "GET 50% OFF EVERYTHING," "Hurry! Limited Time Only."



The same message is displayed in a prominent banner near the top of the page throughout the website.  Two examples are provided below.

**SECOND AMENDED CLASS ACTION COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21



22    43.    PLT uses discounts from falsely inflated Reference Prices to represent fake

23  sales to customers. The Reference Price reflects a fake former price. For example, as shown

24  in the graphic below, on May 14, 2020, Defendants represented that PLT's "pink peach

25  skin pocket flared pants" were originally priced at $42.00, when in reality, upon

26` information and belief, those pants were never (or almost never) sold for $42.00 within the

27  recent past, if ever, including within ninety days prior to the date of sale.

28

1

2

3

4

5

6

7

8

9

10

11

12

13



14    44.    Using signs, banners, promo codes, discounts, crossed-out prices, and other

15 similar methods throughout the shopping and ordering process, PLT continually reinforces

16 the false perception that the customer is receiving a deep discount off of a former retail or

17 regular price when this is not true at all. Even at checkout, PLT usually displays a crossed

18 out Reference Price as a fake former price and includes a line item for the total "Discount"

19 that the customer has allegedly received.  The following graphic reflects an example:

20 / / /

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26` / / /

27 / / /

28 / / /

**SECOND AMENDED CLASS ACTION COMPLAINT**



By doing so, PLT not only deceives the customer with the sham sale and fake former pricing, but then further uses that deception to build goodwill to lure customers back for more fake "sales" and "discounts."

45.     By way of further example, on May 13, 2020, Nasty Gal's landing page prominently displayed the statement "60% OFF EVERYTHING."   On the individual product pages of all (or nearly all) Nasty Gal products offered on the site, as well as on the thumbnail displays of each product when presented as a list, Nasty Gal represented each product as being marked down by 60% and included this representation beside the crossed-out fake Reference Price.  Thus, for a product being offered for $20.00, Nasty Gal displayed the following:

## **$20.00**  $~~50.00~~

**SECOND AMENDED CLASS ACTION COMPLAINT**

**E.**    **The Plaintiffs' Purchase of Falsely Advertised Items from Defendants.**

**1.**    **Plaintiff Laura Habberfield (New York)**

46.    Plaintiff Laura Habberfield ("Habberfield") fell victim to Defendants' false advertising and deceptive pricing practices. On or about November 20, 2021, Habberfield visited Nasty Gal's U.S. website to shop for clothing. Habberfield visited the site from her home in the State of New York. Habberfield saw on the website that Nasty Gal was running a "70% Off Everything" sale. Habberfield browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was 70% off the crossed-out Reference Price. She found and selected a number of items (consisting of five (5) Satin Ruffle Pajama Shirt and Shorts Sets) and added them to her shopping cart, with each item displayed by Nasty Gal as having a Reference Price and a sale price of 70% off. The Reference Price was displayed as a substantially higher price containing a strikethrough.

47.    Similarly, on or about January 14, 2022, Habberfield visited Nasty Gal's U.S. website to shop for clothing. Habberfield visited the site from her home in the State of New York. Habberfield saw on the website that Nasty Gal was running a "70% Off Everything" sale. Habberfield browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was 70% off the crossed-out Reference Price. She found and selected a Satin Ruffle Pajama Shirt and Shorts Set and added it to her shopping cart, with the item displayed by Nasty Gal as having a Reference Price and a sale price of 70% off. The Reference Price was displayed as a substantially higher price containing a strikethrough.

48.    At no point during any of her visits to the Nasty Gal U.S. website did Habberfield see a disclosure or disclaimer explaining that the Reference Price was not intended to be the former price of the product offered on the site, what the Reference Price meant, or how Defendants came up with the Reference Price.

49.    Habberfield purchased the products referenced above. Before doing so, she relied on the Reference Price advertised on each product she purchased as representing the

former price of the product, meaning the price at which the product had in fact been offered for sale, or previously sold, in the recent past. Habberfield thus relied on Nasty Gal's representation that each of the products referenced above was truly on sale and being sold at a substantial markdown or discount, and thereby fell victim to the deception intended by Nasty Gal. The items Habberfield ordered were delivered to her in New York.

50.     The truth, however, is that the products Habberfield purchased were not substantially marked down or discounted, or at the very least, any discount she was receiving had been grossly exaggerated. That is because none of the products Habberfield bought had been offered for sale on Nasty Gal's website for any reasonably substantial period of time (if ever) at the full Reference Prices. Those Reference Prices were fake prices used in Nasty Gal's deceptive marketing scheme.

### 2.     Plaintiff Keona Kalu (New York)

51.     Plaintiff Keona Kalu ("Kalu") fell victim to Defendants' false advertising and deceptive pricing practices. Between August 15, 2019 and December 2, 2019, Kalu placed three (3) orders: two (2) from Boohoo's U.S. website to shop for clothing, and one (1) from Nasty Gal's U.S. website to shop for clothing.

52.     On or about August 15, 2019, Kalu visited Boohoo's U.S. website to shop for clothing from her home in the State of New York. Kalu saw on the website that Boohoo was running a "60% Off Everything" sale. Kalu browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was 60% off the crossed-out Reference Price. She found and selected a Pointed Buckle Detail Court Mules and added it to her shopping cart, with the item displayed by Boohoo as having a Reference Price and a sale price of at least 60% off. The Reference Prices were displayed as substantially higher prices containing a strikethrough.

53.     On or about December 2, 2019, Kalu visited Boohoo's U.S. website to shop for clothing from her home in the State of New York. Kalu saw on the website that Boohoo was running an "Up to 75% Off Everything" sale, plus an extra 20% off. Kalu browsed the site and observed that the products offered each had a Reference Price that was crossed

out and a sale price that was at least 75% off the crossed-out Reference Price. She found and selected a Premium Feather Trim Cupped Bralet and added it to her shopping cart, with the item displayed by Boohoo as having a Reference Price and a sale price of at least 75% off. The Reference Prices were displayed as substantially higher prices containing a strikethrough.

54.    On or about August 15, 2019, Kalu visited Nasty Gal's U.S. website to shop for clothing from her home in the State of New York. Kalu saw on the website that Nasty Gal was running a "55% Off Everything" sale. Kalu browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was 55% off the crossed-out Reference Price. She found and selected a Snake Charmer Chunky Choker and added it to her shopping cart, with the item displayed by Nasty Gal as having a Reference Price and a sale price of at least 55% off. The Reference Prices were displayed as substantially higher prices containing a strikethrough.

55.    At no point during any of her visits to the Boohoo or Nasty Gal U.S. websites did Kalu see a disclosure or disclaimer explaining that the Reference Price was not intended to be the former price of the product offered on the site, what the Reference Price meant, or how Defendants came up with the Reference Price.

56.    Kalu purchased the products referenced above. Before doing so, she relied on the Reference Price advertised on each product she purchased as representing the former price of the product, meaning the price at which the product had in fact been offered for sale, or previously sold, in the recent past. Kalu thus relied on Boohoo and Nasty Gal's representations that each of the products referenced above was truly on sale and being sold at a substantial markdown or discount, and thereby fell victim to the deception intended by Boohoo and Nasty Gal. The items Kalu ordered were delivered to her in New York.

57.    The truth, however, is that the products Kalu purchased were not substantially marked down or discounted, or at the very least, any discount she was receiving had been grossly exaggerated. That is because none of the products Kalu bought had been offered for sale on Boohoo or Nasty Gal's website for any reasonably substantial period of time (if

ever) at the full Reference Prices.  Those Reference Prices were fake prices used in Boohoo and Nasty Gal's deceptive marketing scheme.

### 3.    Plaintiff Katie Runnells (New York)

58.    Plaintiff Katie Runnells ("Runnells") fell victim to Defendants' false advertising and deceptive pricing practices.  Between July 18, 2020 and November 17, 2021, Runnells placed six (6) orders from Boohoo's U.S. website to shop for clothing.

59.    On or about July 18, 2020, Runnells visited Boohoo's U.S. website to shop for clothing from her home in the State of New York.  Runnells saw on the website that Boohoo was running a "60% Off Everything" sale.  Runnells browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was 60% off the crossed-out Reference Price.  She found and selected a number of items (consisting of a Plus V-Neck Keyhole Back T-Shirt, Plus Extreme Rip Jean Shorts, Plus Mesh Top 2 in 1 Slip Dress, and Butterfly Detail Pool Slider) and added them to her shopping cart, with all of the items displayed by Boohoo as having a Reference Price and a sale price of at least 60% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

60.    On or about September 9, 2020, Runnells visited Boohoo's U.S. website to shop for clothing from her home in the State of New York.  Runnells saw on the website that Boohoo was running a "40% Off Everything" sale.  Runnells browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was 40% off the crossed-out Reference Price.  She found and selected a number of items (consisting of a Plus Denim Rip Knee & Frayed Hem Skinny Jeans, Plus High Rise 5 Pocket Jeans, and Plus High Rise Stretch Skinny Jeans) and added them to her shopping cart, with the items displayed by Boohoo as having a Reference Price and a sale price of at least 40% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

61.    On or about January 10, 2021, Runnells visited Boohoo's U.S. website to shop for clothing from her home in the State of New York.  Runnells saw on the website that

Boohoo was running a "50% to 80% Off Everything" sale.  Runnells browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 50% off the crossed-out Reference Price.  She found and selected a number of items (consisting of Plus Distressed Skinny Jeans, Plus Bleach Wash Rip Knee Boyfriend Jean, Premium Fluffy Trim Maxi Robe, and Plus Bonded Aviator Jacket) and added them to her shopping cart, with the items displayed by Boohoo as having a Reference Price and a sale price of at least 50% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

62.     On or about February 24, 2021, Runnells visited Boohoo's U.S. website to shop for clothing from her home in the State of New York.  Runnells saw on the website that Boohoo was running a "50% Off Everything" sale.  Runnells browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was advertised as being 50% off the crossed-out Reference Price.  She found and selected a number of items (consisting of Denim Ripped Print Jeans, Mid Rise Marble Wash Mom Jeans, Buckle Strap Detail Skinny Trousers, High Waist Light Wash Distressed Mom Jeans, and Mid Rise 5 Pocket Stretch Skinny Jeans) and added them to her shopping cart, with the items displayed by Boohoo as having a Reference Price and a sale price of at least 50% off.   The Reference Prices were displayed as substantially higher prices containing a strikethrough.

63.     On or about October 13, 2021, Runnells visited Boohoo's U.S. website to shop for clothing from her home in the State of New York.  Runnells saw on the website that Boohoo was running a "50% Off Everything" sale.  Runnells browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 50% off the crossed-out Reference Price.  She found and selected a number of items (consisting of Candy Pink Bleached High Waist Boyfriend Jeans, Purple Bleached High Waist Boyfriend Jeans, Basics Mid Rise Super Distressed Mom Jeans, Extreme Distressed High Waist Split Hem Jeans, and Ombre Slim Fit Trousers) and added them to her shopping cart, with the items displayed by Boohoo as having a Reference Price and a

sale price of at least 50% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

64.   At no point during any of her visits to the Boohoo U.S. website did Runnells see a disclosure or disclaimer explaining that the Reference Price was not intended to be the former price of the product offered on the site, what the Reference Price meant, or how Defendants came up with the Reference Price.

65.   Runnells purchased the products referenced above.  Before doing so, she relied on the Reference Price advertised on each product she purchased as representing the former price of the product, meaning the price at which the product had in fact been offered for sale, or previously sold, in the recent past.  Runnells thus relied on Boohoo's representation that each of the products referenced above was truly on sale and being sold at a substantial markdown or discount, and thereby fell victim to the deception intended by Boohoo.  The items Runnells ordered were delivered to her in New York.

66.   The truth, however, is that the products Runnells purchased were not substantially marked down or discounted, or at the very least, any discount she was receiving had been grossly exaggerated.  That is because none of the products Runnells bought had been offered for sale on Boohoo's website for any reasonably substantial period of time (if ever) at the full Reference Prices.  Those Reference Prices were fake prices used in Boohoo's deceptive marketing scheme.

### 4.   Plaintiff Juanita Carmet Cachadina (Florida)

67.   Plaintiff Juanita Carmet Cachadina ("Cachadina") fell victim to Defendants' false advertising and deceptive pricing practices.  Between June 6, 2017 and July 17, 2021, Cachadina placed two (2) orders: one (1) from Boohoo's U.S. website to shop for clothing, and one (1) from Nasty Gal's U.S. website to shop for clothing.

68.   On or about June 24, 2017, Cachadina visited Boohoo's U.S. website to shop for clothing from her then home when she resided in the State of New York.  Cachadina saw on the website that Boohoo was running a "50% Off Everything" sale.  Cachadina browsed the site and observed that many of the products offered had a Reference Price and

a sale price that was 50% off the Reference Price.  She found and selected a number of items (consisting of a Sophie Ruffle Off Shoulder Woven Dress, Jade Floral Cold Shoulder Ruffle Skater Dress, Hannah Tie Belt Shorts, Unity Oversized Boyfriend V Neck Tee, Freya Embroidered Mesh Short Sleeve Shirt, Hannah Embroidered Stripe Ruffle Shirt, and Charlotte Tie Cord Choker) and added them to her shopping cart, with all of the items displayed by Boohoo as having a Reference Price and a sale price of at least 50% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

69.     Similarly, on or about July 17, 2021, Cachadina visited Nasty Gal's U.S. website to shop for clothing from her current home in the State of Florida.  Cachadina saw on the website that Nasty Gal was running a sale where everything on the site was at least "50% off".  Cachadina browsed the site and observed that the products offered each had a sale price that was at least 50% off the crossed-out Reference Price.  She found and selected a Backless Puff Sleeve Polka Dot Blouse and added it to her shopping cart, with the item displayed by Nasty Gal as having a Reference Price and a sale price of at least 50% off.  The Reference Price was displayed as a substantially higher price containing a strikethrough.

70.     At no point during any of her visits to the Boohoo or Nasty Gal U.S. websites did Cachadina see a disclosure or disclaimer explaining that the Reference Price was not intended to be the former price of the product offered on the site, what the Reference Price meant, or how Defendants came up with the Reference Price.

71.     Cachadina purchased the products referenced above.  Before doing so, she relied on the Reference Price advertised on each product she purchased as representing the former price of the product, meaning the price at which the product had in fact been offered for sale, or previously sold, in the recent past.  Cachadina thus relied on Boohoo and Nasty Gal's representation that each of the products referenced above was truly on sale and being sold at a substantial markdown or discount, and thereby fell victim to the deception intended by Boohoo and Nasty Gal.  The items Cachadina ordered were delivered to her in Florida.

72.     The truth, however, is that the products Cachadina purchased were not substantially marked down or discounted, or at the very least, any discount she was receiving had been grossly exaggerated.  That is because none of the products Cachadina bought had been offered for sale on Boohoo and Nasty Gal's websites for any reasonably substantial period of time (if ever) at the full Reference Prices.  Those Reference Prices were fake prices used in Boohoo and Nasty Gal's deceptive marketing schemes.

### 5.     Plaintiff Sarah Huebner (Florida)

73.     Plaintiff Sarah Huebner ("Huebner") fell victim to Defendants' false advertising and deceptive pricing practices.  Between April 15, 2020, and September 15, 2021,  Huebner placed nine (9) orders from Boohoo's U.S. website to shop for clothing.

74.     On or about April 15, 2020, Huebner visited Boohoo's U.S. website to shop for clothing from her home in the State of Florida.  Huebner saw on the website that Boohoo was running a "60% Off Everything" sale.  Huebner browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was 60% off the crossed-out Reference Price.  She found and selected a  number of items (consisting of a Eva Pom Trim Off Shoulder Beach Co-ord Set, Leopard Strappy Romper, Cheese Cloth Embroidered Tassel Sun Dress, Leopard Print Smock Dress, Bardot Ruffle Detail Short Co-ord Set, Floral Cap Sleeved Shift Dress, and Bardot Off The Shoulder Frill Jersey Romper) and added them to her shopping cart, with the items displayed by Boohoo as having a Reference Price and a sale price of at least 60% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

75.     On or about May 16, 2020, Huebner visited Boohoo's U.S. website to shop for clothing from her home in the State of Florida.  Huebner saw on the website that Boohoo was running a "60% Off Everything" sale.  Huebner browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 60% off the crossed-out Reference Price.  She found and selected a number of items (consisting of a Mix & Match Lace PJ Shorts, Frill Hem Shorts & Cami Satin Set, Floral Strappy Sundress, Strappy Rib Mini Dress, Leopard Strappy Sundress, Broderie Trim

Belted Romper, Basic Swing Dress, and Strappy Crop Top & Skater Mini Skirt Two-Piece Set) and added them to her shopping cart, with the items displayed by Boohoo as having a Reference Price and a sale price of at least 60% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

76.     On or about June 30, 2020, Huebner visited Boohoo's U.S. website to shop for clothing from her home in the State of Florida.  Huebner saw on the website that Boohoo was running a "60% Off Everything" sale.  Huebner browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was advertised as being 60% off the crossed-out Reference Price.  She found and selected a number of items (consisting of a Leopard Print Side Split Mini Skirt, Leopard Print Swing Dress, Snake Wrap Front Thong Bodysuit, Basic Swing Dress, Strappy Swing Dress, Basic V Neck Swing Dress, Snake Print Western Belt, 1 Pack Snake Print Boxers, Double Layered Heart Pendant Anklet, and Croc Engraved Skinny Buckle Belt) and added them to her shopping cart, with the items displayed by Boohoo as having a Reference Price and a sale price of at least 60% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

77.     On or about July 15, 2020, Huebner visited Boohoo's U.S. website to shop for clothing from her home in the State of Florida.  Huebner saw on the website that Boohoo was running a "60% Off Everything" sale.  Huebner browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 60% off the crossed-out Reference Price.  She found and selected a number of items (consisting of a Snake Print Strappy Top & Mini Skirt Two-Piece Set, Floral Chiffon off the Shoulder Mini Dress, Strappy Swing Dress, Diamante Drop Anklet, and Jersey Ruched Front Strappy Skater Dress) and added them to her shopping cart, with the items displayed by Boohoo as having a Reference Price and a sale price of at least 60% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

78.     On or about September 24, 2020, Huebner visited Boohoo's U.S. website to shop for clothing from her home in the State of Florida.  Huebner saw on the website that

Boohoo was running a promotion of "40% Off Everything".  Huebner browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 40% off the crossed-out Reference Price.  She found and selected a number of items (consisting of a Lace Up Detail Skater Dress, Leopard Shoulder Pad T-Shirt Dress, Backless Crop Sleeve Skater Dress, Leopard Print Bomber Jacket, Satin Leopard Kimono, High Neck Cut Out Mini Dres, and 5 Pack Mixed Chain & Diamante Anklets) and added them to her shopping cart, with most of items displayed by Boohoo as having a Reference Price and a sale price of at least 40% off.  The items with a Reference Price was displayed as a substantially higher price containing a strikethrough.

79.    On or about January 10, 2021, Huebner visited Boohoo's U.S. website to shop for clothing from her home in the State of Florida.  Huebner saw on the website that Boohoo was running a "Sale 50%-80% off Every Single Thing" sale .  Huebner browsed the site and observed that many of the products had a Reference Price that was crossed out and a sale price that was advertised as being 50% off the crossed-out Reference Price.  She found and selected a number of items (consisting of an Off the Shoulder Mini Dress, Leopard V Neck Bodycon Dress, Bandage Rib Cut Out Shoulder Detail Mini Dress, Square Neck Open Back Rib Bodycon Dress, Oversized High Neck Long Sleeve Top, Distressed Denim Jacket, Double Layer Frill Bodysuit, and Babydoll & String Set) and added them to her shopping cart, with some of the items having Reference Prices as displayed by Boohoo as having a Reference Price and a sale price of at least 50% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

80.    On or about March 17, 2021, Huebner visited Boohoo's U.S. website to shop for clothing from her home in the State of Florida.  Huebner saw on the website that Boohoo was running a "60% OFF Everything" sale.  Huebner browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was 60% off the crossed-out Reference Price.  She found and selected a number of items (consisting of a Woven Leopard Print Ruffle Tea Dress, Tie Strap Shirred Tiered Skater Dress, High Neck Cut Out Back Midi Dress, Ruched Square Neck Rib Mini Dress, Frill

Drop Hem Belted Maxi Dress, and Leopard Dressing Gown) and added them to her shopping cart, with the items displayed by Boohoo as having a Reference Price and a sale price of at least 60% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

81.     On or about March 28, 2021, Huebner visited Boohoo's U.S. website to shop for clothing from her home in the State of Florida.  Huebner saw on the website that Boohoo was running a "60% Off Everything" sale.  Huebner browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was 60% off the crossed-out Reference Price.  She found and selected a number of items (consisting of a Side Split Cap Sleeve Midi Dress, Rib Double Strap Midi Dress, Crinkle Rib Halterneck Midaxi Dress, and Ribbed Midi Dress and Duster Set) and added them to her shopping cart, with the items displayed by Boohoo as having a Reference Price and a sale price of at least 60% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

82.     On or about September 15, 2021, Huebner visited Boohoo's U.S. website to shop for clothing from her home in the State of Florida.  Huebner saw on the website that Boohoo was running a promotion that gave customers the choice of "60% Off Everything" or "50% Off Everything" plus a reduced shipping price of $3.00.  Huebner browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 50% off the crossed-out Reference Price.  She found  and selected a Maternity Long Sleeve Rib Mini Dress and added it to her shopping cart, with the item displayed by Boohoo as having a Reference Price and a sale price of at least 50% off.  The Reference Price was displayed as a substantially higher price containing a strikethrough.

