ALMADANI LAW
Yasin M. Almadani, State Bar No. 242798
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph: 949-877-7177
Fax: 949-877-8757
yma@lawalm.com

AI LAW, PLC
Ahmed Ibrahim, State Bar No. 238739
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph.:   949-266-1240
Fax:   949-266-1280
aibrahim@ailawfirm.com

Attorneys for Plaintiffs, Individually
and On Behalf of All Others Similarly Situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA HABBERFIELD, an individual, KEONA KALU, an individual, KATIE RUNNELLS, an individual, JUANITA CARMET CACHADINA, an individual, SARAH HUEBNER, an individual, YESENIA VALIENTE, an individual, VERONICA WALTON, an individual, LISA MURPHY, an individual, NICOLE HILL, an individual, NICOLE STEWART, an individual, ME'LISA THIMOT, an individual, MARIKA WALTON, an individual, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>BOOHOO.COM USA, INC., a Delaware corporation, BOOHOO.COM UK LIMITED, a United Kingdom private limited company, BOOHOO GROUP PLC, a Jersey public limited company, PRETTYLITTLETHING.COM USA INC., a Delaware corporation, PRETTYLITTLETHING.COM LIMITED, a United Kingdom private limited company, NASTYGAL.COM USA INC., a Delaware corporation, NASTY GAL LIMITED, a United Kingdom private limited company, and DOES 1-10, inclusive.<br><br>Defendants. | CASE NO.: 2:22-CV-03899-GW-JEMx<br><br>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**<br><br>**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |

## <u>DECLARATION OF CHRISTIAN TREGILLIS</u>

I, Christian Tregillis, declare under penalty of perjury, pursuant to U.S.C. § 1746 and based on my own personal knowledge, that the following statements are true:

1.    I make this declaration of my personal knowledge and could and would testify competently on the matters stated in this declaration.

2.    I am a partner at Hemming Morse, LLP, a forensic and financial consulting firm with offices across California.  I have performed financial, economic, and accounting investigations for over 30 years and obtained Certified Public Accountant ("CPA"), Accredited in Business Valuation ("ABV"), Certified in Financial Forensics ("CFF"), and Certified Licensing Professional ("CLP") credentials.  I was a partner at Deloitte & Touche, LLP, from which I departed in 2004.  I have led the Economic Damages section of the California Society of Certified Public Accountants ("CalCPA") and the Economic Damages Task Force of the American Institute of Certified Public Accountants ("AICPA"), for which I have taught and authored articles and practice aids, such as *Calculating Lost Profits*; *Reasonable Certainty in Economic Damages Calculations*; *Discount Rates, Risk & Uncertainty in Economic Damages Calculations*; and several other classes and publications.  I have worked on several matters involving claims by putative classes, including approximately five matters related to advertised reference prices in the sale of products to consumers.  My practice is almost exactly evenly split between work for counsel for plaintiffs and defendants, and on several occasions I have worked as a neutral forensic accountant, appraiser, and damages expert.  My curriculum vitae is attached as Exhibit A.

## <u>BACKGROUND AND TASK OVERVIEW</u>

3.    I have been hired by Almadani Law and AI Law, PLC (collectively, "Class Counsel"), in their role as counsel to plaintiffs Laura Habberfield, Keona Kalu, Katie Runnells, Juanita Carmet Cachadina, Sarah Huebner, Yesenia Valiente, Veronica Walton, Lisa Murphy, Nicole Hill, Nicole Stewart, Me'Lisa Thimot, Marika Walton, and others

1

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

similarly situated, in the U.S. (excluding California) and certain U.S. territories[1] (collectively, "Plaintiffs" and the "Putative Classes"), to analyze economic, financial, and accounting issues pertaining to the claims of the Putative Classes against Defendants Boohoo Group PLC ("Boohoo Group"), Boohoo.com USA, Inc., and Boohoo.com UK Limited (collectively, the "Boohoo Defendants"), as well as Prettylittlething.com USA, Inc., Prettylittlething.com Limited (collectively, the "Pretty Little Thing Defendants"), NastyGal.com USA, Inc., and Nasty Gal Limited (collectively, the "Nasty Gal Defendants") (the Boohoo Defendants, Pretty Little Thing Defendants, and Nasty Gal Defendants collectively referred to as "Defendants"), for false advertising and related causes of action.[2]  Specifically, I have developed a damages model relating to Plaintiffs' claims and performed economic and financial analyses to value elements of the proposed agreement to settle the instant litigation, as it pertains to the Putative Classes, assuming that that the Putative Classes will be certified and Plaintiffs will prevail on liability.[3]  Below I explain in detail my analysis and conclusions.

## DEFENDANTS, THEIR WEBSITES, AND PRICING INFORMATION SHOWN TO CONSUMERS

4.      Defendants are UK-based online fashion retailers, or "e-tailers,"[4] with a target market aged 16 to 45.[5]  Founded in 2006, Boohoo Group had sales in 2022 of over $2.4

---

[1] For the purposes of this declaration, relevant U.S. sales cover 49 states (which excludes California) as well as the District of Columbia, Guam, Puerto Rico, American Samoa, U.S. Virgin Islands, and the Northern Mariana Islands ("U.S. Sales").
[2] First Amended Class Action Complaint for Damages and Injunctive Relief,  June 22, 2022, pp. 1-105 ("First Amended Complaint").
[3] Data and analysis described herein exclude sales made to California addresses.
[4] Boohoo has also had occasional "pop-up stores," but not traditional brick-and-mortal retail locations. http://www.catwalkyourself.com/fashion-news/e-commerce-site-boohoo-opens-first-physical-store-as-a-pop-up-in-nyc/ (retrieved May 8, 2022);
https://us.fashionnetwork.com/news/boohoo-opening-la-pop-up-store,675607.html (retrieved May 8, 2022).
[5] Boohoo 2022 Annual Report, p. 2.

1  billion globally.[6]  Boohoo Defendants' us.boohoo.com website is one of the four websites
2  at issue in this matter (us.boohoo.com, boohooman.com/us, nastygal.com, and
3  prettylittlething.us), each of which is part of Boohoo Group[7] and employs similar
4  marketing as regards pricing, as seen below.

5      5.      I understand that the products of Boohoo and BoohooMAN (collectively,
6  "BooHoo/MAN") are sold in the U.S. exclusively through Boohoo Defendants' Boohoo
7  and BoohooMAN U.S. websites. PrettyLittleThing Defendants' products are sold in the
8  U.S. exclusively through the PrettyLittleThing U.S. website.  NastyGal Defendants'
9  products are sold in the U.S. exclusively through the NastyGal U.S. website.

10     6.      Below is a screenshot of the us.boohoo.com homepage, with steep discounts
11 advertised.[8]



24 ─────────────────────────

25 [6] Boohoo 2022 Annual Report, p. 23 (£1,982.8 million in revenue converted to U.S.
   dollars using an exchange rate of $1.24 per GBP as of April 3, 2023
26 (https://www.bloomberg.com/quote/GBPUSD:CUR#xj4y7vzkg (retrieved April 3,
   2023)).
27 [7]  https://www.boohooplc.com/brands (retrieved May 19, 2022).
28 [8] https://us.boohoo.com/ (retrieved May 8, 2022).

3

7.    Below is a screenshot of the prettylittlething.us homepage, which uses similarly touted discounts in its presentation to website visitors.[9]



8.    Nastygal.com displays similar deep discounts on its U.S. websites.[10]



_____

[9] https://www.prettylittlething.us/ (retrieved May 8, 2022).
[10] https://www.nastygal.com/ (retrieved May 8, 2022).

4

9.     Below is a screen shot of the www.boohooman.com/us website, which employs similar advertising, promising deep discounts.[11]



10.     In sum, Plaintiffs allege that Defendants make deceptive sales by displaying artificially inflated reference prices—or deceptively concealing the actual prices at which their products are generally sold—in order to give the perception of deep discounts and have consumers pay more for Defendants' products than those consumers would have otherwise paid had they known the truth about Defendants' pricing practices.[12]

11.     Below is one of us.boohoo.com's popular products, Satin Floral Cowl Flute Hem Slip Dress, as it has appeared on the us.boohoo.com website.[13]

---

[11] https://www.boohooman.com/us/ (retrieved May 8, 2022).
[12] *See*, *e.g.*, First Amended Complaint , ¶ 1.
[13] https://us.boohoo.com/satin-floral-cowl-flute-hem-slip-dress/FZZ97741.html (retrieved May 16, 2022)

5

1
2
3
4
5
6
7
8
9
10



11    12.    This product was presented on the us.boohoo.com website in a typical

12    manner, similar to other products on each of the four websites at issue, with a site-wide

13    discount that is substantial (*e.g.*, the $68.00 reference price compared to the actual price of

14    $27.00 seen above).  In some situations, it is possible to see a discount that is composed of

15    a product-specific and/or a site-wide or other discount.    Information produced by

16    Defendants in this matter shows the sales history of Defendants on its websites at issue.

17    For example, below is a summary of U.S. Sales and Boohoo/MAN cost data for the above-

18    mentioned Satin Floral Cowl Flute Hem Slip Dress (product number FZZ97741), for the

19    sample date of May 4, 2020, representing sales on the us.boohoo.com / boohooman.com/us

20    websites.