83.     At no point during any of her visits to the Boohoo U.S. website did Huebner see a disclosure or disclaimer explaining that the Reference Price was not intended to be the former price of the product offered on the site, what the Reference Price meant, or how Defendants came up with the Reference Price.

84.     Huebner purchased the products referenced above.  Before doing so, she relied on the Reference Price advertised on each product she purchased as representing the former price of the product, meaning the price at which the product had in fact been offered for sale, or previously sold, in the recent past.  Huebner thus relied on Boohoo's representation that each of the products referenced above was truly on sale and being sold at a substantial markdown or discount, and thereby fell victim to the deception intended by Boohoo.  The items Huebner ordered were delivered to her in Florida.

85.     The truth, however, is that the products Huebner purchased were not substantially marked down or discounted, or at the very least, any discount she was receiving had been grossly exaggerated.  That is because none of the products Huebner bought had been offered for sale on Boohoo's website for any reasonably substantial period of time (if ever) at the full Reference Prices.  Those Reference Prices were fake prices used in Boohoo's deceptive marketing scheme.

### 6.   Plaintiff Yesenia Valiente (Florida)

86.     Plaintiff Yesenia Valiente ("Valiente") fell victim to Defendants' false advertising and deceptive pricing practices.  Between February 24, 2020, and January 10, 2021, Valiente placed two (2) orders from PrettyLittleThing's U.S. website to shop for clothing.

87.     On or about February 24, 2020, Valiente visited PrettyLittleThing's U.S. website to shop for clothing from her home in the State of Florida.  Valiente saw on the website that Boohoo was running a "40% Off Sitewide" sale.  Valiente browsed the site and observed that the products offered each had a sale price that was at least 40% off the advertised Reference Price based on the availability of a sitewide promo code. She found and selected a Black Knot Front Wrapped Sarong, and a White Knot Front Wrapped Sarong and added them to her shopping cart, with all the items displayed by PrettyLittleThing as having a Reference Price and a sale price of at least 40% off.

88.     On or about January 10, 2021, Valiente visited PrettyLittleThing's U.S. website to shop for clothing from her home in the State of Florida.  Valiente saw on the

website that PrettyLittleThing was running an "Up to 80% Off Everything Plus Extra 10% Off" sale.  Valiente browsed the site and observed that the products offered each had a sale price that was substantially discounted from the advertised Reference Price. She found and selected a number of items (consisting of a Caris White Long Sleeve Lace Bodycon Dress, Stone Jersey Scoop Strappy Maxi Dress, Basic Black Bandeau Midaxi Dress, Basic Camel Bandeau Midaxi Dress, Black High Neck Cap Sleeve Bodycon Dress, and Navy Ribbed Midi Dress) and added them to her shopping cart, with the items displayed by PrettyLittleThing as having a Reference Price and a substantially discounted selling price based on the advertised promotion.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

89.     At no point during any of her visits to the PLT U.S. website did Valiente see a disclosure or disclaimer explaining that the Reference Price was not intended to be the former price of the product offered on the site, what the Reference Price meant, or how Defendants came up with the Reference Price.

90.     Valiente purchased the products referenced above.  Before doing so, she relied on the Reference Price advertised on each product she purchased as representing the former price of the product, meaning the price at which the product had in fact been offered for sale, or previously sold, in the recent past.  Valiente thus relied on PrettyLittleThing's representation that each of the products referenced above was truly on sale and being sold at a substantial markdown or discount, and thereby fell victim to the deception intended by PrettyLittleThing.  The items Valiente ordered were delivered to her in Florida.

91.     The truth, however, is that the products Valiente purchased were not substantially marked down or discounted, or at the very least, any discount she was receiving had been grossly exaggerated.  That is because none of the products Valiente bought had been offered for sale on PrettyLittleThing's website for any reasonably substantial period of time (if ever) at the full Reference Prices.  Those Reference Prices were fake prices used in PrettyLittleThing's deceptive marketing scheme.

7.   **Plaintiff Veronica Walton (Maryland)**

92.    Plaintiff Veronica Walton ("Walton") fell victim to Defendants' false advertising and deceptive pricing practices.  Between August 5, 2021 and September 11, 2021, Walton placed two (2) orders from Boohoo's U.S. website to shop for clothing.

93.    On or about August 5, 2021, Walton visited Boohoo's U.S. website to shop for clothing from her then home when she resided in the State of Maryland.  Walton saw on the website that Boohoo was running a promotion that gave customers the choice of "60% Off Everything" or "50% Off Everything" plus a reduced shipping price.  Walton browsed the site and observed that all or substantially all of the products offered had a Reference Price and a sale price that was at least 50% off the Reference Price.  She found and selected a number of items (consisting of a O Ring Cheesecloth Volume Sleeve Top, Mid Rise Super Distressed Boyfriend Jeans, Brushed Check Shacket, and 3 Pack Ring Detail Bucklet Belt) and added them to her shopping cart, with all of the items displayed by Boohoo as having a Reference Price and a sale price of at least 50% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

94.    On or about September 11, 2021, Walton visited Boohoo's U.S. website to shop for clothing from her then home when she resided in the State of Maryland.  Walton saw on the website that Boohoo was running a promotion that gave customers the choice of "60% Off Everything" or "50% Off Everything" plus a reduced shipping price.  Walton browsed the site and observed that all or substantially all of the products offered had a Reference Price and a sale price that was at least 50% off the Reference Price.  She found and selected a number of items (consisting of Basic Regular Joggers, Heart Embroidered Joggers, Mid Rise Super Distressed Boyfriend Jeans, Cuffed Denim Joggers, Woman Rainbox Slogan T-Shirt, and Germany Football T-shirt, Long Sleeve Ruffle Detail Skater Dress) and added them to her shopping cart, with all of the items displayed by Boohoo as having a Reference Price and a sale price of at least 50% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

95.    At no point during any of her visits to the Boohoo U.S. website did Walton

see a disclosure or disclaimer explaining that the Reference Price was not intended to be the former price of the product offered on the site, what the Reference Price meant, or how Defendants came up with the Reference Price.

96.     Walton purchased the products referenced above.  Before doing so, she relied on the Reference Price advertised on each product she purchased as representing the former price of the product, meaning the price at which the product had in fact been offered for sale, or previously sold, in the recent past.  Walton thus relied on Boohoo's representation that each of the products referenced above was truly on sale and being sold at a substantial markdown or discount, and thereby fell victim to the deception intended by Boohoo.  The items Walton ordered were delivered to her in Maryland.

97.     The truth, however, is that the products Walton purchased were not substantially marked down or discounted, or at the very least, any discount she was receiving had been grossly exaggerated.  That is because none of the products Walton bought had been offered for sale on Boohoo's website for any reasonably substantial period of time (if ever) at the full Reference Prices.  Those Reference Prices were fake prices used in Boohoo's deceptive marketing scheme.

**8.     Plaintiff Lisa Murphy (Massachusetts)**

98.     Plaintiff Lisa Murphy ("Murphy") fell victim to Defendants' false advertising and deceptive pricing practices.

99.     On or about March 18, 2021, Murphy visited PrettyLittleThing's U.S. website to shop for clothing from her home in the State of Massachusetts.  Murphy saw on the website that PrettyLittleThing was running an "up to 70% Off Everything" sale.  Murphy browsed the site and observed that all or substantially all of the products offered had a sale price that was a substantial discount off the Reference Price.  She found and selected a number of items (consisting of a Black Ditsy Floral Tie Front Bardot Jersey Bodycon Dress, Red Ditsy Floral Print Ruched Bust Shift Dress, and White Crinkle Chiffon Cami and Shorts PJ Set) and added them to her shopping cart, with the items displayed by PrettyLittleThing as having a Reference Price and a substantially lower sale price.

100.   At no point during any of her visits to the PLT U.S. website did Murphy see a disclosure or disclaimer explaining that the Reference Price was not intended to be the former price of the product offered on the site, what the Reference Price meant, or how Defendants came up with the Reference Price.

101.   Murphy purchased the products referenced above.  Before doing so, she relied on the Reference Price advertised on each product she purchased as representing the former price of the product, meaning the price at which the product had in fact been offered for sale, or previously sold, in the recent past.  Murphy thus relied on PrettyLittleThing's representation that each of the products referenced above was truly on sale and being sold at a substantial markdown or discount, and thereby fell victim to the deception intended by PrettyLittleThing.  The items Murphy ordered were delivered to her in Massachusetts.

102.   The truth, however, is that the products Murphy purchased were not substantially marked down or discounted, or at the very least, any discount she was receiving had been grossly exaggerated.  That is because none of the products Murphy bought had been offered for sale on PrettyLittleThing's website for any reasonably substantial period of time (if ever) at the full Reference Prices.  Those Reference Prices were fake prices used in PrettyLittleThing's deceptive marketing scheme.

### 9.   Plaintiff Nicole Hill (Michigan)

103.   Plaintiff Nicole Hill ("Hill") fell victim to Defendants' false advertising and deceptive pricing practices.  Between June 29, 2020, and August 19, 2020, Hill placed two (2) orders from Boohoo's U.S. website to shop for clothing.

104.   On or about June 29, 2020, Hill visited Boohoo's U.S. website to shop for clothing from her home in the State of Michigan.  Hill saw on the website that Boohoo was running an up to "60% Off Everything" sale.  Hill browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 50% off the crossed-out Reference Price.  She found and selected a number of items (consisting of a High Waist Slinky Biker Shorts, Basic Solid Biker Shorts, Tall Longline Jean Shorts, Plus Slinky Biker Short, Tres Bien Graphic T-Shirt and Cap Sleeve High Neck

Tie Dye Rib Top) and added them to her shopping cart, with all of the items displayed by Boohoo as having a Reference Price and a sale price with a substantial percentage off discount. The Reference Prices were displayed as substantially higher prices containing a strikethrough.

105.   Similarly, on or about August 18, 2020, Hill visited Boohoo's U.S. website to shop for clothing from her home in the State of Michigan. Hill saw on the website that Boohoo was running an up to "60% Off Everything" sale. Hill browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 50% off the crossed-out Reference Price. She found and selected a number of items (consisting of a two Butterfly Print Oversized Joggers, Butterfly Print Oversized Hoody, Petite Oversize Boyfriend Jogger, and 2 Pack Seamfree Dip Front Thong) and added them to her shopping cart, with all of the items displayed by Boohoo as having a Reference Price and a sale price with a substantial percentage off discount. The Reference Prices were displayed as substantially higher prices containing a strikethrough.

106.   At no point during any of her visits to the Boohoo U.S. website did Hill see a disclosure or disclaimer explaining that the Reference Price was not intended to be the former price of the product offered on the site, what the Reference Price meant, or how Defendants came up with the Reference Price.

107.   Hill purchased the products referenced above. Before doing so, she relied on the Reference Price advertised on each product she purchased as representing the former price of the product, meaning the price at which the product had in fact been offered for sale, or previously sold, in the recent past. Hill thus relied on Boohoo's representation that each of the products referenced above was truly on sale and being sold at a substantial markdown or discount, and thereby fell victim to the deception intended by Boohoo. The items Hill ordered were delivered to her in Michigan.

108.   The truth, however, is that the products Hill purchased were not substantially marked down or discounted, or at the very least, any discount she was receiving had been grossly exaggerated. That is because none of the products Hill bought had been offered

for sale on Boohoo's website for any reasonably substantial period of time (if ever) at the full Reference Prices. Those Reference Prices were fake prices used in Boohoo's deceptive marketing scheme.

### 10.   Plaintiff Nicole Stewart (Ohio)

109.   Plaintiff Nicole Stewart ("Stewart") fell victim to Defendants' false advertising and deceptive pricing practices. Between December 7, 2019 and June 25, 2021, Stewart placed at least six (6) orders: two (2) from Boohoo's U.S. website to shop for clothing, three (3) from PrettyLittleThing's U.S. website to shop for clothing, and one (1) from Nasty Gal's U.S. website to shop for clothing.

110.   On or about December 19, 2020, Stewart visited Boohoo's U.S. website to shop for clothing from her home in the State of Ohio. Stewart saw on the website that Boohoo was running a "50% Off Everything" sale. Stewart browsed the site and observed that all or substantially all of the products offered had a Reference Price and a sale price that was significantly discounted from the Reference Price. She found and selected a Plus Check Wool Look Boyfriend Coat and added it to her shopping cart, with the item displayed by Boohoo as having a Reference Price and a sale price with a substantial percentage off discount. The Reference Price was displayed as a substantially higher price containing a strikethrough.

111.   On or about June 25, 2021, Stewart visited Boohoo's U.S. website to shop for clothing from her home in the State of Ohio. Stewart saw on the website that Boohoo was running a promotion that gave customers the choice of "60% Off Everything" or "50% Off" plus a reduced shipping price. Stewart browsed the site and observed that all or substantially all of the products offered had a Reference Price and a sale price. She browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was a significant discount off the crossed-out Reference Price. She found and selected a Floral Strappy Ruffle Wide Leg Jumpsuit and added it to her shopping cart, with the item displayed by Boohoo as having a Reference Price and a sale price of at least 50% off. The Reference Price was displayed as a substantially higher price containing

1    a strikethrough.

2        112.   Similarly, on or about December 17, 2019, Stewart visited Nasty Gal's U.S.

3    website to shop for clothing from her State of Ohio.  Stewart saw on the website that Nasty

4    Gal was running an "80% Off Absolutely Everything" sale.  Stewart browsed the site and

5    observed that the products offered each had a Reference Price that was crossed out and a

6    sale price that were at a substantial markdown off the Reference Price.  She found and

7    selected a Woman's World Houndstooth Longline Plus Blazer and added it to her shopping

8    cart, with the item displayed by Nasty Gal as having a Reference Price and a sale price.

9    The Reference Price was displayed as a substantially higher price containing a

10   strikethrough.

11       113.   Similarly on or about December 7, 2019, Stewart visited PrettyLittleThing's

12   U.S. website to shop for clothing from her home in the State of Ohio.  Stewart saw on the

13   website that PrettyLittleThing was running an "Up to 80% off = EXTRA 10% PROMO10"

14   sale.  Stewart browsed the site and observed that all or substantially all of the products had

15   a sale price that was a substantial discount off the Reference Price.  She found and selected

16   a Plus Black Belt Detail Wide Leg Cargo Jumpsuit and added it to her shopping cart, with

17   the items displayed by PrettyLittleThing as having a Reference Price and a substantially

18   lower sale price.

19       114.   On or about December 10, 2020, Stewart visited PrettyLittleThing's U.S.

20   website to shop for clothing from her home in the State of Ohio.  Stewart saw on the website

21   that PrettyLittleThing was running a "50% Off Everything" sale.  Stewart browsed the site

22   and observed that all or substantially all of the products offered had a sale price that was a

23   substantial discount off the Reference Price.  She found and selected a Stone Badge Detail

24   Seam Front Extreme Wide Leg Joggers and added it to her shopping cart, with the item

25   displayed by PrettyLittleThing as having a Reference Price and a substantially lower sale

26`  price.

27       115.   On or about February 25, 2021, Stewart visited PrettyLittleThing's U.S.

28   website to shop for clothing from her home in the State of Ohio.  Stewart saw on the website

that PrettyLittleThing was running an "Up to 70% Off Everything" sale.  Stewart browsed the site and observed that all or substantially all of the products offered had a sale price that was a substantial discount off the Reference Price.  She found and selected a pair of black sweatpants and added it to her shopping cart, with the item displayed by PrettyLittleThing as having a Reference Price and a substantially lower sale price.

116.   At no point during any of her visits to the Boohoo, PLT, or Nasty Gal U.S. websites did Stewart see a disclosure or disclaimer explaining that the Reference Price was not intended to be the former price of the product offered on the site, what the Reference Price meant, or how Defendants came up with the Reference Price.

117.   Stewart purchased the products referenced above.  Before doing so, she relied on the Reference Price advertised on each product she purchased as representing the former price of the product, meaning the price at which the product had in fact been offered for sale, or previously sold, in the recent past.  Stewart thus relied on Boohoo, Nasty Gal, and PrettyLittleThing's representation that each of the products referenced above was truly on sale and being sold at a substantial markdown or discount, and thereby fell victim to the deception intended by Boohoo, Nasty Gal, and PrettyLittleThing.  The items Stewart ordered were delivered to her in Ohio.

118.   The truth, however, is that the products Stewart purchased were not substantially marked down or discounted, or at the very least, any discount she was receiving had been grossly exaggerated.  That is because none of the products Stewart bought had been offered for sale on Boohoo, Nasty Gal, or PrettyLittleThing's websites for any reasonably substantial period of time (if ever) at the full Reference Prices.  Those Reference Prices were fake prices used in Boohoo's deceptive marketing scheme.

### 11.   Plaintiff Me'Lisa Thimot (Illinois)

119.   Plaintiff Me'Lisa Thimot ("Thimot") fell victim to Defendants' false advertising and deceptive pricing practices.  Between May 7, 2018, and September 24, 2020, Thimot placed five (5) orders from Boohoo's U.S. website to shop for clothing and shoes.

120.   On or about May 7, 2018, Thimot visited Boohoo's U.S. website to shop for clothing from her home in the State of Illinois.  Thimot saw on the website that Boohoo was running an "Up to 80% Off" sitewide sale that day.  Thimot browsed the site and observed that all or substantially all of the products offered had a sale price that was a substantial discount off the Reference Price.  She found and selected an Alice Embroidered Skate Dress and a Kirsty All Over Embroidered Skate Dress and added the items to her shopping cart, with the items displayed by Boohoo as each having a Reference Price and a substantially lower sale price.

121.   On or about May 15, 2018, Thimot visited Boohoo's U.S. website to shop for clothing from her home in the State of Illinois.  Thimot saw on the website that Boohoo was running an "Up to 80% Off" sitewide sale that day.  Thimot browsed the site and observed that all or substantially all of the products offered had a sale price that was a substantial discount off the Reference Price.  She found and selected an Alicia NYPD Sleep Tee, Viola Stripe Blazer – Short Co-ord, Jasmine 2 Part Heels, and Tia Chunky Cleated Heel Chelsea Boots, and added the items to her shopping cart, with the items displayed by Boohoo as each having a Reference Price and a substantially lower sale price.

122.   On or about August 12, 2020, Thimot visited Boohoo's U.S. website to shop for clothing from her home in the State of Illinois.  Thimot saw on the website that Boohoo was running a "60% Off Everything" sale that day.  Thimot browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 60% off the crossed-out Reference Price.  She found and selected a Wool Blend Herringbone Double Breasted Overcoat and added it to her shopping cart, with the item displayed by Boohoo as having a Reference Price and a sale price of at least 60% off. The Reference Price was displayed as a substantially higher price containing a strikethrough.

123.   On or about August 17, 2020, Thimot visited Boohoo's U.S. website to shop for clothing from her home in the State of Illinois.  Thimot saw on the website that Boohoo was running a "50% Off Everything" sale that day.  Thimot browsed the site and observed

that the products offered each had a Reference Price that was crossed out and a sale price that was at least 50% off the crossed-out Reference Price.  She found and selected a Contrast Lapel Leopard Print Blazer and a Check Ruffle Hem Smock Dress, and added the items to her shopping cart, with the items displayed by Boohoo as each having a Reference Price and a sale price of at least 50% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

124.  On or about September 24, 2020, Thimot visited Boohoo's U.S. website to shop for clothing from her home in the State of Illinois.  Thimot saw on the website that Boohoo was running a "40% Off Everything" sale that day.  Thimot browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 40% off the crossed-out Reference Price.  She found and selected a Striped Suit Two-Piece and a Ribbed Seamless Longline Lounge Bra, and added the items to her shopping cart, with the items displayed by Boohoo as each having a Reference Price and a sale price of at least 40% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

125.  At no point during any of her visits to the Boohoo website did Thimot see a disclosure or disclaimer explaining that the Reference Price was not intended to be the former price of the product offered on the site, what the Reference Price meant, or how Boohoo came up with the Reference Price.

126.  Thimot purchased the products referenced above.  Before doing so, she relied on the Reference Price advertised on each product she purchased as representing the former price of the product, meaning the price at which the product had in fact been offered for sale, or previously sold, in the recent past.  Thimot thus relied on Boohoo's representations that each of the products referenced above was truly on sale and being sold at a substantial markdown or discount, and thereby fell victim to the deception intended by Boohoo.  The items Thimot ordered were delivered to her in Illinois.

127.  The truth, however, is that the products Thimot purchased were not substantially marked down or discounted, or at the very least, any discount she was

receiving had been grossly exaggerated.  That is because none of the products Thimot bought had been offered for sale on Boohoo's website for any reasonably substantial period of time (if ever) at the full Reference Prices.  Those Reference Prices were fake prices used in Boohoo's deceptive marketing scheme.

### 12.   Plaintiff Marika Walton (New York)

128.   Plaintiff Marika Walton ("M Walton") fell victim to Defendants' false advertising and deceptive pricing practices.  Between September 5, 2017, and June 8, 2020, M Walton placed three (3) orders from Boohoo's U.S. website to shop for clothing and accessories.

129.   On or about September 5, 2017, M Walton visited Boohoo's U.S. website to shop for clothing from her home in the State of New York.  She saw on the website that Boohoo was running a "60% Off Everything" sale that day.  She browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 60% off the crossed-out Reference Price.  She found and selected two Scarlett Tailored Cape Tux Jumpsuits (one in black and one in ivory) and added the items to her shopping cart, with the items displayed by Boohoo as each having a Reference Price and a sale price of at least 60% off. The Reference Prices were displayed as substantially higher prices containing a strikethrough.