21
22
23
24
25
26
27
28

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

13.    Sales data produced by Defendants allow for the analysis of the prices at which products have sold on each day during the class period at issue in this matter.  This includes information such as the actual sales price, undiscounted/reference price, and cost of goods sold, for each product, by day.   For example, below is a summary of us.boohoo.com / boohooman.com/us U.S. Sales data, for all products, for the month of September 2019.



14.    Defendants have also produced a calendar summary of the discounts that were offered on each day, dating back to 2016, for each of the websites at issue, with the us.boohoo.com discount promo calendar excerpted below, showing discounts by hour, from January 4, 2021, to January 17, 2021.[14]

_____

[14] 49-D00546058 – USA Promo Calendar 2021.xlsx.

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR
PRELIMINARY APPROVAL OF CLASS SETTLEMENT**



15.    The sales data produced, consistent with the promo calendars, show that the amount of discounts from advertised reference prices have been significant, with very few transaction lines at undiscounted prices.[15]



---

[15] A "transaction line" refers to a line in an order.  For example, if a consumer were to order two identical jackets in the same size, and two t-shirts in different colors, that would show up as three "transaction lines," with one line for the two jackets in the same color, and two additional "transaction lines" for each of the t-shirts in the different colors. All of those lines and items would be part of one "order."

DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT



16.    As seen above, there are many transactions at 50% or more off of an advertised reference price, with the mode seen as the tallest bar in the charts above.

- Us.boohoo.com / boohooman.com/us
  - ○  of transaction lines were at discounts of 50% or more off of reference prices, with a mode of 50%.
- Nastygal.com

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

o ███ of transaction lines were at discounts of 50% or more off of reference prices, with a mode of 60%.

- Prettylittlething.us
  o ███ of transaction lines were at discounts of 40% or more off of reference prices, with a mode of 50%.

## ADVERTISED REFERENCE PRICES

17.    The question of whether consumers are susceptible to advertised reference prices in product pricing/tagging has been studied, with these studies generally indicating that consumers' willingness to buy products increases when the products have a high but believable advertised reference price and a lower offer price.

18.    For example, Kan, Lichtenstein, Grant, and Janiszewski found that "[t]hirty years of research supports the conclusion that advertised reference prices (*e.g.*, $119.99) exert an influence on consumers' responses to offer prices (*e.g.*, $39.99) via their assimilative influence on consumers' internal reference prices."[16]    According to the authors, "[a]dvertised reference prices have been shown to exert a favorable influence across a range of consumer responses, including judgments of a fair price, the normal price, the average market price, the lowest available price in the market, expected savings, purchase value, and purchase intentions (*e.g.*, Grewal, et al. 1998; Lichtenstein and Bearden 1989; Lichtenstein, Burton, and Karson 1991; Urbany, Bearden, and Weilbaker 1988), as well as actual marketplace sales (Kaufmann, et al. 1994)."[17]    The study found that, in general, when a consumer has an internal sense of the value of a product (an "internal reference price"), that value tends to decline when a consumer sees that a product is being sold for a lower offer price than the internal reference price.    However, "[a]n

---

[16] Christina Kan, Donald R. Lichtenstein, Susan Jung Grant, and Chris Janiszewski (April 2014), "Strengthening the Influence of Advertised Reference Prices through Information Priming," *Journal of Consumer Research*, Vol. 40, No. 6, p. 1078.
[17] Christina Kan, Donald R. Lichtenstein, Susan Jung Grant, and Chris Janiszewski (April 2014), "Strengthening the Influence of Advertised Reference Prices through Information Priming," *Journal of Consumer Research*, Vol. 40, No. 6, p. 1078.

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

advertised reference price is beneficial because it can counteract the downward influence of the offer price on the internal reference price. To the extent an advertised reference price is considered valid price information, it can increase the level of the internal reference price and, consequently, make the offer price appear more attractive."[18]

19.    Gotlieb and Fitzgerald (1990) similarly found that reference prices play a prominent role in purchasing decisions and that consumers are willing to pay significantly more for products with a high reference price compared to products with a lower reference price.[19]  In the study, on average, consumers presented with a reference price of $289 were willing to pay $178.60 for a product, while consumers presented with a reference price of $429 were willing to pay $250.80 for the same product.[20]  In other words, these consumers were willing to pay 58.5% of the $429 advertised reference price, or 61.8% of the $289 reference price, for the same product.  The $250.80 price represents a $72.20 price premium, which is a 40.4% price increase due to the use of the advertised reference price, over the $178.60 price willing to be paid without a reference price ($72.20 / $178.60 = 0.404).  The $72.20 price premium is 28.8% of the $250.80 inflated price that could be charged with the reference price ($72.20 / $250.80 = 0.288).

20.    Compeau and Grewal (1998) had similar findings in their review of research on the topic.  As they explained, whether the consumer actually got what they bargained for depends on the validity of the advertised reference price.[21]

> An advertised reference price (*e.g.*, regular price, original price, manufacturer's suggested price) suggests that consumers will save money,

---

[18] Christina Kan, Donald R. Lichtenstein, Susan Jung Grant, and Chris Janiszewski (April 2014), "Strengthening the Influence of Advertised Reference Prices through Information Priming," *Journal of Consumer Research*, Vol. 40, No. 6, p. 1079.

[19] Jerry Gotlieb and Cindy Fitzgerald (1990), "An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product," *Journal of Applied Business Research*, 6 (1), 59-69.

[20] Jerry Gotlieb and Cindy Fitzgerald (1990), "An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product," *Journal of Applied Business Research*, 6 (1), 59-69.

[21] Larry Compeau and Dhruv Grewal (1998), "Comparative Price Advertising: An Integrative Review," *Journal of Public Policy & Marketing*, 17 (2), 257.

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

that they will "get a deal." Advertisers often appeal to this desire to "get a deal" by comparing the offering price (*e.g.*, sale price) with some higher reference price (*e.g.*, regular price), thereby making the offered price more attractive. Whether the consumers actually save money depends primarily in the validity of this advertised comparative reference price.

## **FRAMEWORK FOR ANALYSIS OF FALSE ADVERTISING CLAIMS**

21. While I do not hold myself out to be an expert in the law, I understand that California state law, as well as analogous laws in other states, prohibit false or misleading trade practices such as false advertising. For example, California Business and Professions Code section 17501, pertaining to "False Advertising," states, in relevant part: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement."[22] Other states have similar laws protecting consumers as alleged in Plaintiffs' First Amended Complaint.[23]

## **SURVEY DATA AND RESULTS REGARDING BOOHOO PRODUCTS SOLD**

22. Two surveys about consumer preferences and values were performed by a marketing expert ("Marketing Expert"), at the request of Class Counsel. According to the Marketing Expert Output document, provided to me by Class Counsel, summarizing the studies' results, the Marketing Expert performed these studies in a manner consistent with standards cited in the Federal Judicial Center's *Manual for Complex Litigation*.[24] According to the Marketing Expert Output, the studies were performed using established and validated principles of scholarly marketing research (*i.e.*, survey design and administration) according to the field's best practices, and showed that the relevant consumer population has been deceived, by the alleged false advertising using reference

---

[22] https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=BPC&sectionNum=17501 (retrieved May 19, 2022).
[23] *See, e.g.,* First Amended Complaint, pp. 88-92.
[24] Marketing Expert Output, March 18, 2022, p. 1.

prices and advertised discounts, into paying more than those consumers would have paid absent the reference prices (*i.e.*, the reference prices have wrongly indicated that the reference prices are routinely charged by Boohoo Defendants).[25]

23.    According to the Marketing Expert Output, the first study found the following, showing very similar results to those of Gotlieb and Fitzgerald:[26]

> 4.    The main findings of the Consumer Perceptions Study 1 (based on an advertised Boohoo discount sale of 50% off) can be summarized as follows:
>
> a.    The discount associated with a fashion product sold online is an important purchase consideration that is material to consumer purchase decisions.
>
> b.    Consumers trust that a retailer's reference price (i.e., what the online retailer claims to be an item's regular price) is truthful and thus the discounts being offered by the retailer are honest and meaningful.
>
> c.    The use of artificially inflated references prices causes consumers to become more likely to purchase items than they otherwise would have been, and causes them to pay more for those items than they otherwise would have paid had they been shown the true retail prices at which the items were generally being offered for sale or sold by the retailer.
>
> d.    The use of artificially inflated reference prices is seen by consumers as misleading.
>
> e.    The results of the Consumer Perceptions Study 1 show that consumers in the online fashion market are driven by both the presence and magnitude of the discounts they are shown. Therefore, an online fashion retailer that artificially inflates its reference prices to create false perceptions of savings unduly increases the purchase likelihood for these products and consequently increases the amount extracted from consumers by means of deception. In the absence of these false reference prices, consumers would seek and expect true sales and display similar levels of purchase likelihood only at lower price points, a fact that renders the retailer's behavior misleading and produces financial harm to the consumer. The average amount of overpayment due to the inflated sale across the six products featured in Study 1 was 44.21%.