130.   On or about September 27, 2017, M Walton visited Boohoo's U.S. website to shop for clothing from her home in the State of New York.  She saw on the website that Boohoo was running a "50% Off Everything" sale that day.  She browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 50% off the crossed-out Reference Price.  She found and selected a Boutique Margot Open Shoulder Fishtail Maxi Dress, Mona Sports Trim Jumpsuit, Mai Sweetheart Off Shoulder Midi Dress, and Boutique Kiko Embroidered Hem Mesh Maxi Dress, and added the items to her shopping cart, with the items displayed by Boohoo as each having a Reference Price and a sale price of at least 50% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

131.   On or about June 8, 2020, M Walton visited Boohoo's U.S. website to shop for clothing and accessories from her home in the State of New York.  She saw on the website that Boohoo was running a "50% Off Everything" sale that day.  She browsed the site and observed that the products offered each had a Reference Price that was crossed out and a sale price that was at least 50% off the crossed-out Reference Price.  She found and selected a pair of Tonal Stripe Tie Waist Linen Look Beach Pants, a Maxi Beach Kaftan, Scoop Back Swimsuit, Bride Tassel Beach Dress, Tall Rope Waist Belt Swimsuit, Tall Snake Print Plunge Swimsuit, Crepe Cuffed Bell Sleeve Mini Tie Kimono, Bride Vibes Jersey Robe, Satin Bride Robe, Camo Print Easy Wear Top, Orange Camo Print Swim Shorts, Neon Plunge Lace Up Back Swimsuit, Off the Shoulder Wide Leg Extreme Cape Jumpsuit, Ruffle Back High Neck Maxi Dress, Ginger Ray Bride Headband, Ginger Ray Bride to Be Sash, Ginger Ray From Miss to Mrs Bunting Banner, Ginger Ray Rose Gold Advice Card, Leopard Print High Neck Pussybow Blouse, and Petite Basic T-Shirt, and added the items to her shopping cart, with the items displayed by Boohoo as each having a Reference Price and a sale price of at least 50% off.  The Reference Prices were displayed as substantially higher prices containing a strikethrough.

132.   At no point during any of her visits to the Boohoo website did M Walton see a disclosure or disclaimer explaining that the Reference Price was not intended to be the former price of the product offered on the site, what the Reference Price meant, or how Boohoo came up with the Reference Price.

133.   M Walton purchased the products referenced above.  Before doing so, she relied on the Reference Price advertised on each product she purchased as representing the former price of the product, meaning the price at which the product had in fact been offered for sale, or previously sold, in the recent past.  M Walton thus relied on Boohoo's representations that each of the products referenced above was truly on sale and being sold at a substantial markdown or discount, and thereby fell victim to the deception intended by Boohoo.  The items M Walton ordered were delivered to her in New York.

134.   The truth, however, is that the products M Walton purchased were not

substantially marked down or discounted, or at the very least, any discount she was receiving had been grossly exaggerated.  That is because none of the products M Walton bought had been offered for sale on Boohoo's website for any reasonably substantial period of time (if ever) at the full Reference Prices.  Those Reference Prices were fake prices used in Boohoo's deceptive marketing scheme.

135.   At all times relevant to this complaint, Defendants knew that the Reference Prices advertised on their U.S. websites were fake and artificially inflated and intentionally used them in their deceptive pricing scheme on their websites to increase sales and profits by misleading Plaintiffs and members of the putative class to believe that they were buying products at a substantial discount.  Defendants thereby induced customers to buy products they never would have bought—or at the very least, to pay more for merchandise than they otherwise would have if Defendants were simply being truthful about their "sales."

136.   Therefore, Plaintiffs would not have purchased the items listed above, or at the very least, would not have paid as much as they did, had Defendants been truthful. Plaintiffs were persuaded to make their purchases only because of the fake sales based on Defendants' fake Reference Prices.

**F.**   **Research Shows That the Use of Reference Price Advertising Schemes Similar to Defendants' Deceptive Pricing Scheme Influences Consumer Behavior and Affects Consumers' Perceptions of a Product's Value**

137.   The effectiveness of Defendants' deceitful pricing scheme is backed up by longstanding scholarly research.   In the seminal article entitled *Comparative Price Advertising: Informative or Deceptive?* (cited in *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013), Professors Dhruv Grewal and Larry D. Compeau write that, "[b]y creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."  Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992).   Thus, "empirical studies indicate that, *as discount size increases*, *consumers' perceptions of value and their willingness to buy the product*

*increase*, while their intention to search for a lower price decreases." *Id.* at 56 (emphasis added).  For this reason, the Ninth Circuit in *Hinojos* held that a plaintiff making a claim of deceptive pricing (strikingly similar to the claim at issue here) had standing to pursue his claim against the defendant retailer. In doing so, the Court observed that "[m]isinformation about a product's 'normal' price is . . . significant to many consumers in the same way as a false product label would be." *Hinojos*, 718 F.3d at 1106.

138.    Professors Compeau and Grewal reached similar conclusions in a 2002 article: "decades of research support the conclusion that advertised reference prices do indeed enhance consumers' perceptions of the value of the deal."  Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising:  Believe It Or Not*, J. of Consumer Affairs, Vol. 36, No. 2, at 287 (Winter 2002).  The professors also found that "[c]onsumers are influenced by comparison prices *even when the stated reference prices are implausibly high*." *Id.* (emphasis added).

139.    In another scholarly publication, Professors Joan Lindsey-Mullikin and Ross D. Petty concluded that "[r]eference price ads strongly influence consumer perceptions of value . . . .  Consumers often make purchases not based on price but because a retailer assures them that a deal is a good bargain.  This occurs when . . . the retailer highlights the relative savings compared with the prices of competitors . . . [T]hese bargain assurances (BAs) change consumers' purchasing behavior and may deceive consumers."  Joan Lindsey-Mullikin & Ross D. Petty, *Marketing Tactics Discouraging Price Search: Deception and Competition*, 64 J. of Bus. Research 67 (January 2011).

140.    Similarly, according to Professors Praveen K. Kopalle and Joan Lindsey-Mullikin, "research has shown that retailer-supplied reference prices clearly enhance buyers' perceptions of value" and "have a significant impact on consumer purchasing decisions."  Praveen K. Kopalle & Joan Lindsey-Mullikin, *The Impact of External Reference Price On Consumer Price Expectations*, 79 J. of Retailing 225 (2003).

141.    The results of a 1990 study by Professors Jerry B. Gotlieb and Cyndy Thomas Fitzgerald, came to the conclusion that "reference prices are important cues consumers use

when making the decision concerning how much they are willing to pay for the product." Jerry B. Gotlieb & Cyndy Thomas Fitzgerald, *An Investigation Into the Effects of Advertised Reference Prices On the Price Consumers Are Willing To Pay For the Product*, 6 J. of App'd Bus. Res. 1 (1990). This study also concluded that "consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price." *Id.*

142.   The unmistakable inference to be drawn from this research and the Ninth Circuit's opinion in *Hinojos* is that the deceptive advertising through the use of false reference pricing employed here by Defendants is intended to, and does in fact, influence customer behavior—as it did Plaintiffs' purchasing decision here—by artificially inflating customer perceptions of a given item's value and causing customers to spend money they otherwise would not have, purchase items they otherwise would not have, and/or spend more money for a product than they otherwise would have absent the deceptive advertising.

## V.   CLASS ACTION ALLEGATIONS

143.   Plaintiffs bring this action on behalf of themselves and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure and seeks certification of the following classes:

> All persons in the United States of America, including the District of Columbia, Guam, Puerto Rico, American Samoa, U.S. Virgin Islands, and Northern Mariana Islands (excluding California) who purchased one or more boohoo products from http://us.boohoo.com between April 9, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

> All persons in the United States of America, including the District of Columbia, Guam, Puerto Rico, American Samoa, U.S. Virgin Islands, and Northern Mariana Islands (excluding California) who purchased one or more "PrettyLittleThing" products from https://www.prettylittlething.us between May 19, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

All persons in the United States of America, including the District of Columbia, Guam, Puerto Rico, American Samoa, U.S. Virgin Islands, and Northern Mariana Islands (excluding California) who purchased one or more "Nasty Gal" products from https://nastygal.com between March 1, 2017, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

144.   The above-described classes of persons shall hereafter be referred to as the "Nationwide Class."  Excluded from the Nationwide Class are any and all past or present officers, directors, or employees of Defendants, any judge who presides over this action, and any partner or employee of Class Counsel.

145.   In the alternative, Plaintiffs seek certification of the subclasses described below.

146.   Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton seek certification of the following subclasses pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

All persons in the State of New York who purchased one or more boohoo products from http://us.boohoo.com between April 9, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

All persons in the State of New York who purchased one or more "PrettyLittleThing" products from https://www.prettylittlething.us between May 19, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

All persons in the State of New York who purchased one or more "Nasty Gal" products from https://nastygal.com between March 1, 2017, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

147.   The above-described subclasses of persons shall hereafter be referred to collectively as the "New York Subclass."  Excluded from the New York Subclass are any and all past or present officers, directors, or employees of Defendants, any judge who

**SECOND AMENDED CLASS ACTION COMPLAINT**

presides over this action, and any partner or employee of Class Counsel.

148.  Plaintiffs Cachadina, Huebner, and Valiente seek certification of the following subclasses pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All persons in the State of Florida who purchased one or more boohoo products from http://us.boohoo.com between April 9, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

> All persons in the State of Florida who purchased one or more "PrettyLittleThing" products from https://www.prettylittlething.us between May 19, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

> All persons in the State of Florida who purchased one or more "Nasty Gal" products from https://nastygal.com between March 1, 2017, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

149.  The above-described subclasses of persons shall hereafter be referred to collectively as the "Florida Subclass."  Excluded from the Florida Subclass are any and all past or present officers, directors, or employees of Defendants, any judge who presides over this action, and any partner or employee of Class Counsel.

150.  Plaintiff Veronica Walton seeks certification of the following subclasses pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All persons in the State of Maryland who purchased one or more boohoo products from http://us.boohoo.com between April 9, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

> All persons in the State of Maryland who purchased one or more "PrettyLittleThing" products from https://www.prettylittlething.us between May 19, 2016, through the present at a discount from a higher reference price and who

SECOND AMENDED CLASS ACTION COMPLAINT

have not received a refund or credit for their purchase(s).

All persons in the State of Maryland who purchased one or more "Nasty Gal" products from https://nastygal.com between March 1, 2017, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

151.    The above-described subclasses of persons shall hereafter be referred to collectively as the "Maryland Subclass."  Excluded from the Maryland Subclass are any and all past or present officers, directors, or employees of Defendants, any judge who presides over this action, and any partner or employee of Class Counsel.

152.    Plaintiff Murphy seeks certification of the following subclasses pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

All persons in the State of Massachusetts who purchased one or more boohoo products from http://us.boohoo.com between April 9, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

All persons in the State of Massachusetts who purchased one or more "PrettyLittleThing" products from https://www.prettylittlething.us between May 19, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

All persons in the State of Massachusetts who purchased one or more "Nasty Gal" products from https://nastygal.com between March 1, 2017, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

153.    The above-described subclasses of persons shall hereafter be referred to collectively as the "Massachusetts Subclass."  Excluded from the Massachusetts Subclass are any and all past or present officers, directors, or employees of Defendants, any judge who presides over this action, and any partner or employee of Class Counsel.

154.    Plaintiff Hill seeks certification of the following subclasses pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

All persons in the State of Michigan who purchased one or more boohoo products from http://us.boohoo.com between April 9, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

All persons in the State of Michigan who purchased one or more "PrettyLittleThing" products from https://www.prettylittlething.us between May 19, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

All persons in the State of Michigan who purchased one or more "Nasty Gal" products from https://nastygal.com between March 1, 2017, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

155.    The above-described subclasses of persons shall hereafter be referred to collectively as the "Michigan Subclass."  Excluded from the Michigan Subclass are any and all past or present officers, directors, or employees of Defendants, any judge who presides over this action, and any partner or employee of Class Counsel.

156.    Plaintiff Stewart seeks certification of the following subclasses pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

All persons in the State of Ohio who purchased one or more boohoo products from http://us.boohoo.com between April 9, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

All persons in the State of Ohio who purchased one or more "PrettyLittleThing" products from https://www.prettylittlething.us between May 19, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

All persons in the State of Ohio who purchased one or more "Nasty Gal" products from https://nastygal.com between March 1, 2017, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

157.   The above-described subclasses of persons shall hereafter be referred to collectively as the "Ohio Subclass."  Excluded from the Ohio Subclass are any and all past or present officers, directors, or employees of Defendants, any judge who presides over this action, and any partner or employee of Class Counsel.

158.   Plaintiff Thimot seeks certification of the following subclasses pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All persons in the State of Illinois who purchased one or more boohoo products from http://us.boohoo.com between April 9, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

> All persons in the State of Illinois who purchased one or more "PrettyLittleThing" products from https://www.prettylittlething.us between May 19, 2016, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

> All persons in the State of Illinois who purchased one or more "Nasty Gal" products from https://nastygal.com between March 1, 2017, through the present at a discount from a higher reference price and who have not received a refund or credit for their purchase(s).

159.   The above-described subclasses of persons shall hereafter be referred to collectively as the "Illinois Subclass."  Excluded from the Illinois Subclass are any and all past or present officers, directors, or employees of Defendants, any judge who presides over this action, and any partner or employee of Class Counsel.

160.   There is no California subclass.  There is no claim in this action being pursued on behalf of any California purchaser of Defendants' products.

161.   For reference purposes, collectively, the Nationwide Class (which excludes California purchasers), New York Subclass, Florida Subclass, Maryland Subclass, Massachusetts Subclass, Michigan Subclass, Ohio Subclass, and Illinois Subclass shall be referred to hereafter as the "Class."  Collectively, the New York Subclass, Florida Subclass, Maryland Subclass, Massachusetts Subclass, Michigan Subclass, Ohio Subclass, and

Illinois Subclass shall be referred to hereafter as the "Subclasses."

162.   For reference purposes, April 9, 2016 through the present shall be referred to hereafter as the "Boohoo Class Period."  May 19, 2016 through the present shall be referred to hereafter as the "PLT Class Period."  March 1, 2017 through the present shall be referred to hereafter as the "Nasty Gal Class Period."  Collectively, the Boohoo Class Period, PLT Class Period, and Nasty Gal Class Period shall be referred to hereafter as the "Class Periods."

163.   Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions stated above, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

164.   **Numerosity.**  The putative class members who are part of the Class are so numerous that joinder of all members in one action is impracticable.  The exact number and identities of the members of the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, but on information and belief, Plaintiffs allege that there are in excess of 7 million members.

165.   **Typicality.**  Plaintiffs' claims are typical of those of other members of the Class, all of whom have suffered similar harm due to Defendants' course of conduct as described herein.

166.   **Adequacy of Representation.**  Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.  Plaintiffs have retained attorneys who are experienced in the handling of complex litigation and class actions, and Plaintiffs and their counsel intend to prosecute this action vigorously.

167.   **Existence and Predominance of Common Questions of Law or Fact.** Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary among members of the Class, and which may be determined without reference to the individual circumstances of any member of the Class,

**SECOND AMENDED CLASS ACTION COMPLAINT**

include, but are not limited to, the following:

(a) Whether, during the Class Periods, Defendants advertised false Reference Prices on products offered on their website.

(b) Whether, during the Class Periods, Defendants advertised price discounts from false Reference Prices on products offered on their website.

(c) Whether the products listed on Defendants' website during the Class Periods were offered at their Reference Prices for any reasonably substantial period of time prior to being offered at prices that were discounted from their Reference Prices.

(d) Whether Defendants' Reference Prices on products offered on their websites during the Class Periods are false representations.

(e) Whether and when Defendants learned that false Reference Prices on products offered on their websites during the Class Periods are false representations.

(f) Whether Defendants disclosed to the Class during the Class Periods that the Reference Prices advertised on their websites are not based on former prices.

(g) For the Nationwide Class, does Defendants' deceptive pricing scheme using false Reference Prices constitute "unfair, deceptive, untrue or misleading advertising" in violation of the California Unfair Competition Law, Cal. Bus & Prof. Code § 17200, *et seq.*?

(h) For the Nationwide Class, does Defendants' deceptive pricing scheme using false Reference Prices constitute false advertising in violation of the California False Advertising Law under Business & Professions Code section 17500, *et seq.*?

(i) For the Nationwide Class, does Defendants' deceptive pricing scheme using false Reference Prices violate the California Consumer Legal Remedies Act under California Civil Code section 1750, *et seq.*?

(j) For the Subclasses, does Defendants' pricing scheme using false Reference Prices violate the consumer protection laws of the States of New York, Florida, Maryland, Massachusetts, Michigan, Ohio, and/or Illinois referenced in this Second Amended Complaint?

(k) What did Defendants hope to gain from using a false Reference Price scheme?

(l)     What did Defendants gain from their false Reference Price scheme?

(m)    Whether Defendants' use of false Reference Prices on products offered on their websites during the Class Periods was material.

(n)    Whether Defendants had a duty to disclose to their customers that the Reference prices were fake "original" prices in furtherance of sham sales.

(o)    To what extent did Defendants' conduct cause, and continue to cause, harm to the Class?

(p)    Whether the members of the Class above are entitled to damages and/or restitution.

(q)    What type of injunctive relief is appropriate and necessary to enjoin Defendants from continuing to engage in false or misleading advertising?

(r)    Whether Defendants' conduct was undertaken with conscious disregard of the rights of the members of the classes described above and was done with fraud, oppression, and/or malice.

168.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class described above is impracticable.  Requiring each individual class member to file an individual lawsuit would unreasonably consume the amounts that may be recovered.  Even if every member of the Class could afford individual litigation, the adjudication of at least tens of thousands of identical claims would be unduly burdensome to the courts.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the members of the Class.  Plaintiff anticipates no difficulty in the management of this action as a class action.  The prosecution of separate actions by individual members of the Class may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the

other members of the Class who are not parties to such adjudications, or that would substantially impair or impede the ability of such non-party class members to protect their interests.

169.   **Ascertainability.**   Defendants keep extensive computerized records of their sales and customers through, among other things, databases storing customer orders, customer order histories, customer profiles, and general marketing programs. Defendants have one or more databases through which all members of the Class may be identified and ascertained, and they maintain contact information, including email addresses and home addresses (such as billing, mailing, and shipping addresses), through which notice of this action is capable of being disseminated in accordance with due process requirements.

## VI.   ALTER EGO AND AGENCY RELATIONSHIP BETWEEN THE DEFENDANTS

### A.   <u>Boohoo Defendants.</u>

170.   Upon information and belief and at all times relevant to this Complaint: Boohoo Group exercised substantial decision-making, discretion, and control over the activities of Boohoo USA.  This included the exercise of substantial decision-making, discretion, and control over Boohoo USA with respect to its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of Boohoo's website: http://us.boohoo.com.  Likewise, Boohoo USA acted on behalf of Boohoo Group as its agent within California, as well as the entire U.S., and was subject to its control with respect to all of its activities, including, without limitation, its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of Boohoo's website: http://us.boohoo.com.

171.   Upon information and belief and at all times relevant to this Complaint: Boohoo Limited exercised substantial decision-making, discretion, and control over the activities of Boohoo USA.  This included the exercise of substantial decision-making, discretion, and control over Boohoo USA with respect to its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of Boohoo's website:

http://us.boohoo.com.  Likewise, Boohoo USA acted on behalf of Boohoo Limited as its agent within California, as well as the entire U.S., and was subject to its control with respect to all of its activities, including, without limitation, its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of Boohoo's website: http://us.boohoo.com.

172.   Upon information and belief and at all times relevant to this Complaint: Boohoo Group exercised substantial decision-making, discretion, and control over the activities of Boohoo Limited.  This included the exercise of substantial decision-making, discretion, and control over Boohoo Limited with respect to its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of Boohoo's website: https://us.boohoo.com.  Likewise, Boohoo Limited acted on behalf of Boohoo Group as its agent within California, as well as the entire U.S., and was subject to its control with respect to all its activities, including, without limitation, its marketing activities relating to the sale of products to all U.S. consumers, on the U.S. version of Boohoo's website.

173.   Upon information and belief and at all times relevant to this Complaint: Boohoo Group, in actuality, was not really separate from Boohoo USA or Boohoo Limited.  Specifically, there is such unity of interest and ownership that separate personalities of the three entities no longer exist and the failure to disregard their separate identities would result in fraud or injustice.

174.   Upon information and belief and at all times relevant to this Complaint: Likewise, Boohoo Limited, in actuality, was not really separate from Boohoo USA.  Specifically, there is such unity of interest and ownership that separate personalities of the two entities no longer exist and the failure to disregard their separate identities would result in fraud or injustice.

175.   Upon information and belief and at all times relevant to this Complaint:  The Boohoo Companies are all materially involved in the marketing and sale of products to U.S. consumers on the U.S. version of Boohoo's website: http://us.boohoo.com.  This includes involvement in the false advertising and marketing, deceptive pricing scheme, and

other wrongdoing set forth in this Complaint.

176.   The information forming the basis upon which Plaintiff has formed the beliefs set forth in paragraphs 155 through 178 includes, but is not limited to, the information stated in the ensuing paragraphs.