24.    As seen above, the first study investigated the price premium paid by consumers of Boohoo Defendants' products, as a result of an advertised discount of 50% off an artificially inflated reference price, finding that such advertising resulted in a price that was 44.21% higher than what the Boohoo Defendants' consumer would have been

---

[25] Marketing Expert Output, March 18, 2022, pp. 1-2.
[26] Marketing Expert Output, March 18, 2022, p. 2.

willing to pay for the same product had Boohoo accurately represented to the consumer the actual price at which the item was normally offered for sale by Boohoo.

25.    For example, for a Boohoo Defendants' product with a reference price of $20.00 and a sale price of $10.00 (advertised as 50% off), the study found that, had consumers known that the item customarily sold for $10.00/unit (*i.e.*, the true reference price), they would have displayed equivalent interest in buying it at $6.93, instead of the $10.00 price paid as a result of the inflated reference price of $20.00. Thus, the fake sale resulted in a price premium of $3.07 or 44.21%.  Identifying the price premium paid by consumers as a result of Defendants' deceptive sales practices allows for the calculation of damages resulting from Defendants' actions that created the legal liability alleged by Plaintiffs.

**Reference and Actual Prices Demonstrating Price Premium From False Advertising**

| | With Reference Price | Without Reference Price | Premium From False Advertising |
|---|---|---|---|
| Reference Price | $20.00 | none | |
| Actual Price | $10.00 | $6.93 | $3.07 |

| | |
|---|---|
| Premium as a Percent of Price Without Reference Price | $3.07/$6.93 = 44.21% |
| Premium as a Percent of Price Actually Paid With Reference Price | $3.07/$10.00 = 30.66% |

26.    These figures align closely with those found in the Gotlieb and Fitzgerald study, which found a price premium of 40.4% of the price without the reference price, as discussed above.

27.    The second study by the Marketing Expert found that an advertised reference price that touted a 60%-off discount resulted in a price that was 61.11% higher than what the Boohoo Defendants' consumer would have been willing to pay for the same product had the Boohoo Defendants accurately represented the price at which the item was normally offered for sale (as compared to the 44.21% found on the first study, testing a 50%-off discount effect, or the 40.4% found in the Gotlieb and Fitzgerald study, testing a 33%-off discount effect).[27]

28.    The Marketing Expert observed that the findings of the two studies were remarkably consistent in their core finding: that a retailer's use of inflated reference pricing is material to a consumer's purchase decision and deceptively increases the price the consumer is willing to pay, in the retailer's favor.[28]  The Marketing Expert also noted that the results are very much in line with scholarly research on the topic of reference pricing that spans several decades.[29]

29.    While the Marketing Expert's study focused on the "boohoo" brand, the Marketing Expert Output noted that the lawsuits filed against PrettyLittleThing and NastyGal make similar allegations, and that all three brands at issue are commonly owned and controlled by Boohoo Group, PLC.[30]  The Marketing Expert Output noted further that all three brands target a largely similar demographic and engage in similar pricing and discount practices, as alleged in the respective complaints.[31]  Therefore, according to the Marketing Expert Output, there is a reasonable expectation that the findings by the

---

[27] Marketing Expert Output, March 18, 2022, p. 3.
[28] Marketing Expert Output, March 18, 2022, pp. 3-4.
[29] Marketing Expert Output, March 18, 2022, pp. 3-4.
[30] Marketing Expert Output, March 18, 2022, n.3.
[31] Marketing Expert Output, March 18, 2022, n.3.

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

marketing expert concerning the boohoo brand would be relatively consistent for PrettyLittleThing and NastyGal.[32]

## MONETARY REMEDIES IN THE SUBJECT CLASS ACTIONS

30.    The issue of monetary remedies in advertised reference price disputes is one I have previously analyzed.  This has included the matter of *Stacey Chester, et al. v. TJX Companies, et al.*, (case no. EDCV 15-01437 ODW (DTBx) (Central District of California)), an advertised reference price class action lawsuit.  I also worked on *Murillo v. Kohl's* (case no. 2:16-cv-00196-JPS (Eastern District of Wisconsin)).  I also opined on a methodology for calculating monetary remedies in an advertised reference price matter involving the Children's Place, and another involving GNC Nutrition, as well as the related consolidated case to this matter, *Khan v. Boohoo.com USA Inc.,* No. 2:20-cv-03332GW-JEMx, *Hilton v. PrettyLittleThing.com USA Inc., No. 2:20-cv-04658-GW-JEMx*, and ILee v. NastyGal.com USA Inc., No. 2:20-cv-04659-GW-JEMx (collectively, the "*Khan* Litigation").

31.    I understand that Plaintiffs in this case are seeking restitution and damages.  One available remedy may be a "full refund."  While I am aware of at least one case in which a full refund has been endorsed by the court, I am also aware of another case in which that measure was not accepted on the grounds that a full refund does not account for the value that the consumer received—to permit an accurate calculation of the price premium paid by the consumer, in excess of value received—as a result of the fake sale.

32.    Consistent with this reasoning, I understand that monetary recovery may be provided by the return of the excess of what the plaintiff gave the defendants over the value of what the plaintiff received.  As such, another measure of monetary remedies is to compare the amount paid with the value received, thereby estimating the price premium paid by the consumer as a result of the fake sale.  This allows for the calculation of damages based on Plaintiffs' theory of liability vis-à-vis Defendants' deceptive pricing practices.

---

[32] Marketing Expert Output, March 18, 2022, n.3.

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

33.    In the present case, the Marketing Expert's analysis compared (1) consumers' purchase probability for products as a result of Boohoo's use of its inflated reference prices in a sale, with (2) consumers' purchase probability for the same products using the true reference price in a sale.  The studies identified what level of true discount would be required to induce the same product appeal as the inflated-reference-price sale discount deployed by Boohoo.  This occurs when the purchase probability associated with a true sale would be statistically equal to that associated with the inflated-reference-price sale (as in the Gotlieb and Fitzgerald study).  In other words, the studies measured the real-price discount (*i.e.*, a genuine sale) that was similarly valued to the inflated-reference-price discount (*i.e.*, the fake sale) to calculate the price premium paid by the consumer as a result of the fake sale.

34.    This is a notable element of the Marketing Expert's analysis, consistent with not only studies on the effect of advertised reference prices, but also the widely accepted methodologies I have used in the other matters in which I have been involved, using similar surveys that estimate the price at which a consumer would receive a similar amount of what economists call "utility," which is akin to economic well-being, satisfaction, or happiness, to estimate the value of what the consumer has received in the purchases at issue (*i.e.*, the value to the consumer without the artificial reference price).  Identifying prices that provide equal utility makes it possible to accurately estimate and calculate the price premium paid by the consumers as a result of the inflated reference price in a fake sale.  In other words, consistent with the other matters on which I have worked, the price premium is seen by comparing the transactions that provide equally valued exchanges to consumers, showing that higher amounts of perceived discounts create greater consumer interest/utility, based on the perception of a "deal."

35.    A similar and related issue with this analysis is the amount of discount a consumer would expect compared to the intrinsic value of a product.  This is consistent with the Marketing Expert's surveys and the Gotlieb and Fitzgerald study.  For example, a

dress advertised as having an artificial reference price of $50 and an actual price of $25 (50% discount) are equally interesting/compelling when the reference price is not artificially inflated and the actual normal price of $25 is known, and the consumer needs then only a 30.66% discount to be equally compelled to make the purchase. This "discount compression" as prices drop is not only empirically supported but also makes economic sense. In other words, once the same dress is advertised as having a normal price of $25, the discount expected to provide equal consumer utility falls to 30.66%.

36.    The comparison of the Marketing Expert's survey 1 and survey 2 results in this case further confirms the discount compression issue I describe above (as well as comparison to Gotlieb and Fitzgerald).

37.    Here, data produced by Boohoo has permitted a calculation of amounts overpaid by consumers, accounting for the issues I describe above, including discount compression, in combination with the actual sales, discounts, and cost history of the products at issue.