177.   Based on annual reports and at all times relevant to this Complaint: Boohoo Group had a controlling interest in and has 100% ownership of Boohoo Limited and Boohoo USA; and Boohoo Limited had a controlling interest in and has 100% ownership of Boohoo USA.   Based upon information and belief and at all times relevant to this Complaint: The "subsidiaries" of Boohoo Group (including Boohoo Limited and Boohoo USA) operated like divisions or departments within the larger Boohoo company.   Boohoo Group existed for the purpose of exercising dominion and control over the Boohoo Companies, to fund their activities, and to collect their profits.   Boohoo Limited acted on behalf of Boohoo Group and was substantially subject to its control.   Boohoo USA acted on behalf of both Boohoo Group and Boohoo Limited and was substantially subject to their control.

178.   Upon information and belief and at all times relevant to this Complaint: The Boohoo Companies are all materially involved in the marketing and sale of products to U.S. consumers on the U.S. version of the company's website, which can be found at http://us.boohoo.com.   This includes involvement in the false advertising and marketing, deceptive pricing scheme, and other wrongdoing set forth in this Second Amended Complaint.

179.   Boohoo Group itself boasts that: "We Are boohoo, the brand behind the clothes helping you to #DOYOURTHING. Our brands, boohoo, boohooMAN, PrettyLittleThing, Nasty Gal, Miss Pap, Karen Millen and Coast design, source, market and sell clothing, shoes, accessories and beauty products.   We've been doing our thing since 2006 and *we've gone global with offices in* Manchester, Burnley, London, Leicester, Paris, *Los Angeles*, and Sydney.   We're always bringing something new with up to 100 new pieces hitting site every day. And we're 24/7 on social with millions of followers."

Boohoo Group sees itself as having "grown from Manchester's best kept fashion secret to one of the fastest growing *international retailers*," through the various brands Boohoo Group controls, including boohoo, PrettyLittleThing, and NastyGal.

180.   Boohoo Group routinely tells investors that it sells its products to customers across the globe, which includes the United States.  For example, in one communication to its investors, Boohoo Group states:  "Our vision is to lead the fashion e-commerce market *globally*, in a way that delivers for *our* customers, people, suppliers and stakeholders. *Our brands* operate along the same principles today as when boohoo was founded in 2006: through *a test and repeat model* that brings the latest trends and fashion inspiration in a matter of weeks to *our customers across the world*."  Similarly, Boohoo Group tells investors: "*Our* brands design, source, market and sell clothing, shoes, accessories and beauty products targeted at 16-40-year-old consumers in the UK and *internationally*."

181.   In another communication, Boohoo Group states: "we want to thank *our customers*, *our amazing teams* and our wonderful suppliers for their continued support." Boohoo itself thus admits that it controls its brands and considers the customers and teams of its various brands its own direct customers and teams.  Boohoo Group also boasts of having "5000+ colleagues working across the world," referring to its employees across its various brands and subsidiaries, including Boohoo USA and Boohoo Limited, as one big collective company would.

182.   By way of further example, Boohoo Group's LinkedIn page states they have offices around the world including "Los Angeles," with PLT listed as one of "our brands." Boohoo Group admittedly considers the offices and headquarters of its various subsidiaries as its own offices and headquarters within any given country.

183.   The philosophy of the Boohoo Companies is that they do not open stores, they open "countries" by opening a marketing hub within a country.  For example, Boohoo Group controls and directs sales of its boohoo products in the U.S. by controlling and utilizing together Boohoo Limited (one of Boohoo Group's international "Trading" arms) and Boohoo USA (Boohoo Group's U.S. "Marketing" hub for the sale of boohoo products

in the U.S.).

184.   Boohoo Limited's 2019 Annual Report states that its "controlling party is boohoo group plc, [i.e., Boohoo Group]." Boohoo Group's 2020 Annual Report states that its "financial statements consolidate those of its subsidiaries and the Employee Benefit Trust. All intercompany transactions between group companies are eliminated." Boohoo Group also boasts that: "Subsidiaries are entities controlled by the group [referring to Boohoo Group]. The group controls an entity when the group is exposed to, or has *rights to, variable returns from its involvement with the entity* and *has the ability to affect those returns through its power over the entity*." The same report lists Boohoo Limited and Boohoo USA as "subsidiaries."

185.   Upon information and belief and at all times relevant to this Complaint: In or about 2017-18, Boohoo Group, exercising its dominion and control over its various subsidiaries and brands, directed its subsidiaries, including Boohoo, to leverage the over-arching benefits and shared service functions of the collective Boohoo Group.  As an example, Boohoo Group and Boohoo Limited directed and caused Boohoo USA to purchase a property at 2135 Bay Street, Los Angeles, California for $3.5 million, and then to transfer that property to NastyGal USA, Inc. (another Boohoo Group subsidiary Boohoo Group controls) for $3.5 million.  As another example, Boohoo Group directed and caused Boohoo Limited to register Boohoo's U.S. trademarks for the collective benefit of the Boohoo Companies.

186.   In August 2019, Boohoo Group issued the following statement concerning the shared supply chain for the Boohoo Companies that supplies products to the U.S., including California: "The boohoo group ('boohoo group') is a leading online fashion *retail group*. *Our* brands include boohoo, boohooMAN, PrettyLittleThing, Nasty Gal and MissPap. *Our brands* design, source, market and sell clothing, shoes, accessories and beauty products to customers *in almost every country in the world*. *These products are distributed globally from two warehouses in the UK, located in Burnley and in Sheffield*."

187.   Indeed, the Boohoo Companies are run and controlled by a common,

overlapping group of individuals who hold the same or similar position(s) at each company. The Boohoo Companies run at the control and direction of Mahmud Kamani ("M. Kamani"). M. Kamani is an Executive Director and the Co-founder & Group Executive Chairman of the Boohoo Group; he is also the Chief Executive Officer of Boohoo USA, with an address of "49-51 Dale Street Manchester, England M1 2HF United Kingdom of Great Britain and Northern Ireland (the)," the same address as Boohoo Group and Boohoo Limited's headquarters. Similarly, Neil Catto ("Catto"), is an Executive Director and Chief Financial Officer of Boohoo Group; he is also the Chief Financial Officer of Boohoo USA with the same Manchester address as M. Kamani. M. Kamani, Catto, and Carol Kane ("Kane") are also Directors of Boohoo Limited. M. Kamani and Kane controlled Boohoo Limited almost entirely until 2019 when they transferred the company to a holding company, Boohoo Holdings, and took on positions as "Directors." Nevertheless, Kamani and Kane continue to exercise significant dominance and control over Boohoo Limited along with Boohoo Group; meanwhile Catto runs the finances for the Boohoo Companies.

188. As further proof of the absence of any meaningful separateness of Boohoo Group and Boohoo Limited the companies share the same office address located at 49-51 Dale Street, Manchester, England M1 2HF. Boohoo Group and Boohoo Limited maintain their U.S. headquarters and principal place of business at Boohoo USA's headquarters and principal place of business located at 8431 Melrose Place, Los Angeles, CA 90069. Outside of these Los Angeles headquarters, there is no other place within the United States where Boohoo Limited or Boohoo USA have employees, offices, facilities, or any other physical presence.

189. Boohoo Group also shares numerous administrative functions across all of its brands, including boohoo, PrettyLittleThing, and Nasty Gal. This includes, among other things, financing, information technology, e-commerce, and procurement of non-stock items.

190. Upon information and belief and at all times relevant to this Complaint: In 2019, Boohoo Group and Boohoo Limited directed and caused Boohoo USA to move the

Boohoo Companies' collective U.S. principal place of business, office, and marketing hub in the U.S. from New York to Los Angeles, California.  Boohoo Group now boasts about having offices in "Los Angeles."  The Boohoo Companies' U.S. headquarters is presently located at 8431 Melrose Place, Los Angeles, CA 90069.  This is a 4,000-square-foot facility that boasts fancy offices and showrooms complete with lounge areas, an acrylic staircase, a fully stocked bar, custom furniture, neon signage, a wraparound balcony, and studio to create content for the Boohoo's U.S. website.

191.   Upon information and belief and at all times relevant to this Complaint: Boohoo USA is closely involved with, and responsible in substantial part for, marketing and product direction on http://us.boohoo.com.  This is the same site from which, as detailed above, certain Plaintiffs and members of the Class purchased items and which caused harm to them as a result of the false advertising and marketing, deceptive pricing scheme, and other wrongdoing described in this Complaint.

192.   In addition, Boohoo USA collects all credit card payments of U.S. sales.  In other words, every time a credit card sale is made in the U.S. on http://us.boohoo.com, Boohoo USA receives the money.  This money from U.S. sales is later remitted to Boohoo Limited and/or Boohoo Group with a markup, which further demonstrates that they are all in reality one big company.

193.   Boohoo USA maintains Boohoo Group and Boohoo Limited's U.S. headquarters and marketing office for the "boohoo" brand in Los Angeles, California, so that the Boohoo Companies can maximize sales to U.S. residents.  For example, in its annual report Boohoo Group, which owns 100% of Boohoo USA through Boohoo Limited, describes Boohoo USA's principal activity as "Marketing," and identifies the address of Boohoo USA's Los Angeles headquarters office.  Boohoo Limited, which owns 100 percent of Boohoo USA, also describes Boohoo USA's "Principal activity" as "Marketing."

194.   There are no physical "Boohoo" retail stores in the U.S.  Nor is Plaintiff aware of any "Boohoo" business other than the online sale of clothing, shoes, and accessories.

-54-
**SECOND AMENDED CLASS ACTION COMPLAINT**

Therefore, the only "marketing" Boohoo USA is engaged in is with regards to the sale of boohoo clothing, shoes, and accessories to U.S. customers on http://us.boohoo.com—the same marketing that, as described below, constitutes false advertising in violation of the law.

195.   Based on the foregoing upon information and belief and at all times relevant to this Complaint:  In conjunction with Boohoo USA, Boohoo Group and Boohoo Limited are involved in the operation and marketing aspects of http://us.boohoo.com, and in directing the U.S. marketing activities of Boohoo USA in order to directly sell goods in the U.S. market.

196.   As further proof that Boohoo Group controls the "boohoo" brand through the Boohoo Companies acting as one big company, Boohoo calls the collective companies the "boohoo Family."  The Boohoo Companies operate a careers website stating that "boohoo" as a brand has offices in "Manchester, Burnley, London, Leicester, Paris, and Los Angeles."  When searching for jobs to "BE PART OF THE BOOHOO FAMILY," users can choose Los Angeles as a location to search.  As of August 3, 2020, Boohoo was hiring a permanent "Social Media Coordinator" to be based in Los Angeles as a "[f]ull time employee working out of the boohoo US office in LA," and "working with the US marketing team and members of the UK social teams."  Under the overarching direction of Boohoo Group, Boohoo Limited in the UK and Boohoo USA in Los Angeles together coordinate the marketing and sales of boohoo products to U.S. and California residents.

197.   Upon information and belief and at all times relevant to this Complaint:  For the collective benefit of the Boohoo Companies, Boohoo USA solicited a paid intern to "[a]ssist on day to day project management and support for the US marketing team (creating and updating proper documents, raising POs, overall marketing admin tasks)[;] [a]ssist in planning and executing overall social media content and campaign strategies from a US perspective for boohoo initiatives (social, paid social, email, web)[;] [a]ssist in provide tracking, analytics, and reporting of performance for all US led campaigns on boohoo platforms[;] [a]ssist in conceptualizing and developing US led initiatives that

represent the brand and are consistent with brand identity."

198.   Upon information and belief and at all times relevant to this Complaint: In 2015, Boohoo Group and Boohoo Limited directed and caused Boohoo USA to sponsor at least one H-1B visa for a "Vice President of Marketing" for the collective benefit of the Boohoo Companies.

199.   Upon information and belief and at all times relevant to this Complaint: Boohoo Group, through, *inter alia*, M. Kamani, exercised substantial dominion and control over Boohoo Limited and Boohoo USA's operations, disregarded the existence of these entities, failed to maintain an arm's length relationship with these subsidiaries, used substantial assets of these subsidiaries for its own benefit, caused the assets of these subsidiaries to be transferred to itself without adequate consideration in a manner that left the subsidiaries undercapitalized to pay judgments and other such obligations.

200.   Under the facts and circumstances of this case, adherence to the fiction of separate existence of Boohoo Group, Boohoo Limited, and Boohoo USA would sanction a fraud and promote injustice in that it would allow the Boohoo Companies to use their corporate layering scheme to continue selling goods in the U.S. market without following federal, state, and local laws, and to avoid payment of damages to U.S. residents for injuries caused by the Boohoo Companies acting collectively as one big unit.

**B.   PLT Defendants**

201.   Upon information and belief and at all times relevant to this Complaint: Boohoo Group exercised substantial decision-making, discretion, and control over the activities of PLT USA.   This included the exercise of substantial decision-making, discretion, and control over PLT USA with respect to its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of PLT's website: https://www.prettylittlething.us.  Likewise, PLT USA acted on behalf of Boohoo Group as its agent within California, as well as the entire U.S., and was subject to its control with respect to all its activities, including, without limitation, its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of PLT's website:

https://www.prettylittlething.us.

202.   Upon information and belief and at all times relevant to this Complaint: PLT Limited exercised substantial decision-making, discretion, and control over the activities of PLT USA.  This included the exercise of substantial decision-making, discretion, and control over PLT USA with respect to its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of PLT's website: https://www.prettylittlething.us.  Likewise, PLT USA acted on behalf of PLT Limited as its agent within California, as well as the entire U.S., and was subject to its control with respect to all of its activities, including, without limitation, its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of PLT's website: https://www.prettylittlething.us.

203.   Upon information and belief and at all times relevant to this Complaint: Boohoo Group exercised substantial decision-making, discretion, and control over the activities of PLT Limited.  This included the exercise of substantial decision-making, discretion, and control over PLT Limited with respect to its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of PLT's website: https://www.prettylittlething.us.  Likewise, PLT Limited acted on behalf of Boohoo Group as its agent within California, as well as the entire U.S., and was subject to its control with respect to all of its activities, including, without limitation, its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of PLT's website: https://www.prettylittlething.us.

204.   Upon information and belief and at all times relevant to this Complaint: Boohoo Group, in actuality, was not really separate from PLT USA or PLT Limited.  Specifically, there is such unity of interest and ownership that separate personalities of the three entities no longer exist and the failure to disregard their separate identities would result in fraud or injustice.

205.   Upon information and belief and at all times relevant to this Complaint: Likewise, PLT Limited, in actuality, was not really separate from PLT USA.  Specifically,

there is such unity of interest and ownership that separate personalities of the two entities no longer exist and the failure to disregard their separate identities would result in fraud or injustice.

206.   Upon information and belief and at all times relevant to this Complaint:  The Boohoo-PLT Companies are all materially involved in the marketing and sale of products to U.S. consumers on the U.S. version of PLT's website:  https://www.prettylittlething.us. This includes involvement in the false advertising and marketing, deceptive pricing scheme, and other wrongdoing set forth in this Complaint.

207.   The information forming the basis upon which Plaintiff has formed the beliefs set forth in paragraphs 186 through 206 includes, but is not limited to, the information stated in the ensuing paragraphs.

208.   Based on annual reports and other public sources, at all times relevant to this Complaint: Boohoo Group had a controlling interest in and has 100% ownership of PLT Limited and 100% ownership of PLT USA both directly and through its subsidiaries; and PLT Limited had a controlling interest in and has 100% ownership of PLT USA.  Based upon information and belief and at all times relevant to this Complaint: The "subsidiaries" of Boohoo Group (including PLT Limited and PLT USA) operated like divisions or departments within the larger Boohoo company.  Boohoo Group existed for purpose of exercising dominion and control over the Boohoo-PLT Companies, to fund their activities, and to collect their profits.  PLT Limited acted on behalf of Boohoo Group and was substantially subject to its control.  PLT USA acted on behalf of both Boohoo Group and PLT Limited and was substantially subject to their control.

209.   Upon information and belief and at all times relevant to this Complaint: The Boohoo-PLT Companies are all materially involved in the marketing and sale of products to U.S. consumers on the U.S. version of PLT's website:  https://www.prettylittlething.us. This includes involvement in the false advertising and marketing, deceptive pricing scheme, and other wrongdoing set forth in this Complaint.

210.   As noted above, Boohoo Group itself boasts that: "We Are boohoo, the brand

behind the clothes helping you to #DOYOURTHING. Our brands, boohoo, boohooMAN, *PrettyLittleThing*, Nasty Gal, Miss Pap, Karen Millen and Coast design, source, market and sell clothing, shoes, accessories and beauty products. We've been doing our thing since 2006 and *we've gone global with offices in* Manchester, Burnley, London, Leicester, Paris, *Los Angeles*, and Sydney. We're always bringing something new with up to 100 new pieces hitting site every day. And we're 24/7 on social with millions of followers." Boohoo Group sees itself as having "grown from Manchester's best kept fashion secret to one of the fastest growing *international retailers*," through the various brands Boohoo Group controls, including boohoo, PrettyLittleThing, and NastyGal.

211. Boohoo Group routinely tells investors that it sells its products to customers across the globe, which includes the United States. For example, in one communication to its investors, Boohoo Group states: "Our vision is to lead the fashion e-commerce market *globally*, in a way that delivers for *our* customers, people, suppliers and stakeholders. *Our brands* operate along the same principles today as when boohoo was founded in 2006: through *a test and repeat model* that brings the latest trends and fashion inspiration in a matter of weeks to *our customers across the world*." Similarly, Boohoo Group tells investors: "*Our brands* design, source, market and sell clothing, shoes, accessories and beauty products targeted at 16-40-year-old consumers in the UK and *internationally*."

212. In another communication, Boohoo Group states: "we want to thank *our customers*, *our amazing teams* and our wonderful suppliers for their continued support." Boohoo Group itself thus admits that it controls its brands and considers the customers and teams of its various brands its own direct customers and teams. Boohoo Group also boasts of having "5000+ colleagues working across the world," referring to its employees across its various brands and subsidiaries, including PLT USA and PLT Limited, as one big collective company would.

213. By way of further example, Boohoo Group's LinkedIn page states they have offices around the world including "*Los Angeles*," with PLT listed as one of "*our* brands." Boohoo Group admittedly considers the offices and headquarters of its various subsidiaries

as its own offices and headquarters within any given country.

214.   The philosophy of the Boohoo-PLT Companies is that they do not open stores, they open "countries" by opening a marketing hub within a country.  Boohoo Group thus controls and directs sales of its PLT products in the U.S. market by controlling and utilizing together PLT Limited (one of Boohoo Group's international "Trading" arm) and PLT USA (Boohoo Group's U.S. "Marketing" hub for the sale of PLT products in the U.S.).

215.   PLT Limited's 2019 Annual Report states that "[t]he company [referring to PLT Limited] *is controlled by boohoo group plc* and *is included in the consolidated financial statements of boohoo group plc*."  Meanwhile, Boohoo Group's 2020 Annual Report states that its "financial statements consolidate those of its subsidiaries and the Employee Benefit Trust. All intercompany transactions between group companies are eliminated."  Boohoo Group also boasts that: "Subsidiaries are entities controlled by the group [referring to Boohoo Group]. The group controls an entity when the group is exposed to, or has *rights to, variable returns from its involvement with the entity* and *has the ability to affect those returns through its power over the entity*."  The same report lists PLT Limited and PLT USA as "subsidiaries."

216.   Upon information and belief and at all times relevant to this Complaint: In or about 2017-18, Boohoo Group, exercising its dominion and control over its various subsidiaries and brands, directed its subsidiaries, including PLT, to leverage the over-arching benefits and shared service functions of the collective Boohoo Group.  As an example, Boohoo Group and Boohoo Limited directed and caused Boohoo USA to purchase a property at 2135 Bay Street, Los Angeles, California for $3.5 million, and then to transfer that property to NastyGal USA, Inc. (another Boohoo Group subsidiary Boohoo Group controls) for $3.5 million.  As another example, Boohoo Group directed and caused PLT Limited to register PLT's U.S. trademarks for the collective benefit of the Boohoo-PLT Companies.

217.   In August 2019, Boohoo Group issued the following statement concerning the shared supply chain for the Boohoo-PLT Companies that supplies products to the U.S.:

"The boohoo group ("boohoo group") is a leading online fashion *retail group.  Our brands* include boohoo, boohooMAN, *PrettyLittleThing*, Nasty Gal and MissPap.  *Our brands* design, source, market and sell clothing, shoes, accessories and beauty products to customers *in almost every country in the world.  These products are distributed globally from two warehouses in the UK, located in Burnley and in Sheffield.*"

218.   Indeed, the Boohoo-PLT Companies are run and controlled by a common, overlapping group of individuals who hold the same or similar position(s) at each company. The Boohoo-PLT Companies run at the control and direction of Mahmud Kamani.  M. Kamani is the co-founder of the Boohoo Group along with Carol Kane.  Far from keeping a hands-off approach to operating the PLT business, Boohoo Group acknowledged the additional control its management would need to exert over the PLT business by increasing its executive directors' base salaries for the increased workload to "reflect the substantial increase in the scale and complexity of the company following of [sic] the acquisitions of Nasty Gal and PLT and the resulting increase in the responsibilities of the executive directors."  The executive directors Boohoo Group was referring to were Mahmud Kamani, Carol Kane, and Neil Catto—all of whom are directors of PLT Limited.  Catto is also listed as the "CFO" of Boohoo Group *and* PLT USA.  Keri Devine is listed as the "Secretary" for Boohoo Group, PLT Limited, *and* PLT USA.  Meanwhile, Mahmud Kamani's son, Umar Mahmud Kamani, is the CEO of PLT USA.  Based on his position at PLT USA, Umar Mahmud Kamani has been reported as saying that he received a five-year U.S. work visa in 2018 and plans to spend the majority of his time working out of West Hollywood, California to grow the PLT brand internationally from within California working directly with and at the overarching direction of PLT Limited and Boohoo Group.