38.    To make this calculation I used the sales and cost data from .CSV files, pertaining to www.prettylittlething.us, and .PSV/.CSV files, pertaining to us.boohoo.com, www.nastygal.com, and www.boohooman.com/us, produced by Defendants. Using us.boohoo.com / boohooman.com/us data (for example), the average discount by day can be calculated, as summarized in the excerpt below, for September 2019.[33]

---

[33] Excerpted information excludes transactions with a negative discount.



39.    My price-premium analysis is based on the actual discounts at which transactions occurred using the actual sales data.

40.    These data are then used to determine the mode (most frequently appearing) discount over the then-previous 90 days.  For example, the prevailing price as of February 15 is the most common price/discount over the then-previous 90 days, dating back to the November 17 of the previous year.  What discount is prevailing over that time period could be different from what would be most common as of May 15, three months later.  The calculation as performed accommodates that issue (with daily updates of the mode).  In other words, absent the accused wrongful advertising, the true reference price is the 90-day mode of the actual sale price, and damages are the amount of overpayment as a result of the use of an inflated and inaccurate reference price, using the survey data to estimate

the price at which the consumer would have had equal utility, with knowledge of the true mode price. Doing so allowed me to calculate the price premium paid by the consumer as a result of the fake sale and thereby calculate damages based on Plaintiffs' theory of liability.

41.    In addition, because within the previous 90 days the amount of discounts is not exactly the same on any day or within a day's data, I grouped the discounts into 5% groups (*e.g.*, 30.00% - 34.99% off). From these I was able to see what discount group was prevailing (the most common). I conservatively then used the lowest discount in that range (*e.g.*, for 30.00% - 34.99% off, I used 30% off), as I would if I were to testify at a contested hearing or trial. In other words, my model as described represents what I believe Plaintiffs would adduce as their damages model for class certification and at trial.

42.    As seen in the graphs shown above (¶¶ 14-15), the most frequent discounts (generally speaking) were at ██% for www.nastygal.com, ██% for us.boohoo.com / boohooman.com, and ██% for www.prettylittlething.us. Nevertheless, in my damages calculations, I used the actual mode of (most frequent) discounts on each day, using a 90-day lookback period on each day (as described above).

43.    From the Marketing Expert Output, I was then able to calculate the amount of discount that consumers would require to be equally well off/with equal utility, accounting for linear discount compression based on the 44.21% average amount of overpayment given an advertised discount sale of 50% off (with similar compression comparing with the discount for a 60%-off reference price, as per the second study, as well as Gotlieb and Fitzgerald). That is, as described above, for example, a 50% discount off of a $50 inflated reference price would only need to be discounted 30.66% if the true mode price of $25 was known to consumers, in order for consumers to achieve the same level of utility. Below is a table showing the discount associated with each level of discounting by mode price, with the amount of discount compression shown (*i.e.*, the more the promised discount, the less additional discount that is expected as the price becomes smaller).

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR
PRELIMINARY APPROVAL OF CLASS SETTLEMENT**



44.    Applying the discount compression, to account for the inherent value of the object purchased, this process yields the prices/discounts that are required to make consumers equally well off, based on the prevailing sold prices, and the difference is compared to the actual sold prices to yield the amounts that consumers overpaid as a result of the advertised reference prices used, *i.e.*, the price premium.

45.    In application, this yields the following calculated amounts that consumers overpaid for U.S. Sales as a result of the advertised reference prices used (with the data below shown for sample days from 6/4/2022 to 6/17/2022, for each website, based on actual sales volumes, prices, and discounts, for all U.S. Sales (though the totals at the bottom of each table are for the entire period for which data was analyzed, even though only two weeks of daily data have been shown in the excerpts).[34]

---

[34] us.boohoo.com / boohooman.com/us sales data covers 3/28/2016 to 6/17/2022. Nastygal.com sales data covers 2/28/2017 to 6/17/2022.    Prettylittlething.us sales data covers 2/29/2016 to 6/17/2022.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



46.    For prettylittlething.us, the data files provided by Boohoo lacked geographic data for all transactions in 2016 and 2017, as well as a limited portion of transactions in subsequent years.  Thus, the amount of overcharge shown above for prettylittlething.us

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

underestimates the overcharge to U.S. Sales consumers during the relevant period (*e.g.*, since there is no calculation for 2016 or 2017).

47.    To estimate those transactions related to U.S. Sales, I first calculated the portion of sales that were in the U.S., from the total dataset that had geographic information, which was over 98% for each year of complete data.  I then looked to information produced by Boohoo, which calculated the percent of U.S. Sales compared to all sales, with an excerpt from Boohoo's sales-by-location document excerpted below.[35]



48.    Finally, for the data with geographic information, I determined the per-year overcharge as a percentage of the actual amounts paid by U.S. Sales consumers, which ranged from 16.9% to 27.7%, depending on the year.[36]

49.    I then applied each to the prettylittlething.us transaction data that lacked geographic information, to estimate the amount of overcharge for these transactions.  The amount of overcharge estimated (because Boohoo did not produce that data for 2016 and 2017 for prettylittlething.us) is then added to the amounts calculated under the model.

50.    The damages for each website, for each year, including a comparison to actual sales, are summarized below.

---

[35] Stipulation executed on April 6, 2023, at Ex. 4.  This document, produced by Defendants, from which this excerpt is taken, includes financial information by Boohoo's fiscal year (which ends at the end of February each year).
[36] As described and graphed previously in this declaration, the price premium can be calculated as a percentage of the price without the reference price (lower) or the price with the reference price (higher).

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

51.    The calculations shown and described above are conservative for many reasons, including the following:

- Discounts are grouped by 5% band and rounded down, rather than using the center of the range.

**Us.Boohoo.com, NastyGal.com, and Boohooman.com/us**

- Includes only transactions denominated in U.S. dollars (USD).

- Excludes transactions with ProductCategory coding identified as Beauty or Carriage Charges.

- Excludes transactions with negative calculated discounts (*i.e.*, ActualPrice more than the WebsitePrice).

- Excludes transactions that do not have an estimated cost included in the produced data.

**Prettylittlething.us**

- Excludes transactions with negative discounts (*i.e.*, Net Product Sales LC more than Gross Original Price LC).

- Excludes transactions with ProductCategory coding identified as Beauty.

- Excludes transactions that did not have a product cost included in the produced data.

52.    As referenced above, there are multiple elements of conservatism in this analysis. As a damages expert, these are the figures to which I would testify at class certification and/or trial, because I believe they are conservative and reasonably certain under accepted methodologies for the calculation of economic damages, consistent with my testimony on behalf of both plaintiffs and defendants and as a neutral, as well as my publications and teachings on economic damages, such as for CalCPA and the AICPA.  As can be seen above, these figures total approximately $441 million for the period from 3/28/2016 to 12/7/2021.[37]  I have not included prejudgment interest in this calculation, which I understand could possibly be awarded, at the Court's discretion.

### GIFT CARDS AS PART OF SETTLEMENT AGREEMENT

53.    I understand, per the proposed settlement agreement I have seen (the "Settlement Agreement"), that the Putative Classes, if the Agreement is upheld, would settle their U.S. Sales claim(s).  As described above, I would testify to a damages figure of $441 million for the U.S. websites at issue, based on U.S. Sales, for the time period from 3/28/2016 to 6/17/2022 (not including prejudgment interest).[38]  I do not have an opinion on the likelihood of the Putative Classes being certified or a finding of liability.  Nor do I have an opinion on the amount of legal fees and costs that each side of the dispute would incur or whether legal fees and costs or any other damages would be part of an award.

54.    I also understand that, as part of the Settlement Agreement, each Putative Class Member would receive a gift card for $10, plus free shipping, usable on the U.S. website of the company that issued the gift card, and that Putative Class Members who

---

[37] The data analyzed goes through 6/17/2022.
[38] The data analyzed goes through 6/17/2022.

made purchases on more than one of the websites at issue could obtain one gift card for each site on which the Putative Class Members made a purchase.[39]

55.    The gift cards have no expiration date, no minimum purchase requirement, no fees, no blackout dates, no restriction on use with other offers or promotions, no restriction on transferability, are generally combinable within 24 hours, and are replaceable if lost.[40]

56.    Data produced by Boohoo provide the figures to calculate that, per a stipulation in which Defendants represented totals as of June 17, 2022, 11,312,701 gift cards can be expected to be sent to Putative Class Members, a number that is expected to increase if the case moves to final approval.[41]

57.    I understand that the websites at issue have over 25,000 products that have sold for $10 or less, providing Putative Class Members with many options, across multiple product categories, to use the gift cards without the Class Members having to incur any out-of-pocket costs.  Defendants have represented that "[o]n any given day, Defendants generally have thousands of styles that may be purchased for $10 or less with a wide variety of styles across many different categories on their websites."[42]  For example, Defendants have further represented that:

> as of approximately February 28, 2023, Boohoo had 6,153 styles (17.4% of all available styles) on their U.S. website that were for sale at $10 or less; on March 1, 2023, BoohooMAN had 4,408 styles (26.8% of all available styles) on their U.S. website that were for sale at $10 or less; on February 28, 2023, PrettyLittleThing had 12,234 styles (36.2% of all available styles) on their U.S. website that were for sale at $10 or less; and on February 27, 2023, NastyGal had 620 styles (9.9% of all available styles) on their U.S. website that were for sale at $10 or less. Some of the styles available for purchase for $10 or less will have multiple colors available, allowing for an even larger number of available products for sale. These products generally span numerous product styles and categories, including, for example, tops, pants, dresses, skirts, shorts, swimwear, underwear, activewear, lingerie, sleepwear,

---

[39] Settlement Agreement, §2.1(a)(i-xiii).
[40] Settlement Agreement, §2.1(a)(i-xiii), Ex. I; Stipulation executed April 6, 2023, at ¶ 18.
[41] Stipulation executed on April 6, 2023, at ¶ 12, Ex. 1.
[42] Stipulation executed on April 6, 2023, at ¶ 19.