219.   As further proof of the absence of any meaningful separateness of Boohoo Group and PLT Limited, the companies share the same office address located at 49-51 Dale Street, Manchester, England M1 2HF.

220.   Boohoo Group also shares numerous administrative functions across all of its brands, including boohoo, PrettyLittleThing, and Nasty Gal.  This includes, among other

things, financing, information technology, e-commerce, and procurement of non-stock items.

221.   Upon information and belief and at all times relevant to this Complaint:   In 2019, Boohoo Group and PLT Limited directed and caused PLT USA to open the Boohoo-PLT Companies' collective U.S. principal place of business, office, and marketing hub in Los Angeles, California.   Boohoo Group now boasts about having offices *in "Los Angeles."* The Boohoo-PLT Companies' U.S. headquarters is presently located at 8587 Melrose Avenue, Los Angeles, CA 90069.  This is a large facility that boasts fancy offices and showrooms complete with lounge areas, a fully stocked bar, custom furniture, neon signage, and a studio to create content for the PLT's U.S. website; the content is shared among and between PLT's various international websites.  Umar Mahmud Kamani, PLT USA's CEO was quoted as saying, "There's no brick-and-mortar in the plan. It's more profitable for me, and more beneficial for me, to open a country rather than a store."

222.   Upon information and belief and at all times relevant to this Complaint:  PLT USA is closely involved with, and responsible in substantial part for, marketing on the U.S. version of PLT's website: https://www.prettylittlething.us and leveraging the marketing strategy to PLT's international websites, as it works to grow the brand internationally from within the U.S., according to CEO Umar Mahmud Kamani.  The U.S. website is the same site from which, as detailed above, Plaintiff and members of the class purchased items and that caused harm to Plaintiff and the class because of the false advertising and marketing, deceptive pricing scheme, and other wrongdoing described in this Complaint.

223.   In addition, PLT USA collects all credit card payments of U.S. sales.  In other words, every time a credit card sale is made in the U.S. on https://prettylittlething.us, PLT USA receives the money.  This money from U.S. sales is later remitted to PLT Limited and/or Boohoo Group with a markup, which further demonstrates that they are all in reality one big company.

224.  PLT USA thus maintains Boohoo Group and PLT Limited's U.S. headquarters and marketing office for the "PLT" brand in Los Angeles, California, so that

the Boohoo-PLT Companies can maximize sales to U.S. residents and grow the business internationally.  For example, in its annual report Boohoo Group, which owns and exercises dominance and control over PLT USA through PLT Limited, describes PLT USA's principal activity as "Marketing," and identifies the address of PLT USA's Los Angeles headquarters office.  PLT Limited, which also owns and exercises dominance and control over PLT USA, also describes PLT USA's "Principal activity" as "Marketing."

225.   There are no physical "PLT" retail stores in the U.S.  Nor is Plaintiff aware of any "PLT" business other than the online sale of clothing, shoes, and accessories.  Therefore, the only "marketing" PLT USA is engaged in is with regards to the sale of "PrettyLittleThing" clothing, shoes, and accessories to U.S. customers on https://www.prettylittlething.us—the same marketing that, as described herein, constitutes false advertising in violation of the law.

226.   Based on the foregoing upon information and belief and at all times relevant to this Complaint:  In conjunction with PLT USA, Boohoo Group and PLT Limited are involved in the operation and marketing aspects of https://www.prettylittlething.us, and in directing the U.S. marketing activities of PLT USA in order to directly sell goods in the U.S. and California markets.

227.   Upon information and belief and at all times relevant to this Complaint:  Boohoo Group, through M. Kamani, among others, exercised substantial dominion and control over PLT Limited and PLT USA's operations, disregarded the existence of these entities, failed to maintain an arm's length relationship with these subsidiaries, used substantial assets of these subsidiaries for its own benefit, caused the assets of these subsidiaries to be transferred to itself without adequate consideration in a manner that left the subsidiaries undercapitalized to pay judgments and other such obligations.

228.   Under the facts and circumstances of this case, adherence to the fiction of separate existence of Boohoo Group, PLT Limited, and PLT USA would sanction a fraud and promote injustice in that it would allow the Boohoo Companies to use their corporate layering scheme to continue selling goods in U.S. markets without following federal, state,

or local laws, and to avoid payment of damages to U.S. residents for injuries caused by the Boohoo Companies acting collectively as one big unit.

### C.   <u>Nasty Gal Defendants</u>

229.   Upon information and belief and at all times relevant to this Complaint: Boohoo Group exercised substantial decision-making, discretion, and control over the activities of Nasty Gal USA.  This included the exercise of substantial decision-making, discretion, and control over Nasty Gal USA with respect to its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of http://nastygal.com. Likewise, Nasty Gal USA acted on behalf of Boohoo Group as its agent within California, as well as the entire U.S., and was subject to its control with respect to all of its activities, including, without limitation, its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of http://nastygal.com.

230.   Upon information and belief and at all times relevant to this Complaint:  Nasty Gal Limited exercised substantial decision-making, discretion, and control over the activities of Nasty Gal USA.  This included the exercise of substantial decision-making, discretion, and control over Nasty Gal USA with respect to its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of http://nastygal.com. Likewise, Nasty Gal USA acted on behalf of Nasty Gal Limited as its agent within California, as well as the entire U.S., and was subject to its control with respect to all of its activities, including, without limitation, its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of http://nastygal.com.

231.   Upon information and belief and at all times relevant to this Complaint: Boohoo Group exercised substantial decision-making, discretion, and control over the activities of Nasty Gal Limited.  This included the exercise of substantial decision-making, discretion, and control over Nasty Gal Limited with respect to its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of http://nastygal.com.  Likewise, Nasty Gal Limited acted on behalf of Boohoo Group as its agent within California, as well as the entire U.S., and was subject to its control with respect

to all of its activities, including, without limitation, its marketing activities relating to the sale of products to all U.S. consumers on the U.S. version of http://nastygal.com.

232.   Upon information and belief and at all times relevant to this Complaint: Boohoo Group, in actuality, was not really separate from Nasty Gal USA or Nasty Gal Limited.   Specifically, there is such unity of interest and ownership that separate personalities of the three entities no longer exist and the failure to disregard their separate identities would result in fraud or injustice.

233.   Upon information and belief and at all times relevant to this Complaint: Likewise, Nasty Gal Limited, in actuality, was not really separate from Nasty Gal USA. Specifically, there is such unity of interest and ownership that separate personalities of the two entities no longer exist and the failure to disregard their separate identities would result in fraud or injustice.

234.   Upon information and belief and at all times relevant to this Complaint:  The Boohoo-NG Companies are all materially involved in the marketing and sale of products to U.S. consumers, on the U.S. version of the company's website, located at http://nastygal.com.   This includes involvement in the false advertising and marketing, deceptive pricing scheme, and other wrongdoing set forth in this Complaint.

235.   The information forming the basis upon which Plaintiff has formed the beliefs set forth in paragraphs 214 through 245 includes, but is not limited to, the information stated in the ensuing paragraphs.

236.   Based on annual reports and other public sources at all times relevant to this Complaint: Boohoo Group had a controlling interest in and has 100% ownership of Nasty Gal Limited and 100% ownership in Nasty Gal USA; and Nasty Gal Limited had a controlling interest in, and has 100% ownership of, Nasty Gal USA.   Based upon information and belief and at all times relevant to this Complaint:  The "subsidiaries" of Boohoo Group (including Nasty Gal Limited and Nasty Gal USA) operated like divisions or departments within the larger Boohoo company.  Boohoo Group existed for purpose of exercising dominion and control over the Boohoo-NG Companies, to fund their activities,

and to collect their profits.  Nasty Gal Limited acted on behalf of Boohoo Group and was substantially subject to its control.  Nasty Gal USA acted on behalf of both Boohoo Group and Nasty Gal Limited and was substantially subject to their control.

237.  Boohoo Group itself boasts that:  "We Are boohoo, the brand behind the clothes helping you to #DOYOURTHING.  Our brands, boohoo, boohooMAN, PrettyLittleThing, Nasty Gal, Miss Pap, Karen Millen and Coast design, source, market and sell clothing, shoes, accessories and beauty products.  We've been doing our thing since 2006 and we've gone global with offices in Manchester, Burnley, London, Leicester, Paris, Los Angeles, and Sydney.  We're always bringing something new with up to 100 new pieces hitting site every day. And we're 24/7 on social with millions of followers."  Boohoo Group sees itself as having "grown from Manchester's best kept fashion secret to one of the fastest growing international retailers," through the various brands Boohoo Group controls, including boohoo, PrettyLittleThing, and Nasty Gal.

238.  Boohoo Group routinely tells investors that it sells its products to customers across the globe, which includes the United States and, specifically, California.  For example, in one communication to its investors, Boohoo Group states:  "Our vision is to lead the fashion e-commerce market *globally*, in a way that delivers for *our* customers, people, suppliers and stakeholders.  *Our* brands operate along the same principles today as when boohoo was founded in 2006:  through *a test and repeat model* that brings the latest trends and fashion inspiration in a matter of weeks to *our customers across the world*."  Similarly, Boohoo Group tells investors:  "*Our* brands design, source, market and sell clothing, shoes, accessories and beauty products targeted at 16-40-year-old consumers in the UK and *internationally*."

239.  In another communication, Boohoo Group states: "we want to thank *our customers, our amazing teams* and our wonderful suppliers for their continued support."  Boohoo Group itself thus admits that it controls its brands and considers customers of its various brands its own direct customers and teams.  Boohoo Group also boasts of having "5000+ colleagues working across the world," referring to its employees across its various

brands and subsidiaries, including Nasty Gal USA and Nasty Gal Limited, as one big collective company would.

240.   Boohoo Group's own public filings and statements published in the public record make it very clear that it operates in the United States—and in particular, operates Nasty Gal in Los Angeles.  For example, in 2018, it stated in its Annual Report:  "*We* opened new offices in Los Angeles for *our* US marketing team and in Manchester for the expanding design, product and buying teams."  By way of further example, Boohoo Group's LinkedIn page states they have offices around the world, including "Los Angeles," with Nasty Gal listed as one of "our brands."  Boohoo Group admittedly considers the offices and headquarters of its various subsidiaries as its own offices and headquarters within any given country.

241.   The philosophy of all the companies owned and controlled by Boohoo Group is that they do not open stores, they open "countries" by opening a marketing hub within a country.  For example, Boohoo Group controls and directs sales of its Nasty Gal products in the U.S. by controlling and utilizing together Nasty Gal Limited (Boohoo Group's international "Trading" arm) and Nasty Gal USA (Boohoo Group's U.S. "Market" hub).

242.   Nasty Gal Limited refers to Boohoo Group PLC as its "ultimate parent undertaking and *controlling* party."

243.   Boohoo Group's 2020 Annual Report states that its "financial statements consolidate those of its subsidiaries and the Employee Benefit Trust.  All intercompany transactions between group companies are eliminated."  Boohoo Group also boasts that: "Subsidiaries are entities controlled by the group [referring to Boohoo Group].  The group controls an entity when the group is exposed to, or has rights to, variable returns from its involvement with the entity and has the ability to affect those returns through its power over the entity."  The same report lists Nasty Gal Limited and Nasty Gal USA as "subsidiaries."

244.   Upon information and belief and at all times relevant to this Complaint:  In or about 2017-18, Boohoo Group, exercising its dominion and control over its various

subsidiaries and brands, directed Boohoo, Nasty Gal, and PrettyLittleThing to leverage the over-arching benefits and shared service functions of the collective Boohoo Group.  As an example, Boohoo Group and Boohoo.com UK Limited directed and caused Boohoo.com USA Inc. to purchase a property at 2135 Bay Street, Los Angeles, California for $3.5 million, and then to transfer that property to Nasty Gal USA for $3.5 million.

245.   In August 2019, Boohoo Group issued the following statement concerning the shared supply chain for all the companies owned and controlled by Boohoo Group which supplies products to the U.S., including California: "The boohoo group ('boohoo group') is a leading online fashion retail group.  Our brands include boohoo, boohooMAN, PrettyLittleThing, Nasty Gal and MissPap.  Our brands design, source, market and sell clothing, shoes, accessories and beauty products to customers in almost every country in the world. *These products are distributed globally from two warehouses in the UK, located in Burnley and in Sheffield.*"

246.   Indeed, the Boohoo-NG Companies are run and controlled by a common, overlapping group of individuals who hold the same or similar position(s) at each company. The Boohoo-NG Companies run at the control and direction of Mahmud Kamani.  M. Kamani is an Executive Director and the Co-founder & Group Executive Chairman of the Boohoo Group; he is also the Chief Executive Officer of Nasty Gal USA, with an address of 2135 Bay Street, Los Angeles, California 90021," the same address as Nasty Gal's U.S. headquarters.  Similarly, Neil Catto, is an Executive Director and Chief Financial Officer of Boohoo Group; he is also the Chief Financial Officer of Nasty Gal USA with the same Los Angeles address as M. Kamani.  M. Kamani and Catto also run Nasty Gal Limited as Directors.

247.   In addition to M. Kamani and Catto, Boohoo Group shares the following individuals in an executive management role:  Carol Kane (Co-Founder and Executive Director of Boohoo Group and Director of Nasty Gal Limited), John Lyttle (CEO of Boohoo Group and Director of Nasty Gal Limited), Keri Devine (Secretary of both companies),

248.   Moreover, in addition to M. Kamani and Catto, Allan Pollitt has an executive management role in both Nasty Gal Limited (Director) and Nasty Gal USA (Company Secretary).

249.   M. Kamani and Carol Kane are also substantial shareholders of Boohoo Group.  On information and belief, they also have substantial ownership stakes in Nasty Gal Limited and Nasty Gal USA.

250.   As further proof of the absence of any meaningful separateness of Boohoo Group and Nasty Gal Limited, the companies share the same office address located at 49-51 Dale Street, Manchester, England M1 2HF.

251.   Boohoo Group also shares numerous administrative functions across all of its brands, including boohoo, PrettyLittleThing, and Nasty Gal.  This includes, among other things, financing, information technology, e-commerce, and procurement of non-stock items.

252.   The Boohoo-NG Companies' U.S. headquarters is presently located at 2135 Bay Street, Los Angeles, CA 90021.  Outside of these Los Angeles headquarters, there is no other place within the United States where Nasty Gal Limited or Nasty Gal USA have employees, offices, facilities, or any other physical presence.

253.   Upon information and belief and at all times relevant to this Complaint:  Nasty Gal USA is closely involved with, and responsible in substantial part for, marketing on http://nastygal.com.  This is the same site from which, as detailed above, certain Plaintiffs and members of the Class purchased items and which caused harm to them as a result of the false advertising and marketing, deceptive pricing scheme, and other wrongdoing described in this Complaint.

254.   In addition, Nasty Gal USA collects all credit card payments of U.S. sales.  In other words, every time a credit card sale is made in the U.S. on https://nastygal.com, Nasty Gal USA receives the money.  This money from U.S. sales is later remitted to Nasty Gal Limited and/or Boohoo Group with a markup, which further demonstrates that they are all in reality one big company.

255.   Nasty Gal USA maintains Boohoo Group and Nasty Gal Limited's U.S. headquarters and marketing office for the "Nasty Gal" brand in Los Angeles, California, so that the Boohoo-NG Companies can maximize sales to U.S. residents.  For example, in its annual report, Boohoo Group, which owns 100% of Nasty Gal USA through Nasty Gal Limited, describes Nasty Gal USA's principal activity as "Marketing," and identifies the address of Nasty Gal USA's Los Angeles headquarters office.  Nasty Gal Limited, which owns 100 percent of Nasty Gal USA, also describes Nasty Gal USA's "Principal activity" as "Marketing."   Similarly, according to the most recent Statement of Information filed with the California Secretary of State for Nasty Gal USA, the company is engaged in the business of "Marketing services."

256.   There are no physical "Nasty Gal" retail stores in the U.S.  Nor is Plaintiff aware of any "Nasty Gal" business other than the online sale of clothing, shoes, and accessories.  Therefore, the only "marketing" Nasty Gal USA is engaged in is with regards to the sale of "Nasty Gal" clothing, shoes, and accessories to U.S. customers is on http://nastygal.com—the same marketing that, as described above, constitutes false advertising in violation of the law.

257.   Based on the foregoing upon information and belief and at all times relevant to this Complaint:  In conjunction with Nasty Gal USA, Boohoo Group and Nasty Gal Limited are involved in the operation and marketing aspects of http://nastygal.com, and in directing the U.S. marketing activities of Nasty Gal USA in order to directly sell goods in the U.S. and California markets.

258.   Under the overarching direction of Boohoo Group, Nasty Gal Limited in the UK and Nasty Gal USA in Los Angeles together coordinate the marketing and sales of "Nasty Gal" products to U.S. and California residents.

259.   Boohoo Group does not meaningfully distinguish between Nasty Gal Limited and Nasty Gal USA.  It instead describes it as one company or brand, "Nasty Gal," which in 2018, "moved into new office facilities in Los Angeles and in Manchester, adjacent to the boohoo head office" and which "has its roots in Los Angeles . . ."

260.  On Nasty Gal's LinkedIn page, the company makes no distinction between Nasty Gal USA and Nasty Gal Limited.  Instead, the company is simply listed as "Nasty Gal" with its location as "Los Angeles, CA."  On the About page, the company states: "While we're rooted in California, we live globally online.  Our headquarters are based in Downtown LA and Manchester, UK."  On the same page, the company goes further to describe its unmistakable link to Los Angeles, stating it is "rooted in Los Angeles" with a "head office" in "Downtown LA."  The company underscores a fourth time on the same LinkedIn page that Nasty Gal is linked to Los Angeles, stating that its "Headquarters" are in "Los Angeles, CA."  In fact, below this, Nasty Gal includes an interactive map where visitors can see all of Nasty Gal's "Locations," of which, there are only two—Los Angeles and Manchester.

261.  In various press releases and other communications intended for widespread dissemination, Defendants tell the public that Nasty Gal "is based in Los Angeles."

262.  Boohoo.com PLC, which changed its name to Boohoo Group PLC in July 2018, acquired the Nasty Gal brand in 2017.  Shortly after the completion of the acquisition, Boohoo Group announced the company would continue to be based in Los Angeles.

263.  Nasty Gal Limited admits it is not self-funded, but instead relies on Boohoo Group, stating in its 2019 Annual Report:  "[t]he company is financed by its parent company which has indicted [sic] its willingness to continue to funds [sic] the company's operations."

264.  Similarly, in a section of the 2019 Annual Report describing its "Assessment of prospects and viability," Nasty Gal Limited admits that it "is funded by its parent company, boohoo.com plc [Boohoo Group's old name], which has substantial cash resources and is fully supportive of the company."

265.  Far from keeping a hands-off approach to operating the Nasty Gal business, Boohoo Group acknowledged the additional control its management would need to exert over the business by increasing its executive directors' base salaries for the increased workload to "reflect the substantial increase in the scale and complexity of the company

following of [sic] the acquisitions of Nasty Gal and PLT and the resulting increase in the responsibilities of the executive directors." The executive directors Boohoo Group was referring to were Mahmud Kamani, Carol Kane, and Neil Catto—all of whom are directors of Nasty Gal Limited, with M. Kamani and Catto listed as the CEO and CFO, respectively, of Nasty Gal USA, Inc.

266. The compensation of the Directors of Nasty Gal Limited are not paid by Nasty Gal Limited; rather, they are paid by Boohoo Group.

267. Upon information and belief and at all times relevant to this Complaint: Boohoo Group, through, *inter alia*, M. Kamani, exercised substantial dominion and control over Nasty Gal Limited and Nasty Gal USA's operations, disregarded the existence of these entities, failed to maintain an arm's length relationship with these subsidiaries, used substantial assets of these subsidiaries for its own benefit, caused the assets of these subsidiaries to be transferred to itself without adequate consideration in a manner that left the subsidiaries undercapitalized to pay judgments and other such obligations.

268. Upon information and belief and at all times relevant to this Complaint: each of the Defendants herein was an agent, servant, employee, co-conspirator, partner, joint venturer, wholly owned and controlled subsidiary and/or alter ego of each of the remaining Defendants, and was at all times acting within the course and scope of said agency, service, employment, conspiracy, partnership and/or joint venture.

269. Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein. In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

270. Under the facts and circumstances of this case, Defendants, and each of them, acted with such a unity of interest and/or ownership such that there was no individuality or

separateness between them.

271.   Under the facts and circumstances of this case, adherence to the fiction of separate existence of Boohoo Group, Nasty Gal Limited, and Nasty Gal USA would sanction a fraud and promote injustice in that it would allow the Boohoo-NG Companies to use their corporate layering scheme to continue selling goods in U.S. markets without following federal, state, or local laws, and to avoid payment of damages to U.S. residents for injuries caused by the Boohoo-NG Companies acting collectively as one big unit.