27

footwear, accessories, etc. Going further back, as of approximately May 6, 2022, Boohoo had 8,681 styles (22% of all available styles) on their U.S. website that were for sale at $10 or less; BoohooMAN had 1,000 styles (12% of all available styles) on their U.S. website that were for sale at $10 or less; PrettyLittleThing had 7,955 styles (24.3% of all available styles) on their U.S. website that were for sale at $10 or less; NastyGal had 1,029 styles (9% of all available styles) on their U.S. website that were for sale at $10 or less. These styles generally span numerous categories, including, for example, tops, pants, dresses, skirts, shorts, swimwear, underwear, activewear, lingerie, sleepwear, footwear, accessories, etc.[43]

58.    Examples are shown below.[44]



---

[43] Stipulation executed on May 20, 2022, at ¶ 19.

[44] https://us.boohoo.com/premium-rib-long-sleeve-crop-top/FZZ05891-124-24.html; https://us.boohoo.com/double-layer-long-sleeve-crop-top/FZZ23851-106-352.html;https://us.boohoo.com/womens/dresses?pmin=0.00&pmax=10.00; https://www.nastygal.com/gb/womens?srule=price-low-to-high&sz=60&start=0; https://www.prettylittlething.us/clothing/coats-jackets.html?id=66&ajax=0&sortby=price_asc.

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**



59.    Consistent with Defendants' representations, below is a summary of products with a sales transaction for $10 or less for us.boohoo.com / boohooman.com/us and nastygal.com.[45]

---

[45] As noted elsewhere in this declaration, geographic data for prettylittlething.com sales transactions are missing for 2016 and 2017, as well as for a portion of sales in the produced

Continued on the next page

30

DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

| U.S. Sales: # of Unique Products Sold at Prices Less Than or Equal to $10 | | | | | | | |
| | Partial [1] | | | | | | Partial [1] |
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| BOO/MAN | 25,857 | 44,178 | 39,504 | 39,465 | 47,261 | 52,672 | 26,553 |
| GAL [2] | | 2,127 | 4,754 | 13,260 | 13,011 | 14,826 | 7,606 |

**Notes and Sources**

[1]    Date ranges in the data produced are:  BOO / MAN (3/28/2016 - 6/17/2022; GAL (2/28/2017 - 6/17/2022).

[2]    Sales transaction data for GAL begins on 2/28/27, in data produced.

60.    As referenced above, the gift cards also provide free shipping.  Data from Boohoo show that free shipping is worth $7.45 per gift card, as Defendants customarily charge shipping and handling to their customers and those shipping and handling charges on average amount to $7.45 per purchase.[46]

61.    Free shipping has also been studied and found to be a particularly valuable feature to consumers—in fact it is often valued at a higher level than the actual value of the shipping itself, as found by a study made by Wharton Business School professor David Bell, excerpted below (link to whole article in the footnote below).[47]

---

data covering subsequent years.  As such, for presentation purposes, similar information for prettylittlething.com is not shown.

[46] Stipulation executed April 6, 2023, at ¶ 13, Ex. 2.  The $7.45 charge per order includes consideration of free shipping, when it is offered.  In other words, shipping is more than $7.48 per order when it is charged, and $7.48 is an average of shipping charges per order, including orders with paid shipping and free shipping.  As a result, this is a conservative estimate in that customers can select a higher discount when offered and make use of free shipping, rather than choosing an option of a lesser discount with free shipping.

[47] https://knowledge.wharton.upenn.edu/article/how-the-offer-of-free-shipping-affects-on-line-shopping (retrieved May 8, 2022).



62.    Applied to the number of Putative Class Members and sites from which those Class Members made purchases (as per Boohoo data), the total value of gift cards provided as part of the Settlement Agreement, as of June 17, 2022, is 11,312,701 x $17.45 = $197,406,632.

## **VALUE OF INJUNCTION**

63.    I understand that an additional element of the Settlement Agreement is injunctive relief, under Section 2.10.  Generally, I understand that Defendants have agreed to the following, as of the date of the agreement and going forward:[48]

- Defendants' "comparison pricing practices" in the United States "will not violate then-existing federal or California law, including California's specific price-comparison advertising statutes and Federal Trade Commission ("FTC") regulations," and "any comparison price to which Defendants refer in their price

---

[48] Although I have considered in my analysis all the elements of the injunctive relief under the Settlement Agreement, the summary information provided below and in this section is for informational and background purposes only, and may not reflect a complete description of all elements under the Settlement Agreement.  For the full details regarding the specific injunctive relief agreed to by Defendants, please refer to the Settlement Agreement.

comparison advertising in the United States will comply and be consistent with the terms of [the Settlement Agreement]."[49]

- Defendants will base any "comparison prices on the actual retail prices at which substantial sales of similar items are being made in the relevant market, or if ***Defendants choose to use their own opinion of the value of their products as a comparison price***, then they must ***clearly*** and ***conspicuously inform their customers*** in compliance with and consistent with the terms of [the Settlement Agreement]."[50] [emphasis added]

64.    I further understand that in effectuating the injunctive relief agreed to by Defendants, the Settlement Agreement requires "Maintenance of Changes in Website Practices" implemented by Defendants, that conspicuously informs customers (and potential customers) of the nature of the comparison price used by Defendants, where such price reflects Defendants' "opinion of the full retail value" of a product.[51]  In particular, I understand that Defendants made changes to its U.S. websites on June 17, 2022, under terms of the "Khan Settlement" and Defendants agreed to maintain such changes.  Every product page on the U.S. websites (for any product that is advertised as being "for sale at a discount markdown from its original price or full price") must include a "conspicuously displayed" pricing policy disclosure box in the form below (the "Pricing Policy"):[52]

> *Our percentage off promotions, discounts, or sale markdowns are customarily based on our own opinion of the value of this product, which is not intended to reflect a former price at which this product has sold in the recent past. This amount represents our opinion of the full retail value of this product today based on our own assessment after considering a number of factors.*
>
> *That's why before checking out, it's important you acknowledge that you understand this. Cool with that? Great, happy shopping!*[53]

---

[49] Settlement Agreement, §2.10.1.
[50] Settlement Agreement, §2.10.1.
[51] Settlement Agreement, §2.10.2(a)-(c).
[52] Settlement Agreement, §2.10.2(a)-(c).
[53] Settlement Agreement, §2.10.2(b).

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

65. I understand that the Settlement Agreement requires that the Pricing Policy be "conspicuously displayed at all times on each such product page and shall not be in hidden click-to-reveal form,"[54] and the disclosures be displayed in multiple locations on a product page, such as those identified by the red boxes shown below, and have an "asterisk (*) displayed next to the original price . . . in order to draw the attention of customers . . . to read the Pricing Policy disclaimer."[55]



[red boxes added here to highlight the pertinent language]

---

[54] Settlement Agreement, §2.10.2(a).
[55] Screenshot taken from PrettyLittleThing U.S. website on April 5, 2023.

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

66.    I understand that Defendants are further required to include additional Pricing Policy disclaimer language on all website "Landing Pages"[56] advertising promotions, discounts, or sales that day, as well as "on any e-mails advertising such promotions, discounts or sales available on" Defendants' U.S. websites and "sent to U.S customers and e-mail subscribers."[57]   The short-form Pricing Policy language is shown below:

> *Discounts may not be based on former prices. See pricing policy.*



[red box added here to highlight the pertinent language]

---

<sup>56</sup> The Settlement Agreement defines "Landing Pages" as "the respective homepages of the Boohoo U.S. Websites, the PLT U.S. Website, and the Nasty Gal U.S. Website, as well as any and all pages that a customer may initially land on upon clicking a link (not on the Boohoo U.S. Websites, the PLT U.S. Website, and the Nasty Gal U.S. Website) advertising a sale or promotion" as defined in Sec 2.10.2(d), for example, "a link in an online advertisement or on social media."
<sup>57</sup> Settlement Agreement, §2.10.2(d.)