272.   Moreover, based on the foregoing allegations in paragraphs 179 to 249, it is clear that Boohoo USA, Boohoo Limited, Boohoo Group, PLT USA, PLT Limited, Nasty Gal USA, and Nasty Gal Limited operated as one big company to market and sell products throughout the U.S., including California.  The Boohoo Group "subsidiaries" (e.g., Boohoo USA and Boohoo Limited) operated like divisions or departments within the larger Boohoo company. Therefore, adherence to the fiction of separate existence of Boohoo Group, Boohoo USA, Boohoo Limited, PLT USA, PLT Limited, Nasty Gal USA, and Nasty Gal Limited would sanction a fraud and promote injustice in that it would allow the Boohoo-NG Companies to use their corporate layering scheme to continue selling goods in U.S. markets without following federal, state, or local laws, and to avoid payment of damages to U.S. residents for injuries caused by the Boohoo-NG Companies acting collectively as one big unit.

273.   In sum, under the facts and circumstances of this case, Defendants, and each of them, acted with such a unity of interest and/or ownership such that there was no individuality or separateness between them.  Defendants are indeed alter egos of one another and any of their debts and obligations should be fully assigned to all of them.

/ / /

/ / /

/ / /

/ / /

/ / /

**SECOND AMENDED CLASS ACTION COMPLAINT**

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

### (By All Plaintiffs Against All Defendants on Behalf of the Nationwide Class (Excluding California Purchasers))

274.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

275.   California Business and Professions Code section 17200 *et seq.*, also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" as well as "unfair, deceptive, untrue or misleading advertising."

276.   A cause of action may be brought under the "unlawful" prong of the UCL if a practice violates another law.  Such an action borrows violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under the UCL.

277.   Here, by engaging in false advertising, as well as the false, deceptive, and misleading conduct alleged above, Defendants have engaged in unlawful business acts and practices in violation of the UCL, including violations of state and federal laws and regulations, such as 15 U.S.C. § 45(a)(1), 16 C.F.R. § 233.1, California Business & Professions Code sections 17500 and 17501, and California Civil Code sections 1770(a)(9) and 1770(a)(13).

278.   The Federal Trade Commission Act ("FTCA") prohibits "unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a)(1).  Under FTC regulations, false former pricing schemes similar to the ones employed by Defendants, are deceptive practices that would violate the FTCA:

(a)   One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article.  If the former price is the actual, bona fide price at which the article was offered to the public

on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison.  Where the former price is genuine, the bargain being advertised is a true one.  If, on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects.

(b)     A former price is not necessarily fictitious merely because no sales at the advertised price were made.  The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of her business, honestly and in good faith – and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based.

(c)     The following is an example of a price comparison based on a fictitious former price.  John Doe is a retailer of Brand X fountain pens, which cost him $5 each.  His usual markup is 50 percent over cost; that is, his regular retail price is $7.50.  In order subsequently to offer an unusual "bargain," Doe begins offering Brand X at $10 per pen.  He realizes that he will be able to sell no, or very few, pens at this inflated price.  But he doesn't care, for he maintains that price for only a few days.  Then he "cuts" the price to its usual level—$7.50—and advertises:  "Terrific Bargain: X Pens, Were $10, Now Only $7.50!"  This is obviously a false claim. The advertised "bargain" is not genuine.

(d)     Other illustrations of fictitious price comparisons could be given. An advertiser might use a price at which he never offered the article at all; he might feature a price which was not used in the regular course of business, or which was not used in the recent past but at some remote period in the past, without making disclosure of that fact; he might use a price that was not openly offered to the public, or that was not maintained for a reasonable length of time, but was immediately reduced.

279.   The FTCA also prohibits the pricing scheme employed by Defendants regardless of whether the product advertisements and representations use the words "regular," "original," or "former" price:

(e)     If the former price is set forth in the advertisement, whether accompanied or not by descriptive terminology such as "Regularly,"

"Usually," "Formerly," etc., the advertiser should make certain that the former price is not a fictitious one.  If the former price, or the amount or percentage of reduction, is not stated in the advertisement, as when the ad merely states, "Sale," the advertiser must take care that the amount of reduction is not so insignificant as to be meaningless.  It should be sufficiently large that the consumer, if he knew what it was, would believe that a genuine bargain or saving was being offered. An advertiser who claims that an item has been "Reduced to $9.99," when the former price was $10, is misleading the consumer, who will understand the claim to mean that a much greater, and not merely nominal, reduction was being offered.

280.   Further, as detailed below in the Second Claim for Relief, Defendants' conduct as described herein also violates California false advertising laws.  Specifically, California Business & Professions Code section 17500 provides, in relevant part, that it is unlawful for any corporation, with intent directly or indirectly to dispose of personal property, to make or disseminate in any "manner or means whatever, including over the Internet, any statement, concerning that . . . personal property . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading[.]"

281.   California law also expressly prohibits false former pricing schemes like the one employed by Defendants.  California Business & Professions Code section 17501, entitled "Worth or value; statements as to former price," states as follows:

> For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

> No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

282.   Moreover, as detailed below in the Third Claim for Relief, Defendants' conduct also violates the California Consumer Legal Remedies Act ("CLRA").  *See* Cal. Civ. Code §§ 1750, *et seq.*  More specifically, Defendants violated the CLRA provisions

prohibiting businesses from "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. § 1770(a)(9), and "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions[.]"  Cal. Civ. Code § 1770(a)(13).

283.   A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

284.   Here, Defendants' actions constitute "unfair" business acts or practices because, as alleged above, Defendants engaged in a misleading and deceptive pricing scheme by advertising and representing false Reference Prices and thereby falsely advertising and representing markdowns or "discounts" that were false and inflated. Defendants' deceptive marketing practice gave consumers the false impression that their products were regularly sold on the market for a substantially higher price in the recent past than they actually were and thus led to the false impression that Defendants' products were worth more than they actually were.  Defendants' acts and practices thus offended an established public policy, and they engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

285.   The harm to Plaintiffs and members of the Class outweighs the utility of Defendants' practices.  There were reasonably available alternatives to further Defendants' legitimate business interests, other than the misleading and deceptive conduct described herein.

286.   A business act or practice is "fraudulent" within the meaning of the UCL if members of the public are likely to be deceived.

287.   Here, members of the public are likely to be deceived by Defendants' conduct as alleged above.   Among other things, Defendants affirmatively misrepresented the Reference Prices of their merchandise, which thereby misled and deceived customers into

believing that they were buying merchandise from Defendants at substantially marked-down and discounted prices.  Defendants' deceptive marketing practice gave consumers the false impression that their products were regularly sold on the market for a substantially higher price in the recent past than they actually were and thus led to the false impression that Defendants' products were worth more than they actually were.

288.   In addition, Defendants had a duty to disclose the truth about their pricing deception, including, among other things, that the Reference Prices advertised and published on the U.S. Websites were not, in fact, prices at which boohoo, PrettyLittleThing, and Nasty Gal items had sold for in the recent past for a reasonably substantial period of time, but that instead, in reality, Defendants' products rarely (if ever) were offered at the advertised Reference Prices.  Defendants also failed to disclose to Plaintiffs and the Class that the Reference Prices were not intended to be based on former prices.  Defendants, however, concealed this material information from customers and the general public.  Members of the public, therefore, were also likely to be deceived by Defendants' failure to disclose material information.

289.   Plaintiffs and each member of the Class suffered an injury in fact and lost money or property as a result of Defendants' unlawful, unfair, and/or fraudulent business practices, and as a result of Defendants' unfair, deceptive, untrue or misleading advertising.

290.   Plaintiffs, on behalf of themselves and the members of the Class, seek restitution and disgorgement of all moneys received by Defendants through the conduct described above.

291.   Plaintiffs, on behalf of themselves and the members of the Class, seek a temporary, preliminary, and/or permanent injunction from this Court prohibiting Defendants from engaging in the patterns and practices described herein, including but not limited to, putting a stop to their deceptive advertisements and false Reference Prices in connection with their sale of boohoo, PrettyLittleThing, and Nasty Gal products on the U.S. Websites.

292.   As noted above in the class definition, the Nationwide Class excludes

California purchasers of Defendants' products during the respective class periods defined above.   Although there are no California purchasers in the Nationwide Class, the Nationwide Class invokes the UCL on the grounds that Defendants do business in California, Defendants have their principal offices in California for purposes of their U.S. business activities, and a substantial part of marketing for the U.S. Websites occurs in California.  *See In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237–38 (N.D. Cal. 2012).   By way of example, Defendants Boohoo.com USA Inc., PretttyLittleThing.com USA Inc., and NastyGal.com USA Inc. (collectively, the "U.S. Entities") all have their principal place of business in California.   These offices are the U.S. headquarters of not only the U.S. Entities, but also of Boohoo Group and the UK Limited Entities.   Boohoo Group considers these Los Angeles offices its own.   By way of further example, the Class made all credit card payments (and possibly payments using all other methods) for purchases made on the U.S. Websites to the U.S. Entities in California.   Plaintiffs have alleged sufficient facts in this Second Amended Complaint to demonstrate that the Nationwide Class may assert the UCL and other California consumer protection statutes against Defendants in this action.

## SECOND CLAIM FOR RELIEF

**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW, CAL. BUS. & PROF. CODE § 17500,** *et seq.*

**(By All Plaintiffs Against All Defendants on Behalf of the Nationwide Class (Excluding California Purchasers))**

293.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

294.   The California False Advertising Law, codified at California Business & Professions Code section 17500, *et seq.* (the "FAL") provides, in relevant part, that it is unlawful for any corporation, with intent directly or indirectly to dispose of personal property, to make or disseminate in any "manner or means whatever, including over the Internet, any statement, concerning that . . . personal property . . . which is untrue or

misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading[.]"  Cal. Bus. & Prof. Code § 17500.  The "intent" required by section 17500 is the intent to dispose of property, and not the intent to mislead the public in the disposition of such property.

295.   Similarly, another section of the FAL provides, in relevant part, that "no price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price . . . within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement."  Cal. Bus. & Prof. Code § 17501.

296.   Here, Defendants routinely disseminated on their website false Reference Prices for the products offered for sale on their website, including to Plaintiffs.  Such statements of Defendants were untrue, or at the very least, were misleading.  Among other things, Defendants rarely, if ever, offered boohoo, PrettyLittleThing, or Nasty Gal products on the U.S. Websites at the Reference Prices displayed in connection with their products.  Further, Defendants rarely, if ever, offered boohoo, PrettyLittleThing, or Nasty Gal products on the U.S. Websites at the Reference Prices within the three months immediately preceding the publication of the Reference Prices.  Defendants thus misled customers, including Plaintiffs, into believing that the Reference Prices are or were genuine original, retail, or former prices and that the "sale" prices relative to the published Reference Prices, in fact, reflected real and substantial discounts.  Defendants' deceptive marketing practice gave consumers the false impression that their products were regularly sold for a substantially higher price in the recent past than they actually were and thus led to the false impression that Defendants' products were worth more than they actually were.

297.   Defendants engaged in this deceptive conduct with the intent to dispose of personal property—namely, with the intent to increase the sale of boohoo, PrettyLittleThing, or Nasty Gal products offered by Defendants on the U.S. Websites.

298.   Defendants knew, or by the exercise of reasonable care should have known,

that the Reference Prices for the boohoo, PrettyLittleThing, or Nasty Gal products sold on the U.S. Websites they disseminated were untrue and/or misleading.  Among other things, Defendants represented the Reference Prices in connection with the boohoo, PrettyLittleThing, or Nasty Gal  products sold on the U.S. Websites even though they knew, or in the exercise of reasonable care should have known, that such products had rarely, if ever, sold at the crossed-out Reference Prices.

299.   As a direct and proximate result of Defendants' misleading and false advertisements, Plaintiffs and members of the Class have suffered injury in fact and have lost money.  As such, Plaintiffs request that this Court order Defendants to restore this money to Plaintiffs and all members of the Class, and to enjoin Defendants from continuing their false and misleading advertising practices.  Otherwise, Plaintiffs, members of the Class, and the broader general public will be irreparably harmed and/or denied an effective and complete remedy.

300.   As noted above in the class definition, the Nationwide Class excludes California purchasers of Defendants' products during the respective class periods defined above.   Although there are no California purchasers in the Nationwide Class, the Nationwide Class invokes the FAL on the grounds that Defendants do business in California, Defendants have their principal offices in California for purposes of their U.S. business activities, and a substantial part of marketing for the U.S. Websites occurs in California.  *See In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237–38 (N.D. Cal. 2012).  By way of example, the U.S. Entities all have their principal place of business in California.  These offices are the U.S. headquarters of not only the U.S. Entities, but also of Boohoo Group and the UK Limited Entities.  Boohoo Group considers these Los Angeles offices its own.  By way of further example, the Class made all credit card payments (and possibly payments using all other methods) for purchases made on the U.S. Websites to the U.S. Entities in California.  Plaintiffs have alleged sufficient facts in this Second Amended Complaint to demonstrate that the Nationwide Class may assert the FAL and other California consumer protection statutes against Defendants in this action.

**THIRD CLAIM FOR RELIEF**

**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT,**

**CAL. CIV. CODE § 1750,** *et seq.*

**(By All Plaintiffs Against All Defendants on Behalf of the Nationwide Class**

**(Excluding California Purchasers))**

301.    Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

302.    The Consumer Legal Remedies Act of 1970, Cal. Civ. Code sections 1750 *et seq.* (the "CLRA") is a California consumer protection statute which allows plaintiffs to bring private civil actions for "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction . . . which results in the sale or lease of goods or services to any consumer."  Cal. Civ. Code § 1770(a).  The purposes of the CLRA are "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."  Cal. Civ. Code § 1760.

303.    Plaintiffs and each member of the Class are "consumers" as defined by California Civil Code section 1761(d).  Defendants' sale of their boohoo, PrettyLittleThing, and Nasty Gal products on their website to Plaintiffs and the Class were "transactions" within the meaning of California Civil Code section 1761(e).  The products purchased by Plaintiffs and the Class are "goods" within the meaning of California Civil Code section 1761(a).

304.    Defendants violated and continue to violate the CLRA by engaging in the following practices prohibited by California Civil Code section 1770(a) in transactions with Plaintiffs and the Class which were intended to result in, and did result in, the sale of Defendants' branded products:

      (a)    Advertising goods or services with intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9)); and

      (b)    Making false or misleading statements of fact concerning reasons for,

existence of, or amounts of price reductions (Cal. Civ. Code § 1770(a)(13)).

305.  With regards to section 1770(a)(9), Defendants advertised and represented their branded products on their website with the "intent not to sell" them as advertised because, among other things, (a) the false Reference Prices advertised in connection with products offered on the U.S. Websites misled and continue to mislead customers into believing the merchandise was previously offered for sale and/or sold at the higher Reference Prices for some reasonably substantial period of time, and (b) Defendants sell their branded products only on their website and thus there is no other channel through which the products have previously been offered for sale and/or sold at the false Reference Prices.

306.  With regards to section 1770(a)(13), Defendants made false or misleading statements of fact concerning the "existence of" and the "amounts of price reductions" because, among other things, (a) no true price reductions existed—or at the very least, any amounts of price reductions were exaggerated—in that Defendants' branded merchandise was rarely, if ever, previously offered for sale and/or sold at the higher Reference Prices for a reasonably substantial period of time, (b) Defendants sell their branded products only on the U.S. Websites and thus there is no other channel through which the products have previously been offered for sale and/or sold at the false Reference Price, and (c) the Reference Prices Defendants advertise in connection with their branded products necessarily cannot be former prices or prevailing market prices because Defendants sell their branded products only on the U.S. Websites and thus, the items were never sold elsewhere for any other prices besides the falsely discounted sale prices at which customers bought items from Defendants.

307.  Pursuant to California Civil Code section 1782(a), Plaintiffs' counsel will notify Defendants in writing by registered mail, return receipt requested, to the place where the transaction occurred or to Defendants' principal place of business within California, of the particular violations of Civil Code section 1770 and demand that they rectify the

problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to act.  Plaintiffs seek actual damages, restitution, and punitive damages against Defendants under the CLRA for harm suffered in an amount to be proven at trial.  Plaintiffs further seek an injunction for Defendants' violation of the CLRA to enjoin Defendants' methods, acts, and practices of deceiving customers through their false and misleading pricing scheme as outlined above.  In addition, Plaintiffs seek any other relief that the Court deems proper pursuant to the CLRA.

As noted above in the class definition, the Nationwide Class excludes California purchasers of Defendants' products during the respective class periods defined above. Although there are no California purchasers in the Nationwide Class, the Nationwide Class invokes the CLRA on the grounds that Defendants do business in California, Defendants have their principal offices in California for purposes of their U.S. business activities, and a substantial part of marketing for the U.S. Websites occurs in California.  *See In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237–38 (N.D. Cal. 2012).  By way of example, the U.S. Entities all have their principal place of business in California.  These offices are the U.S. headquarters of not only the U.S. Entities, but also of Boohoo Group and the UK Limited Entities.  Boohoo Group considers these Los Angeles offices its own.  By way of further example, the Class made all credit card payments (and possibly payments using all other methods) for purchases made on the U.S. Websites to the U.S. Entities in California. Plaintiffs have alleged sufficient facts in this Second Amended Complaint to demonstrate that the Nationwide Class may assert the CLRA and other California consumer protection statutes against Defendants in this action.

/ / /

/ / /

/ / /

`/ / /

/ / /

/ / /

-84-

**SECOND AMENDED CLASS ACTION COMPLAINT**

**FOURTH CLAIM FOR RELIEF**

**FRAUD (INTENTIONAL MISREPRESENTATIONS)**

**(By All Plaintiffs Against All Defendants on Behalf of the Nationwide Class (Excluding California Purchasers), or in the Alternative, By Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton on behalf of the New York Subclass, Plaintiffs Cachadina, Huebner, and Valiente on behalf of the Florida Subclass, Plaintiff Veronica Walton on behalf of the Maryland Subclass, Plaintiff Murphy on behalf of the Massachusetts Subclass, Plaintiff Hill on behalf of the Michigan Subclass, Plaintiff Stewart on behalf of the Ohio Subclass, and Plaintiff Thimot on behalf of the Illinois Subclass)**

308.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

309.   Defendants uniformly represented to all members of the Class during the Class Periods in connection with their boohoo, PrettyLittleThing, and Nasty Gal branded clothing, accessories, and other items on the U.S. Websites that each item had a Reference Price.  They made this uniform representation by displaying on the product description page for each branded item and/or on the thumbnail displays of each product when presented as a list, a Reference Price substantially higher than the offered selling price, which was marked down or discounted from the Reference Price by a specified percentage discount.

310.   Defendants' Reference Price representations are false.  Among other things, Defendants' representations conveyed false information about the items Plaintiffs and the Class purchased, namely that the items they purchased had sold in the recent past for a reasonably substantial period of time at the higher Reference Price displayed on the U.S. Websites and/or in the prevailing market.  The truth is that Defendants rarely, if ever, previously offered for sale and/or sold their branded products at the higher Reference Price for any reasonably substantial period of time.  Moreover, the Reference Prices Defendants represented in connection with their branded products necessarily cannot be prevailing

market prices because Defendants sell their branded products only on their websites and thus, the items were never sold elsewhere for any other price besides the falsely discounted sale price at which customers bought items from Defendants.

311.   Defendants knew that their representations were false when they made them, or at the very least, they made the representations recklessly and without regard for their truth.  In other words, Defendants knew that the items Plaintiffs and the Class purchased had rarely, if ever, sold at the substantially higher Reference Price displayed on the U.S. Websites in the recent past and/or in the prevailing market.

312.   Defendants' representations were made with the intent that Plaintiffs and the Class rely on the false representations and spend money they otherwise would not have spent, purchase items they otherwise would not have purchased, and/or spend more money for an item than they otherwise would have absent the deceptive marketing scheme. Defendants engaged in this fraud to the Plaintiffs and the Class's detriment in order to increase Defendants' own sales and profits.

313.   Plaintiffs and the Class reasonably relied on Defendants' representations. Absent Defendants' misrepresentations, Plaintiffs and the Class would not have purchased the items they purchased from Defendants, or, at the very least, they would not have paid as much for the items as they ultimately did.  Plaintiffs and the Class's reliance was a substantial factor in causing them harm.

314.   As a direct and proximate result of the above, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

315.   Defendants undertook the aforesaid illegal acts intentionally or with conscious disregard of the rights of Plaintiffs and the Class, and did so with fraud, malice, and/or oppression.  Based on the allegations above, Defendants' actions constituted fraud because Defendants intended to and did deceive and injure Plaintiffs and the Class.  Based on the allegations above, Defendants' actions constituted malice because Defendants acted with the intent to and did cause injury to Plaintiffs and the Class, and also because Defendants' deceptive conduct was despicable and was done with a willful and knowing disregard of

the rights of Plaintiffs and the Class.  Based on the allegations above, Defendants' actions constituted oppression because Defendants' deceptive conduct was despicable and subjected Plaintiffs and the Class to cruel and unjust hardship in knowing disregard of their rights.

316.   As noted above in the class definition, the Nationwide Class excludes California purchasers of Defendants' products during the respective class periods defined above.  Plaintiffs assert this common law fraud claim on behalf of the Nationwide Class. In the alternative, Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton assert this common law fraud claim on behalf of the New York Subclass under New York law, Plaintiffs Cachadina, Huebner, and Valiente assert this common law fraud claim on behalf of the Florida Subclass under Florida law, Plaintiff Veronica Walton asserts this common law fraud claim on behalf of the Maryland Subclass under Maryland law, Plaintiff Murphy asserts this common law fraud claim on behalf of the Massachusetts Subclass under Massachusetts law, Plaintiff Hill asserts this common law fraud claim on behalf of the Michigan Subclass under Michigan law, Plaintiff Stewart asserts this common law fraud claim on behalf of the Ohio Subclass under Ohio law, and Plaintiff Thimot asserts this common law fraud claim on behalf of the Illinois Subclass under Illinois law.