35

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



[red box added here to highlight the pertinent language]

21
22
23
24
25
26
27
28

  67. Per the Settlement Agreement, the "See pricing policy" will be a hyperlink and take the consumer/potential customer directly to the Pricing Policy disclosure that is required to be part of Defendants' terms and conditions for the four subject U.S. websites.[58] I understand that, for "Landing Pages," the required Pricing Policy language is to be

---

[58] Settlement Agreement, §2.10.2(d).

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

displayed in a conspicuous location, such as that highlighted with the red box in the excerpted image below, from a landing page for the us.boohoo.com website on a mobile device:[59]



[red box added to highlight the pertinent language]

68.    I understand that the conspicuous changes prescribed by the Settlement Agreement are intended to be seen by consumers/potential customers and the explanations about Defendants' pricing are intended to clarify that their reference prices are not based on former prices at which the items were sold, but rather are simply Defendants' own opinion of the value of an item. These changes to the subject websites are intended to inform consumers about the true nature of any alleged sale.

69.    In other words, in simple terms, these changes have been designed and defined to eliminate any misunderstanding that consumers may have had about Defendants' prices, based on a suggestion that the advertised reference prices have actually been charged consumers.  As a result, by eliminating any misunderstanding that consumers have had about Defendants' prices, the extent and value of which has been evidenced in

---

[59] Settlement Agreement, §2.10.2(d), Ex. G.

DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

their responses to the Marketing Expert's survey, indicating the extent of the price difference that was necessary to account for respondents' perceptions about the pricing used by Defendants, that value will be restored to consumers with the elimination of that misunderstanding.

70.     In this context, the value to consumers of the implementation of the injunction as defined in the Settlement Agreement can be estimated based on the damages that have been incurred in the past, because the damages methodology is designed to calculate the price premia paid by consumers as a result of the use of false/inflated reference prices, and the injunctive relief has been designed and defined to eliminate that consumer misunderstanding, as seen in the summary table I included after paragraph 50, reproduced below.



71.     Specifically, in this case, as seen in the table above, the "overcharge" damages for the year 2021 (the most recent full year for which I have data) are approximately $131

**DECLARATION OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP, IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

million (not including prejudgment interest).[60]  If the amount of sales in the future is the same, taking into consideration the trend of increased sales, but also the potential decrease in sales with the clarification that Defendants' reference prices are not based on former prices at which their items were offered for sale, *i.e.*, elimination of deception, then the future value of an injunction is $131 million per year.  In other words, for three years into the future, that is worth $393 million, without considering discounting and the time value of money.  If I discount these damages at 10% per year, which is conservative as that rate is much higher than the current 3-year treasury rate of 3.59%,[61] the present value of eliminating three future years of Defendants' customers' overpayment (assuming damages at the same level as 2021) is $341.7 million for Settlement Class Members.[62]  Obviously, having that injunction put into place as soon as possible provides greater benefits to Defendants' customers than a delayed implementation, as any deception is eliminated to the extent the disclaimers—which are required to be conspicuous and in plain language—are seen and understood by consumers and potential customers, as intended.

Dated:   April 7, 2023

By:   _____

Christian Tregillis, CPA, ABV, CFF, CLP

---

[60] As shown in the schedule preceding paragraph 71, overcharge damages go through June 17, 2022.  The partial-year overcharge damages for 2022 of $50.8 million, considering seasonality, indicate that the use 2021's overcharge damages of $131 million is reasonable.
[61] U.S. Department of the Treasury, 3-year treasury rate as of April 6, 2023 (https://home.treasury.gov/resource-center/data-chart-center/interest-rates/TextView?type=daily_treasury_yield_curve&field_tdr_date_value_month=202304) (retrieved April 6, 2023).
[62] These calculations employ the mid-year convention.  To the extent that the sales are back-end-weighted, as is common in the retail apparel industry, the discounting effect is slightly greater, resulting in slightly lower damages/injunction value after discounting. "Settlement Class Members" is as defined in §1.3 of the Settlement Agreement, covering purchasers from 49 U.S. states (excluding California) and other territories.

Exhibit A



# Christian Tregillis, CPA, ABV, CFF, CLP
## Partner

800 S. Figueroa Street, Suite 1270
Los Angeles, CA 90017
213.222.0888 | tregillisc@hemming.com

## Summary

Christian Tregillis is a partner in Hemming Morse's Los Angeles office. In this role he analyzes financial, accounting, economic, statistical, and market issues, primarily relating to disputes, valuations, and the negotiation of license agreements covering the use of intellectual property. In his 30-year career, he has participated in mediations and has testified in over 140 matters, in state and federal courts and arbitration venues, including more than 50 trials/arbitrations.  His testimony has been almost exactly evenly split between plaintiffs/claimants and defendants/respondents.

Before joining Hemming Morse, Mr. Tregillis was the leader of the Damages, Valuation & IP practice area globally for LECG.  Prior to that he led the Forensic Accounting & Litigation Consulting group in the Western U.S. for Kroll, Inc., following 11 years at "big four" accounting firms, including as a Partner in the Financial Advisory Services practice at Deloitte & Touche.  Early in his career he spent two years at First Interstate Bank, where he helped design a portfolio hedging system to manage interest rate exposure, valued acquisition targets and lines of business, and statistically forecasted loan losses.

Mr. Tregillis is a past Chair of the Economic Damages Task Force of the American Institute of Certified Public Accountants, for which he has authored practice aids and taught on the calculation of economic damages and related topics.  He is also a past Chair of the Economic Damages Section and a current member of the Steering Committee of the Forensic Services Section of the California Society of Certified Public Accountants.  In addition, he is a past co-chair of committees of Certified Licensing Professionals. From 2003 to 2007 he was on the Board of Trustees of the Center for Law in the Public Interest and served as the Center's Chief Financial Officer.

## Education and Certifications

- Occidental College, A.B. Economics with Distinction
- University of Chicago Graduate School of Business, M.B.A. Finance and Accounting
- Certified Public Accountant, Licensed in California and Certified in Illinois
- Accredited in Business Valuation, American Institute of Certified Public Accountants
- Certified in Financial Forensics, American Institute of Certified Public Accountants
- Certified Licensing Professional, Licensing Executives Society

# Christian Tregillis, CPA, ABV, CFF, CLP



## Select Engagements

- **_Putative class v. seller of coconut water_**.  The plaintiffs alleged that the defendant employed false advertising in its use of the phrase "born in brazil" on the product's packaging, when in fact the coconuts used to make the product were from Indonesia, Thailand, and the Philippines.  Mr. Tregillis performed a hedonic regression analysis to evaluate the effect on prices of the use of this tagline on the packaging, and to answer the question of whether there was available a methodology to calculate damages and monetary remedies relating to the alleged misrepresentation.

- **_Putative class v. department store retailer_**.  The plaintiffs alleged that the defendant falsely advertised its products by using advertised reference prices (e.g., "regular price," "retail price," and "formerly") in ads and on product price tags.  Mr. Tregillis developed a methodology to quantify damages to consumer plaintiffs and issued a report for class certification.  The matter settled before any testimony was given.

- **_Putative class v. seller of smartphones_**.  The plaintiffs alleged that the defendant sold extended warranty programs to buyers of smartphones, but the replacement phones were refurbished rather than new, such that plaintiffs alleged that the warranties were sold based on misrepresentations.  Mr. Tregillis issued a declaration on the question of whether there was available a methodology to calculate damages and monetary remedies relating to the alleged misrepresentations.

- **_Putative class v. clothing retailer_**.  The plaintiffs alleged that the defendant falsely advertised its products as being discounted from a "normal" or "reference" price, to a discounted price, when in fact sales were not routinely made at these prices.  Mr. Tregillis issued a declaration on the question of whether there was available a methodology to calculate damages and monetary remedies relating to the alleged false advertising.

- **_Putative class v. sub-sandwich company_**.  The defendant was accused of not paying overtime to employees who worked at multiple restaurant stores, where the individuals had accumulated sufficient time worked when considering the multiple stores at which the individuals worked in a given time period.  Mr. Tregillis analyzed statistical issues and the sample size needed to permit an accurate analysis of damages.

- **_Employees v. gaming software company._** The plaintiffs sued individually, as a class, and under a Private Attorney General Act claim, alleging that the defendant undercompensated female employees at a large company that owned one of the largest online multi-player games on the internet.  Mr. Tregillis performed a statistical analysis, including regression models, to ascertain the effect of gender on compensation and to quantify damages.