## FIFTH CLAIM FOR RELIEF

### FRAUDULENT CONCEALMENT

**(By All Plaintiffs Against All Defendants on Behalf of the Nationwide Class (Excluding California Purchasers), or in the Alternative, By Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton on behalf of the New York Subclass, Plaintiffs Cachadina, Huebner, and Valiente on behalf of the Florida Subclass, Plaintiff Veronica Walton on behalf of the Maryland Subclass, Plaintiff Murphy on behalf of the Massachusetts Subclass, Plaintiff Hill on behalf of the Michigan Subclass, Plaintiff Stewart on behalf of the Ohio Subclass, and Plaintiff Thimot on Behalf of the Illinois Subclass)**

317.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth

herein.

318.   Defendants uniformly disclosed some facts to Plaintiffs and all members of the Class during the Class Periods in connection with their boohoo, PrettyLittleThing, and Nasty Gal branded clothing, accessories, and other items on the U.S. Websites.  Namely, Defendants disclosed a Reference Price for each item by displaying on the product description page for each item, as well as the on the thumbnail displays of each product when presented as a list, a Reference Price substantially higher than the offered selling price, which is marked down or discounted from the Reference Price by a specified percentage discount.

319.   Defendants, however, intentionally failed to disclose other facts, making Defendants' disclosure deceptive. Specifically, Defendants failed to disclose that Defendants rarely, if ever, previously offered for sale and/or sold their branded products at the higher Reference Price for any reasonably substantial period of time.  Moreover, Defendants failed to disclose that the Reference Prices necessarily cannot be prevailing market prices because Defendants sell their branded products only on the U.S. Websites and thus, the items were never sold elsewhere for any other price besides the falsely discounted sale price at which customers bought items from Defendants.  Defendants also failed to disclose to Plaintiffs and the Class that the Reference Prices were not intended to be based on former prices.  As a result, Defendants deceived Plaintiffs and the Class into believing that they were purchasing items at a substantial markdown or discount when, in reality, the false Reference Price and discounting practice artificially inflated the true market value of the items they purchased.

320.   As a separate basis for concealment, Defendants uniformly and intentionally concealed from Plaintiff and all members of the Class that the items they purchased from Defendants had rarely, if ever, been sold by Defendants in the recent past at the substantially higher Reference Price displayed on Defendants' website and/or in the prevailing market.  Defendants also uniformly and intentionally concealed from Plaintiffs and all members of the Class that the Reference Prices were not intended to be based on

former prices.  These were facts known only to Defendants that Plaintiffs and the Class could not have discovered.

321.  Plaintiffs and the Class did not know of the concealed facts.

322.  Defendants intended to deceive Plaintiffs and the Class by concealing the facts described above.

323.  Had the omitted information been disclosed, Plaintiffs reasonably would have behaved differently.  Among other things, Plaintiffs would not have purchased the items he purchased from Defendants, or, at the very least, they would not have paid as much for the items as they ultimately did.

324.  The omitted information was material and thus, reliance is presumed on a classwide basis.  The omitted information related to the price of the items sold on the U.S. Websites and whether Plaintiffs were receiving a true and genuine substantial discount or whether, instead, Plaintiffs were being deceived into buying products through a pricing scheme utilizing fake, artificially inflated original, retail, or former prices.  A reasonable person would plainly attach importance to matters affecting pricing in determining his or her purchasing decision.

325.  As a direct and proximate result of the above, Plaintiffs and the Class have been harmed and suffered damages in an amount to be proven at trial.

326.  Defendants undertook the aforesaid illegal acts intentionally or with conscious disregard of the rights of Plaintiffs and the Class, and did so with fraud, malice, and/or oppression.  Based on the allegations above, Defendants' actions constituted fraud because Defendants intended to and did deceive and injure Plaintiffs and the Class.  Based on the allegations above, Defendants' actions constituted malice because Defendants acted with the intent to and did cause injury to Plaintiffs and the Class, and also because Defendants' deceptive conduct was despicable and was done with a willful and knowing disregard of the rights of Plaintiffs and the Class.  Based on the allegations above, Defendants' actions constituted oppression because Defendants' deceptive conduct was despicable and subjected Plaintiffs and the Class to cruel and unjust hardship in knowing disregard of their

rights.

327.   As noted above in the class definition, the Nationwide Class excludes California purchasers of Defendants' products during the respective class periods defined above.  Plaintiffs assert this common law fraudulent concealment claim on behalf of the Nationwide Class.  In the alternative, Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton assert this common law fraudulent concealment claim on behalf of the New York Subclass under New York law, Plaintiffs Cachadina, Huebner, and Valiente assert this common law fraudulent concealment claim on behalf of the Florida Subclass under Florida law, Plaintiff Veronica Walton asserts this common law fraudulent concealment claim on behalf of the Maryland Subclass under Maryland law, Plaintiff Murphy asserts this common law fraudulent concealment claim on behalf of the Massachusetts Subclass under Massachusetts law, Plaintiff Hill asserts this common law fraudulent concealment claim on behalf of the Michigan Subclass under Michigan law, Plaintiff Stewart asserts this common law fraudulent concealment claim on behalf of the Ohio Subclass under Ohio law, and Plaintiff Thimot asserts this common law fraudulent concealment claim on behalf of the Illinois Subclass under Illinois law.

## SIXTH CLAIM FOR RELIEF

### RESTITUTION FOR UNJUST ENRICHMENT

**(By All Plaintiffs Against All Defendants on Behalf of the Nationwide Class (Excluding California Purchasers), or in the Alternative, By Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton on behalf of the New York Subclass, Plaintiffs Cachadina, Huebner, and Valiente on behalf of the Florida Subclass, Plaintiff Veronica Walton on behalf of the Maryland Subclass, Plaintiff Murphy on behalf of the Massachusetts Subclass, Plaintiff Hill on behalf of the Michigan Subclass, Plaintiff Stewart on behalf of the Ohio Subclass, and Plaintiff Thimot on behalf of the Illinois Subclass)**

328.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

329.   Plaintiffs brings this restitution claim for relief based on Defendants' unjust enrichment.

330.   Defendants actively engaged in, participated in, agreed to, aided and abetted, conspired in, and/or furthered a scheme by which they were unjustly enriched to the detriment of Plaintiffs and the Class.

331.   By their wrongful acts and omissions, Defendants, and each of them, were unjustly enriched at the expense of and to the detriment of Plaintiffs and the Class and/or while Plaintiffs and the Class were unjustly deprived.  That is, Defendants' unlawful and deceptive pricing scheme induced Plaintiffs and the Class to spend money they otherwise would not have spent, purchase items they otherwise would not have purchased, and/or spend more money for a product than they otherwise would have absent the deceptive advertising.

332.   On behalf of the Class, Plaintiffs seek restitution from Defendants, and each of them, and seeks an order of this Court disgorging all payments, commissions, profits, benefits, and other compensation obtained by Defendants, and each of them, from their wrongful conduct.

333.   As noted above in the class definition, the Nationwide Class excludes California purchasers of Defendants' products during the respective class periods defined above.   Plaintiffs assert this common law unjust enrichment claim on behalf of the Nationwide Class.  In the alternative, Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton assert this common law unjust enrichment claim on behalf of the New York Subclass under New York law, Plaintiffs Cachadina, Huebner, and Valiente assert this common law unjust enrichment claim on behalf of the Florida Subclass under Florida law, Plaintiff Veronica Walton asserts this common law unjust enrichment claim on behalf of the Maryland Subclass under Maryland law, Plaintiff Murphy asserts this common law unjust enrichment claim on behalf of the Massachusetts Subclass under Massachusetts law, Plaintiff Hill asserts this common law unjust enrichment claim on behalf of the Michigan Subclass under Michigan law, Plaintiff Stewart asserts this common law unjust enrichment

claim on behalf of the Ohio Subclass under Ohio law, and Plaintiff Thimot asserts this common law unjust enrichment claim on behalf of the Illinois Subclass under Illinois law.

### SEVENTH CLAIM FOR RELIEF

**VIOLATION OF NEW YORK STATE CONSUMER PROTECTION STATUTE,
N.Y. GEN. BUS. LAW §§ 349 and 350**

**(By Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton Against All
Defendants on Behalf of the New York Subclass)**

334.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

335.   The elements of a claim for deceptive practices under New York General Business Law sections 349 and 350 are (1) that the act, practice or advertisement was consumer-oriented; (2) that the act, practice or advertisement was misleading in a material respect, and (3) that the plaintiff was injured as a result of the deceptive practice, act or advertisement.

336.   Defendants are online sellers of clothing, shoes, accessories to consumers on the U.S. Websites.   They engaged in a misleading and deceptive pricing scheme by advertising and representing false Reference Prices and thereby falsely advertising and representing markdowns or "discounts" that were false and inflated, as alleged in detail in this Complaint.   Therefore, Defendants' acts, practices, and advertisements were consumer-oriented.

337.   Defendants' acts, practices, and advertisements were misleading in material respects.   As noted, Defendants engaged in a misleading and deceptive pricing scheme by advertising and representing false Reference Prices and thereby falsely advertising and representing markdowns or "discounts" that were false and inflated.   Plaintiffs Habberfield, Kalu, and Runnells each saw and relied on the false Reference Prices and false discounts, as alleged above.   Defendants' deceptive marketing practices gave consumers, including Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton, the false impression that their products were regularly sold on the market for a substantially higher price in the recent

past than they actually were and thus led to the false impression that Defendants' products were worth more than they actually were.

338.   In addition, Defendants had a duty to disclose the truth about their pricing deception, including, among other things, that the Reference Prices advertised and published on the U.S. Websites were not, in fact, prices at which boohoo, PrettyLittleThing, and Nasty Gal items had sold for in the recent past for a reasonably substantial period of time, but that instead, in reality, Defendants' products rarely (if ever) were offered at the advertised Reference Prices.  Defendants also failed to disclose to Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton, and the New York Subclass that the Reference Prices were not intended to be based on former prices.  Defendants, however, concealed this material information from customers and the general public, including Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton.

339.   Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton and each member of the New York Subclass suffered an injury in fact and lost money as a result of Defendants' violations of New York General Business Law sections 349 and 350.  They therefore seek restitution and/or damages obtained directly or indirectly by Defendants for their unlawful acts or practices in an amount to be proven at trial.

340.   Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton on behalf of themselves and the members of the New York Subclass, seek a temporary, preliminary, and/or permanent injunction from this Court prohibiting Defendants from engaging in the patterns and practices described herein, including but not limited to, putting a stop to their deceptive advertisements and false Reference Prices in connection with their sale of boohoo, PrettyLittleThing, and Nasty Gal products on the U.S. Websites.

/ / /

/ / /

/ / /

/ / /

/ / /

**SECOND AMENDED CLASS ACTION COMPLAINT**

**EIGHTH CLAIM FOR RELIEF**

**VIOLATION OF FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT, FLA. STAT. §§ 501.201, *et seq.***

**(By Plaintiffs Cachadina, Huebner, and Valiente Against All Defendants on Behalf of the Florida Subclass)**

341.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

342.   The elements of a valid claim for violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) claim (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages.  A deceptive practice under the FDUTPA is one that is likely to mislead consumers.  A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.

343.   Defendants engaged in a deceptive act or unfair practice as alleged throughout this Complaint.  As noted, Defendants engaged in a misleading and deceptive pricing scheme by advertising and representing false Reference Prices and thereby falsely advertising and representing markdowns or "discounts" that were false and inflated. Defendants' deceptive marketing practices gave consumers, including Plaintiffs Cachadina, Huebner, and Valiente, the false impression that their products were regularly sold on the market for a substantially higher price in the recent past than they actually were and thus led to the false impression that Defendants' products were worth more than they actually were.

344.   In addition, Defendants had a duty to disclose the truth about their pricing deception, including, among other things, that the Reference Prices advertised and published on the U.S. Websites were not, in fact, prices at which boohoo, PrettyLittleThing, and Nasty Gal items had sold for in the recent past for a reasonably substantial period of time, but that instead, in reality, Defendants' products rarely (if ever) were offered at the advertised Reference Prices.  Defendants also failed to disclose to Plaintiffs Cachadina, Huebner, and Valiente and the Florida Subclass that the Reference Prices were not intended

to be based on former prices.  Defendants, however, concealed this material information from customers and the general public, including Plaintiffs Cachadina, Huebner, and Valiente.  These omissions were also deceptive acts and unfair practices.

345.   Defendants' deceptive acts and unfair practices caused Plaintiffs Cachadina, Huebner, and Valiente, and members of the Florida Subclass, to suffer harm by falsely and artificially inflating the value of the merchandise on the U.S. Websites and misleading them to believe they are buying products at a substantial discount.  As a result, Plaintiffs Cachadina, Huebner, and Valiente, and members of the Florida Subclass bought products from Defendants they never would have bought, or at the very least, paid more for products than they otherwise would have if Defendants did not engage in deceptive acts and unfair practices.

346.   Plaintiffs Cachadina, Huebner, and Valiente, and each member of the Florida Subclass, suffered an injury in fact and actual damages as a result of Defendants' violations of the FDUTPA.  They therefore seek damages they incurred as a result of Defendants' deceptive acts and unfair practices in an amount to be proven at trial.  Plaintiffs Cachadina, Huebner, and Valiente, and each member of the Florida Subclass, also seek an award of reasonable attorneys' fees under the FDUTPA.  Fla. Stat. § 501.2105.

347.   Plaintiffs Cachadina, Huebner, and Valiente, on behalf of themselves and the members of the Florida Subclass, seek a temporary, preliminary, and/or permanent injunction from this Court prohibiting Defendants from engaging in the patterns and practices described herein, including but not limited to, putting a stop to their deceptive advertisements and false Reference Prices in connection with their sale of boohoo, PrettyLittleThing, and Nasty Gal products on the U.S. Websites.

/ / /

/ / /

/ / /

/ / /

/ / /

# NINTH CLAIM FOR RELIEF

## VIOLATION OF MARYLAND CONSUMER PROTECTION ACT, MD. CODE COM. LAW §§ 13-101, *et seq.*

### (By Plaintiff Veronica Walton Against All Defendants on Behalf of the Maryland Subclass)

348.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

349.   The Maryland Consumer Protection Act (MCPA) prohibits unfair, abusive, or deceptive trade practices, including "any [f]alse or misleading oral or written statement . . . which has the capacity, tendency or effect of deceiving or misleading consumers" and "any . . . [f]ailure to state a material fact if the failure deceives or tends to deceive."  Md. Com. Law § 13-301.  The elements of a claim under the MCPA are that the defendant's conduct was (1) an unfair or deceptive practice or misrepresentation that was (2) relied upon, and (3) caused the plaintiff actual injury.

350.   As alleged throughout this Complaint, Defendants engaged in an unfair or deceptive practice, and made false representations and omissions of material fact.  As noted, Defendants engaged in a misleading and deceptive pricing scheme by advertising and representing false Reference Prices and thereby falsely advertising and representing markdowns or "discounts" that were false and inflated.  Plaintiff Veronica Walton saw and relied on the false Reference Prices and false discounts, as alleged above.  Defendants' deceptive marketing practices gave consumers, including Plaintiff Veronica Walton, the false impression that their products were regularly sold on the market for a substantially higher price in the recent past than they actually were and thus led to the false impression that Defendants' products were worth more than they actually were.

351.   In addition, Defendants had a duty to disclose the truth about their pricing deception, including, among other things, that the Reference Prices advertised and published on the U.S. Websites were not, in fact, prices at which boohoo, PrettyLittleThing, and Nasty Gal items had sold for in the recent past for a reasonably substantial period of

time, but that instead, in reality, Defendants' products rarely (if ever) were offered at the advertised Reference Prices.  Defendants also failed to disclose to Plaintiff Veronica Walton and the Maryland Subclass that the Reference Prices were not intended to be based on former prices.  Defendants, however, concealed this material information from customers and the general public, including Plaintiff Veronica Walton.  These omissions were also deceptive and unfair trade practices.

352.  Defendants' deceptive acts and unfair practices caused Plaintiff Veronica Walton and members of the Maryland Subclass to suffer harm by falsely and artificially inflating the value of the merchandise on the U.S. Websites and misleading them to believe they are buying products at a substantial discount.  As a result, Plaintiff Veronica Walton and members of the Maryland Subclass bought products from Defendants they never would have bought, or at the very least, paid more for products than they otherwise would have if Defendants did not engage in deceptive and unfair trade practices.

353.  Plaintiff Veronica Walton and each member of the Maryland Subclass suffered an injury in fact and actual damages as a result of Defendants' violations of the MCPA.  They therefore seek damages they incurred as a result of Defendants' deceptive acts and unfair practices in an amount to be proven at trial.  Plaintiff Veronica Walton and each member of the Maryland Subclass also seek an award of reasonable attorneys' fees under the MCPA.  Md. Code Com. § 13-408(b).

354.  Plaintiff Veronica Walton, on behalf of herself and the members of the Maryland Subclass, seek a temporary, preliminary, and/or permanent injunction from this Court prohibiting Defendants from engaging in the patterns and practices described herein, including but not limited to, putting a stop to their deceptive advertisements and false Reference Prices in connection with their sale of boohoo, PrettyLittleThing, and Nasty Gal products on the U.S. Websites.

/ / /

/ / /

/ / /

**TENTH CLAIM FOR RELIEF**

**VIOLATION OF MASSACHUSETTS STATE CONSUMER PROTECTION**

**LAW, MASS. GEN. LAWS CH. 93A, §§ 1, *et seq.***

**(By Plaintiff Murphy Against All Defendants on Behalf of the Massachusetts**

**Subclass)**

355.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

356.   Chapter 93A of the Massachusetts General Laws prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws Ann. Ch. 93A § 2(a). Under Massachusetts law, conduct is unfair or deceptive if it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness or immoral, unethical, oppressive, or unscrupulous. The claim requires a showing that a person who is engaged in trade or business committed an unfair or deceptive trade practice, and that the plaintiff suffered a loss of money or property as a result.

357.   As alleged throughout this Complaint, Defendants engaged in unfair or deceptive practices, and made false representations and omissions of material fact. As noted, Defendants engaged in a misleading and deceptive pricing scheme by advertising and representing false Reference Prices and thereby falsely advertising and representing markdowns or "discounts" that were false and inflated. Defendants' deceptive marketing practices gave consumers, including Plaintiff Murphy, the false impression that their products were regularly sold on the market for a substantially higher price in the recent past than they actually were and thus led to the false impression that Defendants' products were worth more than they actually were.

358.   In addition, Defendants had a duty to disclose the truth about their pricing deception, including, among other things, that the Reference Prices advertised and published on the U.S. Websites were not, in fact, prices at which boohoo, PrettyLittleThing, and Nasty Gal items had sold for in the recent past for a reasonably substantial period of

time, but that instead, in reality, Defendants' products rarely (if ever) were offered at the advertised Reference Prices.  Defendants also failed to disclose to Plaintiff Murphy and the Massachusetts Subclass that the Reference Prices were not intended to be based on former prices.  Defendants, however, concealed this material information from customers and the general public, including Plaintiff Murphy.  These omissions were also deceptive and unfair trade practices.

359.  Defendants' deceptive acts and unfair practices caused Plaintiff Murphy and members of the Massachusetts Subclass to suffer harm by falsely and artificially inflating the value of the merchandise on the U.S. Websites and misleading them to believe they are buying products at a substantial discount.  As a result, Plaintiff Murphy and members of the Massachusetts Subclass bought products from Defendants they never would have bought, or at the very least, paid more for products than they otherwise would have if Defendants did not engage in deceptive and unfair trade practices.

360.  Plaintiff Murphy and each member of the Massachusetts Subclass suffered an injury in fact and actual damages as a result of Defendants' violations of Chapter 93A of the Massachusetts General Laws.  They therefore seek damages they incurred as a result of Defendants' deceptive acts and unfair practices in an amount to be proven at trial.  Plaintiff Murphy and each member of the Massachusetts Subclass further seek treble damages, or at a minimum, double damages, for Defendants' willful or knowing violation of Chapter 93A of the Massachusetts General Laws.  Plaintiff Murphy and each member of the Massachusetts Subclass also seek an award of reasonable attorneys' fees. Mass. Gen. Laws ch. 93A, § 9(4).

361.  Plaintiff Murphy, on behalf of herself and the members of the Massachusetts Subclass, seek a temporary, preliminary, and/or permanent injunction from this Court prohibiting Defendants from engaging in the patterns and practices described herein, including but not limited to, putting a stop to their deceptive advertisements and false Reference Prices in connection with their sale of boohoo, PrettyLittleThing, and Nasty Gal products on the U.S. Websites.

362.   On information and belief, Plaintiffs allege that Defendants do not have a place of business or assets within the State of Massachusetts.  A pre-suit demand letter under section 9(3) of Chapter 93A off the Massachusetts General Laws was therefore not required prior to the filing of this action.

## ELEVENTH CLAIM FOR RELIEF

**VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT, MICH. COMP. LAWS §§ 445.901, *et seq.***

**(By Plaintiff Nicole Hill Against All Defendants on Behalf of the Michigan Subclass)**

363.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

364.   The Michigan Consumer Protection Act (Michigan CPA) identifies a lengthy list of actionable unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce which may form the basis of an actionable claim for violation of the Michigan CPA.  The provisions of the Michigan CPA are virtually identical to those in the CLRA.  For the same reasons alleged in Plaintiffs' third claim for relief for violation of the CLRA, Plaintiff Hill and the Michigan Subclass have alleged a valid claim against Defendants for violation of the Michigan CPA.