- **_Non-profit corporation v. manufacturers/sellers of personal care products_**.  The plaintiff brought a claim against companies that sell personal care products (e.g., lotion, shampoo, and conditioner).  Allegations included that the products were packaged and marketed as "natural" and/or organic, when the products in question were alleged to in fact not meet particular ingredient criteria.  Mr. Tregillis analyzed the amount of economic benefit that the defendants received as a result of the claims/packaging in question, including price premia and enhanced sales volumes, each of which were elements of incremental profits.  After Mr. Tregillis issued a declaration, the matter settled.

<span style="color:red">Christian  Tregillis,  CPA,  ABV,  CFF,  CLP</span>   

- ***Putative class v. supermarket chain***.  The plaintiffs, women who were at a time pregnant when they worked for the defendant, claimed that they were subject to discrimination in that they were not offered the same accommodations as other employees.  Mr. Tregillis analyzed statistical issues and the sample size needed to provide for the sample to be representative of the class (and subclasses).

- ***Air carriers v. states and city governments***.  Two states and a city each passed laws requiring employers to provide to employees paid sick time, with the employee to not be penalized for using that time off.  Plaintiff air carriers, in three different cases, alleged that if they were forced to comply with this law it would case great harm to the air carriers and the traveling public because of challenges related to when flight attendants call in sick.  Mr. Tregillis performed a statistical/regression analysis to evaluate the effects of compliance on the companies and the traveling public.

- ***Air carrier v. mechanics union***.  In the context of a contract negotiation between the parties, the defendant was accused of encouraging its members to conduct a slow-down, in a manner not permitted by the Railway Labor Act.  Mr. Tregillis performed a statistical analysis to evaluate whether the communications in question had any effect on the productivity and performance of the union's members.

- ***Putative class v. pharmaceutical company***.  The plaintiffs, women sales representatives of the defendant, alleged that they were offered inferior employment terms compared to equally qualified men.  Mr. Tregillis analyzed the sample data provided and used a regression to estimate the effect of gender on employment terms, all else equal.

- ***Putative class v. nutritional products multi-level marketing company***.  The plaintiffs were distributors for the defendant company and claimed that the defendant falsely represented that attending company meetings would lead to better performance as a distributor of nutritional supplement and wellness products.  Mr. Tregillis analyzed whether attendance at the events in fact led to better performance by distributors (e.g., increased sales and income); he also made calculations to assist the court with rescission and out-of-pocket damages measures.

- ***Putative class v. insurance company***.  The plaintiffs alleged that the defendant insurance company breached its contracts with plaintiffs by virtue of the implementation of a policy that limited the reimbursement rate for body work on automotive damage claims.  Given that policies for more expensive vehicles had higher premia than those for lower-priced vehicles, the plaintiffs alleged that it was inappropriate to pay the same rate for all vehicles – especially in light of particular training needed to perform certain repairs in order to keep vehicles under warranty.  As part of the class certification process, Mr. Tregillis analyzed whether there was available a methodology to calculate damages for the class.

- ***Putative class v. pharmaceutical company***.  The plaintiffs alleged that the defendant paid other drug companies to delay their launch of generic drugs, in order to preserve the defendant's monopoly on the branded drug Adderall XR.  Mr. Tregillis valued consideration included in multiple transactions between the defendant and the other companies, so as to better evaluate whether there had been overpayments and underpayments that would effectively transfer money to the other companies in exchange for their willingness, by delaying their competitive drugs' release, to help the defendant earn additional profits during the years in question.

# Christian  Tregillis,  CPA,  ABV,  CFF,  CLP



- **States v. pharmaceutical company.**  The states' attorneys general investigated the defendant related to the prices charged to Medicaid and other agencies for various drugs, particularly in comparison to costs and other figures that were to be a part of the pricing formulae.  Mr. Tregillis led an investigation of the pricing and potential damages to individual states, including development of a database of transactions over several years, with tens of millions of reimbursement events, to calculate amounts owed under a variety of scenarios, dependent on a determination of what the appropriate pricing should have been.

- **Putative class v. manufacturer of artificial sweetener**.  The plaintiffs alleged that the defendant falsely advertised its artificial sweetener as being natural.  Mr. Tregillis issued a declaration on the question of whether there was available a methodology to calculate damages relating to the alleged false advertising.

- **Energy drink company v. energy drink company.**  The defendant advertised and packaged its energy drink as having "Super Creatine," which was alleged to be false as the drink did not contain creatine.  The defendant was also accused of trade secret theft, related to hiring of the plaintiff's sales reps and managers, and tortious interference, relating to taking of shelf space at convenience stores and retailers.  Mr. Tregillis quantified lost profits and defendant's profits and testified in a deposition and at trial.

- **Partial owner of business v. manufacturer of nutritional supplements.**  The plaintiff alleged that an employment agreement entitled her to an ownership stake in the company, which manufactured vitamins and nutritional supplements that are sold under a variety of brands, and that her shares were not included in a transaction between her husband and the company.  Mr. Tregillis testified at trial regarding his valuation of the shares in question.

## Professional  Activities,  Groups  &  Affiliations

- California Society of Certified Public Accountants
  - Past Chair and current member, Economic Damages Section
  - Member, Steering Committee for Forensic Sections
  - Member, Government Relations Committee
  - Past member, CalCPA Council
  - Past member, Financial Literacy Committee
- American Institute of Certified Public Accountants
  - Past Chair, Economic Damages Task Force
  - Past member, Forensic & Litigation Services Committee
- Licensing Executives Society/Certified Licensing Professionals
  - Past Co-Chair, Standards, Admissions, and Recertification Committee
  - Past Co-Chair, Exam Development and Maintenance Committee

# Christian Tregillis, CPA, ABV, CFF, CLP



## Publications, Presentations & Speaking

- *Income Statement Analysis.* Practicing Law Institute, *Basics of Accounting and Finance* (September 1998).

- *The Use of Outside Accountants.* Practicing Law Institute course *Basics of Accounting and Finance* (September 1998) – instructor and chapter author, "*Overview of Services Provided by CPAs*."

- *Evaluating IP Lost Profits: From Panduit to Grain Processing*. California Society of CPAs publication, *The Witness Chair* (Summer 2001).

- *The Valuation of Trademarks.* American Intellectual Property Lawyers Association Annual Meeting (October 2001).

- *The Valuation of Intellectual Property.* San Diego Institute of Intellectual Property Lawyers Association Meeting (April 2002).

- *Issues to Consider in Evaluating a Reasonable Royalty*. American Institute of CPAs publication, *CPA Expert* (Summer 2002).

- *IP Through the Life of Your Business.* The Phelps Group: IP Summit (July 2002).

- *The Use of Multiple Regression in Commercial Litigation.* California Society of CPAs, Economic Damages Section Meeting (October 2002).

- Review of *Valuation for Financial Reporting: Intangible Assets, Goodwill, and Impairment Analysis, SFAS 141 & 142* (by Michael J. Mard, et al.). American Institute of CPAs publication, *CPA Expert* (Winter 2003).

- *The Use of Surveys and Statistics in Litigation.* California Society of CPAs, California Society of CPAs, *Advanced Business Litigation Institute* (May 2003).

- *Current Issues in IP Litigation Damages.* California Society of CPAs, California Society of CPAs, *Advanced Business Litigation Institute* (May 2003).

- *The Role of the Financial Expert in Trade Secret Litigation.* California Society of CPAs, Economic Damages Section Meeting (July 2003).

- *Notes and Numbers: Does the Data on Declining Music Sales "Sing" In an Age of Music Downloading?* Los Angeles County Bar Assoc., Music Section Meeting (December 2003).

- *Peer to Peer File Sharing Suits: What's Next?* California Society of CPAs publication, *The Witness Chair* (Winter 2004).

- *AICPA Statement on Standards for Business Valuation.* California Society of CPAs, Economic Damages Section Meeting (February 2004).

- *Research on Current Issues in Economic Damages.* California Society of CPAs, Economic Damages Section Meeting (May 2004).

# Christian Tregillis, CPA, ABV, CFF, CLP



- *Assessing and Proving Damages from Infringement, Program Moderator*. University of Southern California *Intellectual Property Institute* (May 2004).

- *Daubert Case Law*. American Institute of CPAs, *Conference on Fraud and Litigation Services* (September 2004).

- *Cost Shifting and Electronic Discovery:  How Experts Can Help Clients Minimize Costs*. California Society of CPAs publication, *The Witness Chair*, with Rachel Laybourn (Fall 2004).

- *Valuation of Intellectual Property*. California State Bar Intellectual Property Law Section, *Intellectual Property Institute* (November 2004).

- *From Qualifications to Unsupported Opinions:  A Review of Motions to Exclude Financial Experts*. California Society of CPAs, Economic Damages Section Meeting (February 2005).