365.   Plaintiff Hill and each member of the Michigan Subclass suffered an injury in fact and actual damages as a result of Defendants' violations of the Michigan CPA.  They therefore seek damages they incurred as a result of Defendants' deceptive acts and unfair practices in an amount to be proven at trial.

366.   Plaintiff Hill, on behalf of herself and the members of the Michigan Subclass, seek a temporary, preliminary, and/or permanent injunction from this Court prohibiting Defendants from engaging in the patterns and practices described herein, including but not limited to, putting a stop to their deceptive advertisements and false Reference Prices in connection with their sale of boohoo, PrettyLittleThing, and Nasty Gal products on the U.S. Websites.

**TWELFTH CLAIM FOR RELIEF**

**VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT, OHIO REV. CODE §§ 1345.01,** *et seq.*

**(By Plaintiff Nicole Stewart Against All Defendants on Behalf of the Ohio Subclass)**

367.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

368.   The Ohio Consumer Sales Practices Act (OCSPA) provides a private right of action to consumers for "unfair or deceptive act[s] or practice[s] in connection with a consumer transaction."   Ohio Rev. Code Ann. §§ 1345.02(A), 1345.09(A).   Under the OCSPA, a claim is valid where the defendant performed an act or omission that was unfair or deceptive, and the alleged act impacted the plaintiff's decision to purchase the item at issue.   An OCSPA claim premised on affirmative conduct generally requires that the plaintiff allege she saw or was aware of the alleged misrepresentations at any time before or during the purchase of the product at issue.   Omissions are actionable under the OCSPA if they concern a matter that is or is likely to be material to a consumer's decision to purchase the product or service involved.

369.   As alleged throughout this Complaint, Defendants engaged in an unfair or deceptive practice, and made false representations and omissions of material fact.   As noted, Defendants engaged in a misleading and deceptive pricing scheme by advertising and representing false Reference Prices and thereby falsely advertising and representing markdowns or "discounts" that were false and inflated.   Plaintiff Stewart saw and relied on the false Reference Prices and false discounts, as alleged above.   Defendants' deceptive marketing practices gave consumers, including Plaintiff Stewart, the false impression that their products were regularly sold on the market for a substantially higher price in the recent past than they actually were and thus led to the false impression that Defendants' products were worth more than they actually were.

370.   In addition, Defendants had a duty to disclose the truth about their pricing deception, including, among other things, that the Reference Prices advertised and

published on the U.S. Websites were not, in fact, prices at which boohoo, PrettyLittleThing, and Nasty Gal items had sold for in the recent past for a reasonably substantial period of time, but that instead, in reality, Defendants' products rarely (if ever) were offered at the advertised Reference Prices.  Defendants also failed to disclose to Plaintiff Stewart and the Ohio Subclass that the Reference Prices were not intended to be based on former prices.  Defendants, however, concealed this material information from customers and the general public, including Plaintiff Stewart.  These omissions were also deceptive and unfair trade practices.

371.   The omitted information was material because it related to the price of the items sold on the U.S. Websites and whether Plaintiffs were receiving a true and genuine substantial discount or whether, instead, Plaintiffs were being deceived into buying products through a pricing scheme utilizing fake, artificially inflated original, retail, or former prices.  A reasonable person would plainly attach importance to matters affecting pricing in determining his or her purchasing decision.

372.   Defendants' deceptive acts and unfair practices impacted the decisions of Plaintiff Stewart and members of the Ohio Subclass to purchase the falsely inflated merchandise from Defendants.  More specifically, Defendants' falsely and artificially inflated the value of the merchandise on the U.S. Websites by advertising false Reference Prices and misleading Plaintiff Stewart and the Ohio Subclass to believe they are buying products at a substantial discount.  As a result, Plaintiff Stewart and members of the Ohio Subclass bought products from Defendants they never would have bought, or at the very least, paid more for products than they otherwise would have if Defendants did not engage in deceptive and unfair trade practices.

373.   Also relevant to the OCSPA, Defendants were on notice that their conduct as alleged herein was deceptive or unconscionable by virtue of Rule 109:4-3-12 of the Ohio Administrative Code, which states, in part, that "[i]t is deceptive for a supplier in its out-of-store advertising to make any price comparison by the use of such terms as . . . '. . . . . . . . per cent off,' 'reduced from . . . . . . . . to . . . . . . . .,' [or] 'save $. . . . . . . .,' unless:  (a)

The comparison is to the supplier's regular price; or (b) If the reference price is the regular price of a previous season, the season and year are clearly and conspicuously disclosed; or (c) There is language in the advertisement which clearly and conspicuously discloses that the comparison is to another price and which discloses the nature of the reference price." Ohio Adm. Code 109:4–3–12(E)(1).

374.   Plaintiff Stewart and each member of the Ohio Subclass suffered an injury in fact and actual damages as a result of Defendants' violations of the OCSPA.  They therefore seek damages they incurred as a result of Defendants' deceptive acts and unfair practices in an amount to be proven at trial.  Plaintiff Stewart and each member of the Ohio Subclass also seek an award of reasonable attorneys' fees because Defendants knowingly committed an act or practice that violates the OCSPA.  Ohio Rev. Code Ann. § 1345.09(F).

375.   Plaintiff Stewart, on behalf of herself and the members of the Ohio Subclass, seek a temporary, preliminary, and/or permanent injunction from this Court prohibiting Defendants from engaging in the patterns and practices described herein, including but not limited to, putting a stop to their deceptive advertisements and false Reference Prices in connection with their sale of boohoo, PrettyLittleThing, and Nasty Gal products on the U.S. Websites.

## THIRTEENTH CLAIM FOR RELIEF

### VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILLINOIS COMPILED STATUTES §§ 505/1, *et seq.*

### (By Plaintiff Me'Lisa Thimot Against All Defendants on Behalf of the Illinois Subclass)

376.   Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

377.   A Claim for violation of the Illinois Consumer Fraud and Deceptive Practices Act (ICFA) requires (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a

result of the deception.  The last two elements of the claim require a showing that the allegedly deceptive act proximately caused any damages suffered by the plaintiff.

378.   As alleged throughout this Second Amended Complaint, Defendants engaged in one or more deceptive acts or practices, including by making false representations and omitting material facts.  As noted, Defendants engaged in a misleading and deceptive pricing scheme by advertising and representing false Reference Prices and thereby falsely advertising and representing markdowns or "discounts" that were false and inflated. Plaintiff Thimot saw and relied on the false Reference Prices and false discounts, as alleged above.  Defendants' deceptive marketing practices gave consumers, including Plaintiff Thimot, the false impression that their products were regularly sold on the market for a substantially higher price in the recent past than they actually were and thus led to the false impression that Defendants' products were worth more than they actually were.

379.   In addition, Defendants had a duty to disclose the truth about their pricing deception, including, among other things, that the Reference Prices advertised and published on the U.S. Websites were not, in fact, prices at which boohoo, PrettyLittleThing, and Nasty Gal items had sold for in the recent past for a reasonably substantial period of time, but that instead, in reality, Defendants' products rarely (if ever) were offered at the advertised Reference Prices.  Defendants also failed to disclose to Plaintiff Thimot and the Illinois Subclass that the Reference Prices were not intended to be based on former prices. Defendants, however, concealed this material information from customers and the general public, including Plaintiff Thimot.  These omissions were also deceptive acts and practices.

380.   Defendants' deceptive acts and unfair practices caused Plaintiff Thimot and members of the Illinois Subclass to suffer harm by falsely and artificially inflating the value of the merchandise on the U.S. Websites and misleading them to believe they are buying products at a substantial discount.  As a result, Plaintiff Thimot and members of the Illinois Subclass bought products from Defendants they never would have bought, or at the very least, paid more for products than they otherwise would have if Defendants did not engage in deceptive and unfair trade practices.

381.   Plaintiff Thimot and each member of the Illinois Subclass suffered an injury in fact and actual damages as a result of Defendants' violations of the ICFA.  They therefore seek damages they incurred as a result of Defendants' deceptive acts and unfair practices in an amount to be proven at trial.  Plaintiff Thimot and each member of the Illinois Subclass also seek an award of reasonable attorneys' fees under the ICFA.  815 Ill. Comp. Stat. Ann. 505/10a(c).

382.   Plaintiff Thimot, on behalf of herself and the members of the Illinois Subclass, seek a temporary, preliminary, and/or permanent injunction from this Court prohibiting Defendants from engaging in the practices described herein, including but not limited to, putting a stop to their deceptive advertisements and false Reference Prices in connection with their sale of boohoo, PrettyLittleThing, and Nasty Gal products on the U.S. Websites.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

## ON THE FIRST CLAIM FOR RELIEF FOR VIOLATIONS OF THE UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §§ 17200 *et seq.*)

1.   For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that Plaintiffs be designated the class representatives, and that undersigned counsel be designated as class counsel.

2.   For an injunction putting a stop to the deceptive and misleading conduct described herein and ordering Defendants to correct their deceptive and misleading advertising and pricing practices.

3.   For an award of restitution and disgorgement of moneys paid that Defendants obtained as a result of their unlawful, unfair, and fraudulent business practices, and as a result of their unfair, deceptive, untrue, and misleading advertising, all as described above, in an amount to be proven at trial, which exceeds $250 Million.

4.   For an award of equitable and declaratory relief.

5.     For pre and post judgment interest and costs of suit incurred herein.

6.     For attorneys' fees incurred herein pursuant to California Code of Civil Procedure section 1021.5, or to the extent otherwise permitted by law.

7.     For such other and further relief as the Court may deem just and proper.

**ON THE SECOND CLAIM FOR RELIEF FOR VIOLATIONS OF THE FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE §§ 17500 *et seq.*)**

1.     For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that Plaintiffs be designated the class representatives, and that undersigned counsel be designated as class counsel.

2.     For an injunction putting a stop to the deceptive and misleading conduct described herein and ordering Defendants to correct their deceptive and misleading advertising and pricing practices.

3.     For an award of restitution and disgorgement of moneys paid that Defendants obtained as a result of their unfair, deceptive, untrue, and misleading advertising, all as described above, in an amount to be proven at trial, which exceeds $250 Million.

4.     For an award of equitable and declaratory relief.

5.     For pre and post judgment interest and costs of suit incurred herein.

6.     For attorneys' fees incurred herein pursuant to California Code of Civil Procedure section 1021.5, or to the extent otherwise permitted by law.

7.     For such other and further relief as the Court may deem just and proper.

**ON THE THIRD CLAIM FOR RELIEF FOR VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE §§ 1750 *et seq.*)**

1.     For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that Plaintiffs be designated the class representatives, and that undersigned counsel be designated as class counsel.

2.     For an injunction putting a stop to the deceptive and misleading conduct

described herein and ordering Defendants to correct their deceptive and misleading advertising and pricing practices.

3.     For leave to amend the operative complaint pursuant to California Civil Code section 1782(d) and/or any other basis the Court deems just and proper.

4.     For pre and post judgment interest and costs of suit incurred herein.

5.     For attorneys' fees incurred herein pursuant to California Civil Code section 1780, or to the extent otherwise permitted by law.

6.     For such other and further relief as the Court may deem just and proper.

## ON THE FOURTH CLAIM FOR RELIEF FOR FRAUD (AFFIRMATIVE MISREPRESENTATIONS)

1.     For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that Plaintiffs be designated the class representatives on behalf of the Nationwide Class, on in the alternative, that Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton be designated the class representatives on behalf of the New York Subclass, that Plaintiffs Cachadina, Huebner, and Valiente be designated the class representatives on behalf of the Florida Subclass, that Plaintiff Veronica Walton be designated the class representative on behalf of the Maryland Subclass, that Plaintiff Murphy be designated the class representative on behalf of the Massachusetts Subclass, that Plaintiff Hill be designated the class representative on behalf of the Michigan Subclass, that Plaintiff Stewart be designated the class representative on behalf of the Ohio Subclass, that Plaintiff Thimot be designated the class representative on behalf of the Illinois Subclass, and that undersigned counsel be designated as class counsel.

2.     For compensatory damages in an amount to be proven at trial, which exceeds $250 Million.

3.     For punitive damages in an amount sufficient to punish Defendants and to deter them from engaging in wrongful conduct in the future.

4.     For pre and post judgment interest and costs of suit incurred herein.

5.      For attorneys' fees incurred herein pursuant to California Code of Civil Procedure section 1021.5, or to the extent otherwise permitted by law.

6.      For such other and further relief as the Court may deem just and proper.

## ON THE FIFTH CLAIM FOR RELIEF FOR FRAUDULENT CONCEALMENT

1.      For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that Plaintiffs be designated the class representatives on behalf of the Nationwide Class, on in the alternative, that Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton be designated the class representatives on behalf of the New York Subclass, that Plaintiffs Cachadina, Huebner, and Valiente be designated the class representatives on behalf of the Florida Subclass, that Plaintiff Veronica Walton be designated the class representative on behalf of the Maryland Subclass, that Plaintiff Murphy be designated the class representative on behalf of the Massachusetts Subclass, that Plaintiff Hill be designated the class representative on behalf of the Michigan Subclass, that Plaintiff Stewart be designated the class representative on behalf of the Ohio Subclass, that Plaintiff Thimot be designated the class representative on behalf of the Illinois Subclass, and that undersigned counsel be designated as class counsel.

2.      For compensatory damages in an amount to be proven at trial, which exceed $250 Million.

3.      For punitive damages in an amount sufficient to punish Defendants and to deter them from engaging in wrongful conduct in the future.

4.      For pre and post judgment interest and costs of suit incurred herein.

5.      For attorneys' fees incurred herein pursuant to California Code of Civil Procedure section 1021.5, or to the extent otherwise permitted by law.

6.      For such other and further relief as the Court may deem just and proper.

## ON THE SIXTH CLAIM FOR RELIEF FOR UNJUST ENRICHMENT

1.      For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that

Plaintiffs be designated the class representatives on behalf of the Nationwide Class, on in the alternative, that Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton be designated the class representatives on behalf of the New York Subclass, that Plaintiffs Cachadina, Huebner, and Valiente be designated the class representatives on behalf of the Florida Subclass, that Plaintiff Veronica Walton be designated the class representative on behalf of the Maryland Subclass, that Plaintiff Murphy be designated the class representative on behalf of the Massachusetts Subclass, that Plaintiff Hill be designated the class representative on behalf of the Michigan Subclass, that Plaintiff Stewart be designated the class representative on behalf of the Ohio Subclass, that Plaintiff Thimot be designated the class representative on behalf of the Illinois Subclass, and that undersigned counsel be designated as class counsel.

2.    For an award of restitution and disgorgement of moneys paid that Defendants obtained as a result of their deceptive pricing and advertising, all as described above, in an amount to be proven at trial, which exceeds $250 Million.

3.    For pre and post judgment interest and costs of suit incurred herein.

4.    For attorneys' fees incurred herein pursuant to California Code of Civil Procedure section 1021.5, or to the extent otherwise permitted by law.

5.    For such other and further relief as the Court may deem just and proper.

## ON THE SEVENTH CLAIM FOR RELIEF FOR VIOLATION OF NEW YORK STATE CONSUMER PROTECTION STATUTE (N.Y. GEN. BUS. LAW §§ 349 AND 350)

1.    For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that Plaintiffs Habberfield, Kalu, Runnells, and Marika Walton be designated the class representatives on behalf of the New York Subclass, and that undersigned counsel be designated as class counsel.

2.    For an injunction putting a stop to the deceptive and misleading conduct described herein and ordering Defendants to correct their deceptive and misleading

advertising and pricing practices.

3.      For an award of damages and/or restitution of moneys paid that Defendants obtained directly or indirectly for their unlawful acts or practices, all as described above, in an amount to be proven at trial.

4.      For pre and post judgment interest and costs of suit incurred herein.

5.      For such other and further relief as the Court may deem just and proper.

**ON THE EIGHTH CLAIM FOR RELIEF FOR VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FLA. STAT. §§ 501.201,** *et seq.***)**

1.      For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that Plaintiffs Cachadina, Valiente, and Huebner be designated the class representatives on behalf of the Florida Subclass, and that undersigned counsel be designated as class counsel.

2.      For an injunction putting a stop to the deceptive and misleading conduct described herein and ordering Defendants to correct their deceptive and misleading advertising and pricing practices.

3.      For an award of damages incurred as a result of Defendants' deceptive acts and unfair practices in an amount to be proven at trial.

4.      For an award of attorneys' fees incurred in connection with this action pursuant to section 501.2105 of the Florida Statutes, or to the extent otherwise permitted by law.

5.      For pre and post judgment interest and costs of suit incurred herein.

6.      For such other and further relief as the Court may deem just and proper.

**ON THE NINTH CLAIM FOR RELIEF FOR VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT (MD. CODE COM. LAW §§ 13-101,** *et seq.***)**

1.      For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiff Walton be designated the class representative on behalf of the Maryland Subclass, and that undersigned counsel be designated as class counsel.

2.     For an injunction putting a stop to the deceptive and misleading conduct described herein and ordering Defendants to correct their deceptive and misleading advertising and pricing practices.

3.     For an award of damages incurred as a result of Defendants' deceptive acts and unfair practices in an amount to be proven at trial.

4.     For an award of attorneys' fees incurred in connection with this action pursuant to section 13-408(b) of the Maryland Code of Commercial Law, or to the extent otherwise permitted by law.

5.     For pre and post judgment interest and costs of suit incurred herein.

6.     For such other and further relief as the Court may deem just and proper.

## <u>ON THE TENTH CLAIM FOR RELIEF FOR VIOLATION OF THE MASSACHUSETTS  STATE CONSUMER PROTECTION LAW (MASS. GEN. LAWS CH. 93A, §§ 1, *et seq.*)</u>

1.     For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that Plaintiff Murphy be designated the class representative on behalf of the Massachusetts Subclass, and that undersigned counsel be designated as class counsel.

2.     For an injunction putting a stop to the deceptive and misleading conduct described herein and ordering Defendants to correct their deceptive and misleading advertising and pricing practices.

3.     For an award of damages incurred as a result of Defendants' deceptive acts and unfair practices in an amount to be proven at trial.

4.     For an award of attorneys' fees incurred in connection with this action pursuant to Chapter 93A of the Massachusetts General Laws, or to the extent otherwise permitted by law.

5.     For an award of treble damages, or at a minimum, double damages, for

Defendants' willful or knowing violation of Chapter 93A of the Massachusetts General Laws.

      6.     For pre and post judgment interest and costs of suit incurred herein.

      7.     For such other and further relief as the Court may deem just and proper.

### ON THE ELEVENTH CLAIM FOR RELIEF FOR VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS §§ 445.901, *et seq.*)

      1.     For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that Plaintiff Hill be designated the class representative on behalf of the Michigan Subclass, and that undersigned counsel be designated as class counsel.

      2.     For an injunction putting a stop to the deceptive and misleading conduct described herein and ordering Defendants to correct their deceptive and misleading advertising and pricing practices.

      3.     For an award of damages incurred as a result of Defendants' deceptive acts and unfair practices in an amount to be proven at trial.

      4.     For pre and post judgment interest and costs of suit incurred herein.

      5.     For such other and further relief as the Court may deem just and proper.

### ON THE TWELTH CLAIM FOR RELIEF FOR VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE §§ 1345.01, *et seq.*)

      1.     For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that Plaintiff Stewart be designated the class representative on behalf of the Ohio Subclass, and that undersigned counsel be designated as class counsel.

      2.     For an injunction putting a stop to the deceptive and misleading conduct described herein and ordering Defendants to correct their deceptive and misleading advertising and pricing practices.

      3.     For an award of damages incurred as a result of Defendants' deceptive acts

and unfair practices in an amount to be proven at trial.

4.    For an award of attorneys' fees incurred in connection with this action pursuant to Ohio Revised Code section 1345.09(F), or to the extent otherwise permitted by law.

5.    For pre and post judgment interest and costs of suit incurred herein.

6.    For such other and further relief as the Court may deem just and proper.

## ON THE THIRTEENTH CLAIM FOR RELIEF FOR VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (805 ILL. COMP. STAT. §§ 505/1, *et seq.*)

1.    For an order certifying that the action be maintained as a class action under Rule 23(b)(2), 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure, that Plaintiff Thimot be designated the class representative on behalf of the Illinois Subclass, and that undersigned counsel be designated as class counsel.

2.    For an injunction putting a stop to the deceptive and misleading conduct described herein and ordering Defendants to correct their deceptive and misleading advertising and pricing practices.

3.    For an award of damages incurred as a result of Defendants' deceptive acts and practices in an amount to be proven at trial.

4.    For an award of attorneys' fees incurred in connection with this action pursuant to section 505/10a(c) of Chapter 815 of the Illinois Compiled Statutes, or to the extent otherwise permitted by law.

5.    For pre- and post-judgment interest and costs of suit incurred herein.

6.    For such other and further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

## <u>JURY DEMAND</u>

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury on all triable issues.

Dated: April 6, 2023                    ALMADANI LAW

By:      _/s/ Yasin M. Almadani_
         Yasin M. Almadani, Esq.

AI LAW, PLC

By:      _/s/ Ahmed Ibrahim_
         Ahmed Ibrahim, Esq.

Attorneys for Plaintiffs, Individually and
On Behalf of All Others Similarly Situated

**SECOND AMENDED CLASS ACTION COMPLAINT**