- *Challenges for the Intellectual Property Damages Expert:  Apportionment of Value, Multiple Patent Litigation, Price Erosion, and the Entire Market Value Rule*. California Society of CPAs, *Advanced Business Litigation Institute* (May 2005).

- *You've Been Sued for Infringement – Now What?*  University of Southern California Gould School of Law, *Intellectual Property Institute* (May 2005).

- *Fraud Identification, Protection and Management*. Financial Executives International, Seattle Section meeting (September 2005).

- *Spending Your IP Dollars Wisely in Foreign Markets*. AeA Oregon Section Meeting (December 2005).

- *Differences Between Lost Profits and Diminution in Business Value as a Measure of Damages*. American Institute of CPAs publication, BV-FLS Section Update, with Michael Thompson (January 2006).

- *Practice Aid on Damages in Intellectual Property Disputes* (contributor/editor). American Institute of CPAs publication (February 2006).

- *The Top 10 Things About IP Every Technology Manager Needs to Know*. Mentor Graphics User2User Conference (May 2006).

- *Financing Issues in Managing Intellectual Property Risk*. Risk & Insurance Management Society, Los Angeles Chapter Meeting (June 2006).

- *Awards for Future Damages in Patent Infringement Cases after eBay v. MercExchange*.  American Bar Association, *IPL Newsletter* (Summer 2006, Volume 24, Issue 4).

- *The Forensic Accountant's Role in Claims of Alter-Ego, Successor Liability, and Fraudulent Transfers*. California Society of CPAs, Economic Damages Section Meeting (October 2006).

- *The Financial Expert Post-eBay: The Four-Factor Test and Future Royalties*.  Law Seminars International, *Calculating and Proving Patent Damages* (February 2007).

## Christian  Tregillis,  CPA,  ABV,  CFF,  CLP



- *Econometric Analysis and Multiple Regression*. Chapter in *Litigation Services Handbook:  The Role of the Financial Expert, (Fourth Edition)*, with Dr. Mohan Rao, edited by Peter Frank, Michael Wagner and Roman Weil (February 2007); also in the supplement to the third edition.

- *Patent Rights in the Post-eBay Era:  What You Need to Survive.*  University of Southern California Gould School of Law, *Intellectual Property Institute* (March 2007).

- *Current Issues in Patent Damages.*  IQPC, 3rd *Patent Strategies* (March 2007).

- *Conducting Internal Corporate Investigations.*  Association of Corporate Counsel of America, Southern California quarterly meeting (April 2007).

- *Managing Digital Intellectual Property Risk.*  Automotive News Webinar (April 2007).

- *Protecting Your Intellectual Property:  Essential Strategies to Building a Successful IP Protection Program.*  Microsoft CSO Summit (April 2007).

- *Top 10 Reasons Financial Experts Get Excluded and What to Do About It.*  American Institute of Certified Public Accountants National Conference on Fraud and Litigation Services (September 2007).

- *Forensic Accounting Investigations and Valuation Analysis in an XBRL World.*  16th XBRL International Conference (December 2007).

- *The CPA's Handbook on Fraud and Commercial Crime Prevention.*  American Institute of Certified Public Accountants publication (lead author – 2008 update) (May 2008).

- *Forensic Investigation of Financial Statement Fraud:  Case Studies*.  Florida Institute of Certified Public Accountants, *Accounting and Business Expo* (May 2008).

- *Discovery and Production Issues.*  American Institute of Certified Public Accountants, *National Conference on Fraud and Litigation Services* (September 2008).

- *Quanta, Exhaustion and Patent Damages.*  IP360 (October 2008).

- *Discount Rates and the Time Value of Money in Litigation*.  California Society of CPAs, Economic Damages Section Meeting (May 2009).

- *Understanding, Developing & Managing Forensic Engagements.*  American Institute of Certified Public Accountants Webinar, "Creating a Niche Forensic Practice Series" (February 2010).

- *Economic Damages: An Overview.*  American Institute of Certified Public Accountants Webinar, "Creating a Niche Forensic Practice Series" (May 2010).

- *Reasonable Royalties and Apportionment of Value: Part 2 (Royalty Stacking).*  California Society of Certified Public Accountants and Los Angeles Intellectual Property Lawyers Association, *IP Damages Institute* (November 2010).

- *Hot Issues in Reasonable Royalty Patent Damages* (topics led: *The Use of Surveys and Demand Curves,* and *The Use of Settlement Agreements*).  University of Southern California Gould School of Law, *Intellectual Property Institute* (March 2011).

- *Differences Between Lost Profits and Diminution in Business Value as a Measure of Damages*.  American Institute of Certified Public Accountants, *FVS Consulting Digest* (Issue 1, January 2012).

Christian Tregillis, CPA, ABV, CFF, CLP 

- *Discount Rates, Risk, and Uncertainty in Economic Damages Calculations*. American Institute of Certified Public Accountants Practice Aid (April 2012).

- *Discount Rates, Risk, and Uncertainty in Economic Damages Calculations*. American Institute of Certified Public Accountants Webinar (July 2012).

- *Discount Rates, Risk, and Uncertainty in Economic Damages Calculations; Attaining Reasonable Certainty in Economic Damages Calculations*. California Society of Certified Public Accountants Forensic Services Section Meeting (October 2012).

- *Financial Forensic Accounting Education Series: Applicable Professional Standards*. (Course Author) American Institute of Certified Public Accountants (May 2013).

- *Interpreting and Reconciling Recent Case Decisions: Raising the Bar on Lost Profits, Business Valuation and Intellectual Property Damages*. American Institute of Certified Public Accountants Forensic and Valuation Services Conference (November 2013).

- *Reasonable Certainty Round 2: An Inside Look at the Findings of the Damages Task Force - Reasonable Certainty for New or Unestablished Businesses*. American Institute of Certified Public Accountants Forensic and Valuation Services Conference (November 2013).

- *Reasonable Certainty in Economic Damages Calculations*. California Society of Certified Public Accountants Forensic Services Section Meeting (February 2015).

- *Patent Damages Roundtable*. University of Southern California Gould School of Law, Intellectual Property Institute (March 2015).

- *Reasonable Certainty in Economic Damages Calculations*. American Institute of Certified Public Accountants Practice Aid (August 2015).

- *IP Remedies Roundtable and Workshop*. University of Southern California Gould School of Law, Intellectual Property Institute (March 2017).

- *Reasonable Certainty and the New AICPA Practice Aid*. Kentucky Society of Certified Public Accountants, Forensic Accounting and Litigation Conference (August 2017).

- *Prejudgment Interest*. Chapter in *Lost Profits Damages: Principles, Methods, and Applications,* with Greg Pinsonneault, edited by Everett Harry and Jeffrey Kinrich (First Edition: October 2017; Second Edition: December 2021).

- *Linking Causation to Damages*. American Institute of Certified Public Accountants, Forensic and Valuation Services Conference (November 2017).

- *Calculating Lost Profits*. American Institute of Certified Public Accountants Practice Aid (March 2019).

- *Economic Damages Update: Reasonable Certainty, Lost Profits and Intellectual Property.* American Institute of Certified Public Accountants Webinar (May 2019).

- *Unauthorized Use of Trademarks and Copyrights in Social Media and User-Generated Content: Where are the Boundaries and Who's Responsible?* University of Southern California Gould School of Law, Intellectual Property Institute (September 2020).

- *Revenue Estimation Case Study: Regression*, Association of International Certified Public Accountants, Forensic & Valuation Services Conference (November 2020).

Christian  Tregillis,  CPA,  ABV,  CFF,  CLP 

- *Revenue Estimation Case Study: Benchmarking and Yardstick Method*, Association of International Certified Public Accountants, Forensic & Valuation Services Conference (November 2020).

- *The Alter-Ego Investigation.* California Society of Certified Public Accountants, 4N6 Conference on Fraud and Forensics (May 2021).  Also served as Chair of conference planning committee.

- *Prejudgment Interest.*  Association of International Certified Public Accountants, Forensic & Valuation Services Conference (November 2021).

- *Ask the Experts: Complex Issues in Accounting Investigations.* California Society of Certified Public Accountants, Fraud and Forensic Accounting Conference (May 2022).  Also served as Chair of conference planning committee.

- *Shareholder Claims of Fraud at Small Companies.* California Society of Certified Public Accountants, Fraud and Forensic Accounting Conference (March 2023).  Also served as Chair of conference planning committee.

- Author of quarterly *"AICPA Update"* (2006-2009)*, and "Economic Damages Section Update"* (2008-2010).  California Society of CPAs publication, *The Witness Chair*.

- Research assistant in the publication of textbooks in Microeconomics, Macroeconomics and Econometrics.

- Instructor, the Conviser Duffy (Becker) CPA Review Course.